**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

THE FARMWORKER ASSOCIATION OF FLORIDA, INC., A.M., J.L., R.M., C.A., M.M., D.M., A.C., G.D.L., and M.G.,

                    Plaintiffs,

v.

RONALD D. DESANTIS, in his official capacity as Governor of the State of Florida; ASHLEY MOODY, in her official capacity as the Attorney General of the State of Florida; NICHOLAS B. COX, in his official capacity as the Florida Statewide Prosecutor; GINGER BOWDEN MADDEN, in her official capacity as State Attorney for the First Judicial Circuit of Florida; JACK CAMPBELL, in his official capacity as State Attorney for the Second Judicial Circuit of Florida; JOHN DURRETT, in his official capacity as State Attorney for the Third Judicial Circuit of Florida; MELISSA W. NELSON, in her official capacity as State Attorney for the Fourth Judicial Circuit of Florida; WILLIAM GLADSON, in his official capacity as State Attorney for the Fifth Judicial Circuit of Florida; BRUCE BARTLETT, in his capacity as State Attorney for the Sixth Judicial Circuit of Florida; R.J. LARIZZA, in his official capacity as State Attorney for the Seventh Judicial Circuit of Florida; BRIAN S. KRAMER, in his official capacity as State Attorney for the Eighth Judicial Circuit of Florida; MONIQUE H. WORRELL, in her official capacity as State Attorney for the Ninth Judicial Circuit of Florida; BRIAN HAAS, in his official capacity as State Attorney for the Tenth Judicial Circuit of Florida; KATHERINE FERNANDEZ RUNDLE, in her official capacity as State Attorney for the Eleventh Judicial Circuit of Florida; ED BRODSKY, in his official capacity as State Attorney for the Twelfth Judicial Circuit of Florida; SUSAN S. LOPEZ, in her official capacity as

Case No.

State Attorney for the Thirteenth Judicial Circuit of Florida; LARRY BASFORD, in his official capacity as State Attorney for the Fourteenth Judicial Circuit of Florida; DAVID A. ARONBERG, in his official capacity as State Attorney for the Fifteenth Judicial Circuit of Florida; DENNIS W. WARD, in his official capacity as State Attorney for Sixteenth Judicial Circuit of Florida; HAROLD F. PRYOR, in his official capacity as the State Attorney for the Seventeenth Judicial Circuit of Florida; PHILIP G. ARCHER, in his official capacity as the State Attorney for the Eighteenth Judicial Circuit of Florida; THOMAS BAKKEDAHL, in his official capacity as the State Attorney for the Nineteenth Judicial Circuit of Florida; and AMIRA D. FOX, as the State Attorney for the Twentieth Judicial Circuit of Florida,

      Defendants.

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

Plaintiffs Farmworkers Association of Florida, Inc. on behalf of their organization and members, A.M., J.L., R.M., C.A., M.M., D.M., A.C., G.D.L., and M.G.[1] (collectively, the "Plaintiffs") sue Defendants Ronald D. DeSantis, Governor of the State of Florida, Ashley Moody, Attorney General of the State of Florida, Nicholas B. Cox, Statewide Prosecutor, and Ginger Bowden Madden, Jack Campbell, John Durrett, Melissa W. Nelson, William Gladson, Bruce Bartlett, R.J. Larizza, Brian S. Kramer, Monique H. Worrell, Brian Haas, Katherine Fernandez Rundle, Ed Brodsky, Susan S. Lopez, Larry Basford, David A. Aronberg, Dennis W. Ward, Harold F. Pryor, Philip G. Archer, Thomas Bakkedahl, Amira D. Fox, and Nicholas B. Cox, State Attorneys for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth Judicial Circuits of Florida, respectively (collectively, the "Defendants") and challenge the constitutionality of Section 10 of Florida's Senate Bill 1718.

## I.      INTRODUCTION

1.      Section 10 of Senate Bill 1718 ("SB 1718"), Ch. 2023-40, Laws of Fla. ("Section 10") unconstitutionally criminalizes the act of transporting a broad category of immigrants into Florida.

2.      Upon its effective date, Section 10 put thousands of Floridians and residents of other States—both citizens and noncitizens alike—at risk of being arrested, charged, and prosecuted with a felony for transporting a vaguely defined category of immigrants into Florida. Families may be unable to visit each other across state lines. Parents who live near the state border may be unable to drive their children to medical appointments or soccer matches. Co-workers may

---

[1] The individual Plaintiffs will be filing a separate motion for leave to proceed under their initials and to file their unredacted declarations in support under seal shortly after the filing of this Complaint.

be unable to drive each other to work. Friends may be unable to give each other rides to the grocery store. Churches may be unable to transport members of their congregation to religious events. Section 10 inflicts enormous harm on people's ability to go about their daily lives.

3.      Section 10 imposes criminal penalties on a person who transports an immigrant who "entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry." Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)). However, many people who entered the country in violation of federal immigration law have since sought or obtained immigration relief or are now otherwise lawfully present within the United States, but may not have been "inspected" in the relevant sense.

4.      Section 10 is phrased in a way that could sweep in all manner of immigrants, including people who are lawfully present in the United States or are in the process of seeking lawful immigration status. The statute does not define the term "inspected" and does not explain what it means to be inspected "since" entry.

5.      Section 10 includes no exceptions for the persons or entities doing the transporting. All amendments introduced during the 2023 Florida legislative session that would have narrowed the breadth of Section 10 failed, including amendments that would have exempted persons transporting family members, transportation by emergency service providers, faith-based service providers, and providers of transportation for school and extra-curricular activities. An amendment that would have clarified that a person who has been released into the interior of the United States by the federal government is presumed to have been "inspected" by the federal government also failed.

6.      The United States Court of Appeals for the Eleventh Circuit has already held that two similar statutes in Georgia and Alabama were likely preempted because they were inconsistent

with the federal immigration scheme. *See United States v. Alabama*, 691 F.3d 1269, 1288 (11th Cir. 2012); *Georgia Latino All. for Hum. Rts v. Governor of Georgia*, 691 F.3d 1250, 1265–67 (11th Cir. 2012). The same is true of Section 10.[2]

7.      The federal government has exclusive powers over the regulation of immigration matters and has enacted an exhaustive framework via the Immigration and Nationality Act ("INA"), including with respect to the smuggling and unlawful transport of noncitizens. 8 U.S.C. § 1101 *et seq.*; 8 U.S.C. § 1324(a)(1)(A)(i)-(iv). This federal framework is comprehensive and does not permit parallel or supplemental state immigration laws, including laws regarding the smuggling and unlawful transport of noncitizens.

8.      Section 10 goes far beyond the federal scheme, penalizing a wide array of conduct that Congress chose *not* to prohibit. It impedes the federal immigration scheme by preventing immigrants from entering Florida. And it puts state officials in the unlawful position of making complex determinations about people's immigration status and history. Section 10 is preempted on multiple grounds.

9.      Section 10 is also hopelessly vague and incoherent, because Floridians and travelers into Florida have no way to know which people fall within its terms—particularly, who will be considered to not have "been inspected by the Federal Government since his or her unlawful entry." That category does not appear anywhere in federal law and is undefined in Section 10. Immigration processes are complex and highly variable; Section 10 provides no guidance regarding which of the tens of millions of noncitizens in the United States are covered by its

---

[2] Prior to Senate Bill 1718's passage into law, the Florida Senate Staff Analysis explicitly recognized that Section 10 may well be preempted by federal law, noting that "[t]o the extent that the expansion of the offense of human smuggling is similar to the Arizona's S.B. 1070, it may be preempted by federal law." *See* Professional Staff of the Comm. on Rules, Florida Senate, Bill Analysis and Fiscal Impact Statement 28 (Mar. 17, 2023), https://www.flsenate.gov/Session/Bill/2023/1718/Analyses/2023s01718.rc.PDF.

draconian criminal penalties. It fails to provide Floridians with even basic information about what conduct is actually proscribed, and it invites arbitrary and discriminatory enforcement.

10.     This action challenges Section 10 to prevent imminent harm that Plaintiffs and other Floridians, including both U.S. citizens and noncitizens, will suffer as the law goes into effect and is implemented. Plaintiffs seek injunctive and declaratory relief to bar such egregious unconstitutional actions from occurring in their communities.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the U.S. Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343, because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights and to secure equitable or other relief for the violation of those rights.

12.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

13.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District or Division and a substantial number of Plaintiffs are located in this judicial district. Defendants are sued in their official capacity. Each Defendant resides within the State of Florida.

## III.     PARTIES

### PLAINTIFFS

14.     Plaintiff **Farm Worker Association of Florida, Inc.** ("FWAF") is a non-profit organization with headquarters in Apopka, Florida, with offices throughout the state, including in Homestead, Fellsmere, Immokalee, and Pierson.

15.     FWAF is a grassroots and community-based farmworker membership organization with nearly 12,000 members.

16.     FWAF's mission is to support and build power among farmworker and rural low-income communities. FWAF's programs focus primarily on encouraging farmworkers' civic participation, building farmworker coalitions, supporting worker's rights, improving working conditions, and safeguarding farmworkers' health and safety.

17.     FWAF serves seasonal workers as well as migrant workers who travel with the seasons to harvest crops. To do so, FWAF's members travel back and forth between Florida, Georgia, and Alabama, crossing back into Florida multiple times per year.

18.     FWAF's members include immigrants who are both documented and undocumented, including many who live permanently in Florida.

19.     FWAF's members include immigrants who, if transported back into Florida following seasonal work elsewhere, would trigger a felony charge for the person transporting or traveling with them.

20.     Many of these members entered or remained in the United States unlawfully, and now have a wide range of immigration statuses and histories. For example, FWAF members include: naturalized citizens, asylees, lawful permanent residents ("LPR"), humanitarian parole recipients, holders of a visa for temporary agricultural workers ("H-2A visa"), recipients of Deferred Action for Childhood Arrivals ("DACA"), holders of Temporary Protected Status ("TPS"), recipients of Special Immigrant Juvenile Status ("SIJS"), former unaccompanied minors who were released to relatives or sponsors and were permitted to stay in the U.S. under the custody of the Office of Refugee Resettlement ("ORR"), federal protection beneficiaries, such as persons covered under the Violence Against Women Act ("VAWA"), holders of a visa for Victims of

Human Trafficking ("T visa"), holders of a visa for Victims of Criminal Activity ("U visa"), and persons possessing orders to withhold and/or defer their removal.

21.     FWAF members also include people who have submitted applications for a wide range of immigration benefits that have yet to be resolved, people who are currently in removal proceedings, people who have been released from federal custody with and without federal notices to appear, and people who entered unlawfully and have not subsequently had contact with federal immigration authorities.

22.     Some of these FWAF members entered the United States unlawfully and have since obtained lawful status. Others entered lawfully, such as with a visa, but are now no longer lawfully present.

23.     Some members of FWAF lack the identity documents necessary to establish a presumption of lawful status or do not regularly carry these documents when traveling into Florida and are therefore at risk of lengthy detention and investigation under Section 10.

24.     Many of FWAF's members will be directly harmed by Section 10, as they either transport people into the state of Florida whose immigration status could trigger a felony charge under Section 10, or they themselves have the immigration status that could trigger such a felony charge, and therefore may be unable to receive transportation.

25.     One FWAF member, a U.S. citizen, regularly transports fellow members (mostly co-workers) into Florida to obtain work during the planting and harvesting seasons. This U.S. citizen member regularly transports another member who initially entered the United States unlawfully and has since obtained lawful immigration status. This member obtained lawful immigration status without ever being "inspected," as that term is typically used in the INA, and is now lawfully present in the United States. The FWAF member now fears that the otherwise

perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

26.     Another FWAF member also regularly transports fellow members out of and into Florida based on the harvest seasons. This member regularly transports another member who initially entered the United States unlawfully several years ago and has had no contact at all with any immigration officials since his unlawful entry. The FWAF member now fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

27.     Another FWAF member also regularly transports fellow members, and others, into Florida to obtain work during the planting and harvesting seasons. This member regularly transports another member who entered the United States unlawfully and is currently in removal proceedings. The FWAF member now fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

28.     Another FWAF member regularly travels back and forth across the Florida/Georgia state line with his mixed immigration status family to visit other family members, shop, and vacation. The family now fears taking these regular trips will expose this FWAF member to felony charges.

29.     Another FWAF member, a United States citizen, lives in Florida with her mixed status family. The family often travels to North Carolina to work, and then returns home to Florida. This FWAF member typically drives her parents, both of whom are also FWAF members, back into Florida. Both parents entered the United States unlawfully. One parent has had no contact with immigration officials since entry into the United States, and the other parent will be in the

7

process of obtaining lawful immigration status soon. The family now fears taking these trips to and from North Carolina will expose this member to felony charges.

30.     Not only are individual FWAF members harmed by Section 10, but FWAF as an organization has and will continue to suffer harm because of Section 10.

31.     The passage of SB 1718 has already substantially diverted scarce organizational resources away from FWAF's regular activities.

32.     FWAF has been inundated with questions and requests for assistance relating to travel between Florida, Georgia, and Alabama that members undertake several times a year to obtain work based on the planting and harvesting seasons.

33.     FWAF staff has devoted additional time outside of their regular activities and objectives to training existing volunteers and new volunteers on Section 10 and its impact on their members and the broader immigrant community.

34.     Since SB 1718 passed, and even before Section 10 went into effect, FWAF began providing Know Your Rights presentations to specifically prepare for and educate their members on the impacts of SB 1718, including Section 10. FWAF has also held member meetings regarding SB 1718, including Section 10, and sent out information and communications to its members and the immigrant community. These efforts are outside FWAF's regular activities and have consumed valuable resources. These efforts are also ongoing and continue to drain valuable resources from FWAF that would otherwise go to encouraging farmworkers' civic participation, advancing and educating the community on agroecology, building farmworker coalitions, supporting worker's rights, improving working conditions, and safeguarding farmworkers' health and safety.

35.     FWAF staff have received more calls each day since SB 1718 passed, including calls with concerns regarding travel to Florida and/or travel back into Florida, taking up significant

staff member time, delaying and, in some instances, preventing staff members from completing other work necessary to the organization.

36.     The increase in FWAF staff's time and focus on Section 10 is driven by the needs of FWAF's membership.

37.     FWAF lacks the funds to increase its staffing to educate the community on Section 10 and its consequences. FWAF must now divert even more resources to fundraising in an attempt to address this deficit.

38.     FWAF anticipates that the community impact of Section 10, including arrests and detentions, will continue to divert FWAF's resources from its core mission of strengthening farmworker communities through its different programs and normal organizing work.

39.     Upon information and belief, approximately 100 dues-paying FWAF members and their families left Florida at the end of the harvest season in 2023. FWAF expects that many will not return to Florida due to the risk that Section 10 poses to its members. FWAF will lose many of these members, the dues from those members, and the critical in-kind donations from those members that help run FWAF's programs.

40.     Plaintiff **A.M.**, a U.S. citizen, is one of the directors of a nonprofit organization based in southern Georgia. As part of her work for that nonprofit, A.M. transports individuals with various immigration statuses, including individuals who have never had any contact with immigration authorities, in her personal vehicle to see medical specialists across the Georgia/Florida state line to Jacksonville, Florida.

41.     A.M. also personally transports individuals to appointments with the United States Citizenship and Immigration Service ("USCIS") for fingerprinting and other services. Some immigrants in her nonprofit's service area are directed to attend USCIS appointments in

Jacksonville, even though they reside in Georgia. Many immigrants need her assistance because they entered the United States unlawfully and are ineligible for a driver's license.

42.     A.M. now fears that she will be exposed to felony charges for performing a key aspect of her job, and for doing what she believes to be morally just.

43.     Plaintiff **J.L.**, a resident of Florida, is a field coordinator for a nonprofit organization based in Florida. As part of her job duties, J.L. informs workers in her community about their labor rights. Some of these workers are undocumented immigrants.

44.     J.L.'s work as a field coordinator entails travel outside the state of Florida approximately five times per year for trainings, conferences, and workshops dealing with leadership, activism, and workers' rights, among other subjects. During her trips, she often drives passengers, some of whom are immigrants, including undocumented immigrants. Some of these immigrants entered the United States unlawfully and have since obtained lawful status, such that they are now lawfully present even though they may have never been inspected, as the term is typically used in the INA. Others entered the United States unlawfully and have not had any contact with immigration authorities.

45.     During her trips out of state, J.L. typically uses her personal vehicle to transport people to and from Florida to attend these events. J.L. will also sometimes travel as a passenger in a co-worker's vehicle both into and out of Florida.

46.     Plaintiff **R.M.** is a U.S. citizen and decorated veteran. R.M. is a devout Roman Catholic, and he faithfully ministered to the Hispanic community at St. Joseph's Church in Augusta, Georgia from 2001 to 2016. He has been a permanent deacon with the Diocese of Savannah since 2008. He currently attends St. Theresa's Catholic Church for worship services and

has served as a deacon at a local Army base where he assisted the local priest with the celebration of Mass.

47.    R.M. is also the founder of a nonprofit organization in Georgia whose mission is to strengthen families in the Hispanic community. Aiding immigrants is a critical part of his ministry as a deacon and his faith as a Roman Catholic. Since 1986, he has helped many hundreds of immigrants with transportation in his personal vehicle at no cost. The majority of the immigrants he assists are undocumented and come from Latin America. Many of these immigrants entered the United States without having any encounter with immigration authorities, and many have not had any contact with immigration authorities since they entered the United States.

48.    Although he resides in Georgia, R.M. has driven immigrants to biometrics appointments, asylum interviews, interviews on family-based petitions, and other immigration-related appointments in Jacksonville, Florida. R.M. has also personally transported immigrants into Florida to attend state court proceedings and to request U visa certifications with the help of immigration lawyers. He still receives calls from undocumented immigrants who need his assistance with transportation because they do not have driver's licenses.

49.    Plaintiff **C.A.** is a U.S. citizen and longtime Florida City resident who is the legal guardian for her grandson.

50.    C.A.'s grandson is in the process of applying for Special Immigrant Juvenile Status. As a baby, C.A.'s grandson was brought to the United States by his mother, who was fleeing Nicaragua in fear for their lives. He and his mother did not have contact with federal immigration authorities upon their entry into the United States.

51.    C.A. and her grandson have close family ties to extended family members living in Georgia. They have previously traveled out of Florida to visit these family members, and they

hope to be able to continue to make trips to visit their Georgia-based family members and other close family friends in the future, without fear that C.A. could face felony charges for taking her grandson to visit their family and returning to their home in Florida.

52.     Plaintiff **M.M.** is the mother of five children, four of whom are U.S. citizens. M.M. entered the United States lawfully in 2002, with a border crossing card. However, she no longer has lawful immigration status in the United States. She has a pending immigration case before the Miami Immigration Court, in which she is seeking Cancellation of Removal for Non-Lawful Permanent Residents, a form of immigration relief, that is based upon the extreme harm and trauma that her U.S. citizen children would suffer if their mother were to be deported.

53.     Plaintiff **D.M.** is the eldest daughter of M.M. She was born in Mexico and brought into the United States when she was approximately 11 months old.

54.     D.M. applied to USCIS for DACA on October 26, 2021, and USCIS confirmed the agency's receipt of her DACA application. However, due to a nationwide injunction enjoining the agency from granting initial DACA applications, USCIS has not taken any action to process her application.

55.     Plaintiff **A.C.** is the 19-year-old U.S. citizen son of M.M. and brother of D.M. He was born in El Paso, Texas. He works as a clerk at Wal-Mart and lives with his mother M.M. and sister D.M., as well as his younger siblings. Because his sister D.M. does not have a driver's license, A.C. is often responsible for driving her, and he often drives the family.

56.     M.M., D.M., and A.C. lived in Texas until 2017, at which point the family moved to Fort Lauderdale, Florida. To make this move, they traveled together to Florida by car. They have family and friends living in Texas, whom they hope to travel together to visit. However, they

fear that D.M. or M.M.'s immigration history could mean that A.C. would face Florida criminal charges for human smuggling if the family travels out of state and returns to Florida together.

57.     Plaintiff **G.D.L.** came to the United States from Mexico in 2007. When he entered the United States, G.D.L. did not have any contact with immigration officials, and he has not had contact with immigration authorities in the approximately 16 years that he has lived in the United States.

58.     Plaintiff **M.G.** is married to Plaintiff G.D.L. She first came to United States from Mexico in 2007 when she was 15 years old. At that time, she was stopped at the border by Customs and Border Protection officers and forced to return to Mexico. Shortly thereafter, she again came to the United States. This time, she did not encounter immigration officials, and she has not had any contact with immigration officials in the years since.

59.     Plaintiffs G.D.L. and M.G. work as farmworkers. Each year, to maximize the seasons that they work, they usually spend about six months of the year working in Florida and six months of the year working out of state. They travel together across states. This year, however, they did not leave Florida to work out-of-state because they were frightened that if they left Florida, they would not be able to return, due to Section 10.

## DEFENDANTS

60.     Defendant **Ronald D. DeSantis** is the Governor of Florida. He is sued in his official capacity. In that capacity, he is vested with the "supreme executive power" in Florida and is constitutionally required to "take care that the laws be faithfully executed." Fla. Const. Art. IV, § 1(a). He is also empowered to "initiate judicial proceedings" against, or "suspend from office" state and local officers for failure to comply with state law, including SB 1718. Fla. Const. Art. IV, §§ 1(b), 7(b).

61.     Defendant **Ashley Moody** is the Attorney General of Florida, the chief legal officer of the State. Fla. Const. Art. IV, § 4(b). She is sued in her official capacity. In that capacity, she is responsible for the enforcement of SB 1718. The Attorney General is required to appear in the courts on behalf of the State of Florida. Fla. Stat. § 16.01(4). Under Florida law, the office of Attorney General also encompasses the Office of Statewide Prosecution. Fla. Const. Art. IV § 4(b). This office has concurrent jurisdiction with state attorneys to prosecute alleged violations of certain criminal laws that occur or have occurred in two or more judicial circuits, including alleged human trafficking or smuggling crimes. *See id.*; Fla. Stat. § 16.56(1)(a)(15).

62.     Defendant **Nicholas B. Cox** is the Statewide Prosecutor of the State of Florida, appointed by Defendant Attorney General Moody. *See* Fla. Const. Art. IV § 4(b); Fla. Stat. § 16.56(2). The Statewide Prosecutor has concurrent jurisdiction with state attorneys to prosecute alleged offenses that occur or have occurred in two or more judicial circuits, including alleged human trafficking or smuggling crimes. *Id.* at § 16.56(1)(a)(15). As Statewide Prosecutor, Defendant Cox has the power to, among other duties, "conduct hearings at any place in the state; summon and examine witnesses; require the production of physical evidence; sign informations, indictments, and other official documents; [and] confer immunity." Fla. Stat. § 16.56(3).

63.     Defendant State Attorneys **Ginger Bowden Madden**, **Jack Campbell**, **John Durrett**, **Melissa W. Nelson**, **William Gladson**, **Bruce Bartlett**, **R.J. Larizza**, **Brian S. Kramer**, **Monique H. Worrell**, **Brian Haas**, **Katherine Fernandez Rundle**, **Ed Brodsky**, **Susan S. Lopez**, **Larry Basford**, **David A. Aronberg**, **Dennis W. Ward**, **Harold F. Pryor**, **Philip G. Archer**, **Thomas Bakkedahl**, and **Amira D. Fox** are the state attorneys for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, and Twentieth Judicial

Circuits of Florida, respectively. They are the prosecuting officers of all trial courts in their respective circuits. Fla. Const. Art. V, § 17.

## IV.    FACTS

### A.  History and Intent of SB 1718

64.    On May 2, 2023, the Florida Legislature passed SB 1718, including Section 10, which amends Section 787.07 of Florida Statutes.

65.    Defendant Governor Ronald D. DeSantis signed the bill into law on May 10, 2023.

66.    Section 10, in its entirety, provides as follows:

(1) Except as provided in subsections (3), (4), and (5), a person who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) A person commits a separate offense for each individual he or she transports into this state in violation of this section.

(3) A person who transports a minor into this state in violation of subsection (1) commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4) A person who commits five or more separate offenses under this section during a single episode commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(5) (a) A person with a prior conviction under this section who commits a subsequent violation of this section commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) As used in paragraph (a), the term "conviction" means a determination of guilt that is the result of a plea agreement or a trial, regardless of whether adjudication is withheld or a plea of nolo contendere is entered.

(6) Proof that a person knowingly and willfully presented false identification or gave false information to a law enforcement officer who is conducting an investigation for a violation of this section gives rise to an inference that such person was aware that the transported individual has entered the United States in violation of the law

15

and had not been inspected by the Federal Government since his or her unlawful entry.

(7) A person who is arrested for a violation of this section must be held in custody until brought before the court for admittance to pretrial release in accordance with chapter 903.

**B. The Comprehensive Federal Immigration System Already Governs Smuggling.**

67.     The federal government has exclusive power over the regulation of immigration matters.

68.     The U.S. Constitution grants the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. Art. I, § 8, cl. 3. In addition, the Supreme Court has repeatedly held that the federal government's power to control immigration is inherent in the nation's sovereignty.

69.     Because immigration policies can implicate foreign relations, the United States has a core, constitutionally protected interest in setting a uniform federal immigration scheme. *Arizona v. United States*, 567 U.S. 387, 395 (2012).

70.     Congress has created a comprehensive system of federal laws, agencies, and procedures regulating immigration. *See id.* at 395–96; *see generally*, INA, 8 U.S.C. § 1101 *et seq.*

71.     The extensive statutory scheme created by the INA leaves no room for supplemental state immigration laws.

72.     The INA carefully calibrates the nature—criminal or civil—and the degree of penalties applicable to each possible violation of its terms.

73.     Specifically, under 8 U.S.C. § 1324(a)(1)–(2), Congress set forth the comprehensive federal framework penalizing the transportation of immigrants who unlawfully enter or remain in the United States, thus preempting any analogous state crime, including Section 10.

16

74.     The federal scheme specifically addresses which conduct is punishable as unlawful harboring and transport in this context. As to immigrants who unlawfully enter or remain in the United States, the statute only penalizes transportation and other actions taken "in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii) (addressing "transport"); *id.* § 1324(a)(1)(A)(iii) (requiring that the person "conceal, harbor, or shield from detection").

75.     The federal statute also contains detailed evidentiary rules for how transport and harboring crimes should be prosecuted in federal court. *See* 8 U.S.C. § 1324(b)(3). It also explicitly limits states' role in the federal transport and harboring scheme to a specified circumstance: helping with arrests for violations of its criminal provisions. *See* 8 U.S.C. § 1324(c).

76.     Section 10 is Florida's own version of these provisions, passed to bypass the federal government's definitions and prosecutorial and adjudicatory processes under the parallel federal statute—8 U.S.C. § 1324.

77.     Section 10 enters the exact same federal field—transport of immigrants. It prohibits conduct that federal law does not, in part because it contains no element that the proscribed transport be "in furtherance" of a legal violation. And it applies to a new category of immigrants not recognized in the federal statute and not defined in federal law: those who have "not been inspected since [their] unlawful entry." Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)). Section 10 further jettisons the evidentiary rules in the federal statute.

78.     Section 10 will impede the federal immigration system by preventing people who live in neighboring states with a variety of immigration statuses from getting to immigration courts in Florida, USCIS appointments in Florida, and ICE check-ins in Florida.

17

79.     For example, the USCIS website directs immigrants residing in at least seventeen[3] counties in South Georgia to report to the USCIS Field Office in Jacksonville, Florida, for certain services, including capturing biometrics for national security purposes, applying for permission to travel outside the United States, and attending interviews for lawful permanent residence.

### C. In Enacting SB 1718, Florida Made Clear It Was Seeking to Unilaterally Regulate Immigration in the United States.

80.     In enacting SB 1718, Florida legislated in an area committed exclusively to the federal government under the U.S. Constitution and federal statutes. Indeed, by passing Section 10 in particular, Florida expressly intended not only to intrude into an area of exclusive federal control, but to oppose and supplant the federal government in key respects.

81.     A primary motivating factor in passing SB 1718 was the Florida Legislature's disagreement with federal immigration policy.

82.     The Governor made immigration a clear legislative priority for Florida's 2023 legislative session when he announced his legislative proposal as a response to federal immigration policy: "Florida is a law and order state, and we won't turn a blind eye to the dangers of Biden's Border Crisis. We will continue to take steps to protect Floridians from reckless federal open border policies."[4]

83.     Likewise, Senator Blaise Ingoglia, who would go on to sponsor SB 1718, stated that the "Governor will not stand by idly as this open-borders agenda continues to take over our

---

[3] At least one zip code in each of the follow Georgia counties is routed to the Jacksonville USCIS Field Office: Atkinson, Appling, Bacon, Brantley, Camden, Clinch, Charlton, Echols, Glynn, Jeff Davis, Lanier, Long, Lowndes, Pierce, Ware, Wayne. *See* U.S. Citizenship and Immigration Services, *Field Offices*, https://www.uscis.gov/about-us/find-a-uscis-office/field-offices (last updated May 17, 2023).

[4] Press Release, Gov. Ron DeSantis, *Governor Ron DeSantis Announces Legislation to Counteract Biden's Border Crisis* (Feb. 23, 2023), https://www.flgov.com/2023/02/23/governor-ron-desantis-announces-legislation-to-counteract-bidens-border-crisis.

families, friends and our communities. As a matter of fact, he will boldly push Florida as the blueprint by which other states should fight illegal immigration."[5]

84.     When SB 1718 sponsor Senator Ingoglia introduced SB 1718 he explained that he "want[s] to have legal immigration fixed. We want to stop the illegal immigration. We definitely want to stop the . . . what's happening right now. . . . The biggest thing is a, just a federal immigration legal system that's broken."[6]

85.     At the very first legislative hearing on SB 1718, Senator Ingoglia framed the need for SB 1718 as the "external force" that was going to get the federal government to "fix" the problem of illegal immigration: "This is the point we are at right now. We have to fix this . . . this system. And they continue to refuse to do it. They will only act when they have to and when an external force pushes back. Florida is that external force right now."[7]

86.     When SB 1718's counterpart, HB 1617, was introduced in the Florida House of Representatives, the House co-sponsor, Representative Kiyan Michael, said, "The federal government we know, is not, they're not doing the job. They're not enforcing the laws. We have to do something here, in this state. And this, everything we are talking about is only pertaining to the state of Florida."[8]

87.     During the debates over SB 1718 and its counterpart, HB 1617, legislators expressly stated that the intent of the law was to disincentivize and to deter immigrants from coming to Florida. Senator Ingoglia said, "the focus of this bill, to make sure that we are taking

---

[5] *Id.*

[6] Fla. S. Comm. on Rules, recording of proceedings, at 00:51:03–00:54:46 (Mar. 15, 2023 at 3:30 PM), https://www.flsenate.gov/media/videoplayer?EventID=1_nty0d3lq-202303151530&Redirect=true (Sen. Ingoglia discussing SB 1718).

[7] *Id.* at 02:10:26–02:11:11.

[8] Fla. H. Comm. on Commerce, recording of proceedings, at 02:44:59–02:45:13 (Apr. 24, 2023 at 12:00 PM) [hereinafter H. Comm. on Commerce Debate], https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8882 (Rep. Michael discussing proposed committee substitutes for HB 1617).

away as many of the incentives [to migrate] as possible in the hopes that other states like Texas and Arizona do the same and force the federal government to get off their butt and fix the problem."[9]

88.     Representative Rommel echoed this sentiment, stating "[w]e can't wait on Washington to do their job. I'm not blaming it on any administration, but we know its broken."[10] Likewise, Representative Michael stated, "When you talk about immigration reform, because Washington is not doing their job, we, it's no excuse for us as a state to sit back and do nothing."[11]

89.     Senator Debbie Mayfield questioned whether SB 1718 would fix problems with the immigration system, but still voted in favor of the bill, saying, "I get what people are saying, you know, is this really going to fix the problem? I don't know. We're gonna try, but I can tell you what it is doing. It is bringing the attention to the rest of the people in our country that we have a problem, and we need to make sure that Washington knows that we have this problem and we want it fixed."[12]

90.     The sponsors of HB 1617 and SB 1718 provided no useful guidance as to what "inspection" means under Florida law. Rather, the sponsors confused matters even more. For example, when asked about the meaning of the term "inspection" in Section 10, Representative Michael responded, "[W]hen it's referencing 'inspected,' that means that they have been checked in the system whether their immigration status is, whether their immigration status is American or not."[13]

---

[9] Fla. S. Comm. on Fiscal Policy, record of proceedings, at 06:19:50–06:20:03 (Apr. 25, 2023 at 10:00 AM), https://thefloridachannel.org/videos/4-25-23-senate-committee-on-fiscal-policy-part-2/.
[10] H. Comm. on Commerce Debate, at 04:47:05–04:47:12.
[11] *Id.* at 04:51:19–04:51:29.
[12] Fla. S., recording of proceedings, at 03:49:47–03:50:08 (Apr. 28, 2023 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202304281000&Redirect=true.
[13] H. Comm. on Commerce Debate, at 02:51:16–02:51:31.

91.     Contrary to long-settled law that establishes the federal government's exclusive role in regulating immigration, SB 1718 reflects the view that the State of Florida should regulate immigration unilaterally.

92.     All told, the history of SB 1718 in general, and Section 10 in particular, makes clear that the Florida Legislature enacted the law as a purported state solution to what some members of the legislature claimed to be problems with the federal government's regulation of immigration.

**D.  Section 10 Is Impermissibly Vague and Incoherent.**

93.     Section 10 is impermissibly vague for at least two independent reasons. First, due to the statute's incoherent and potentially conflicting use of the term "inspected," it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *See Hill v. Colorado*, 530 U.S. 703, 732 (2000).

94.     Second, "it authorizes or even encourages arbitrary and discriminatory enforcement," as local and state law enforcement have no competence to apply all the various nuances of federal immigration law that might be relevant to determine whether the law applies to a given individual. *See id.* (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)).

95.     The "void-for-vagueness" doctrine requires that a penal statute, such as the one amended by Section 10, "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (collecting cases). Section 10 lacks any semblance of definiteness.

96.     Under Section 10, "a person who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful

21

entry from another country" commits a third- or second-degree felony. Ch. 2023-40, § 10, at 11–12, Laws of Fla. (amending § 787.07(1), (3)–(5)(a), Fla. Stat. (2022)).

97.     Section 10 does not define the term "inspected" or "inspected . . . since" entry. Section 10 does not refer to or cite any outside statutes, rules, or regulations for a definition of these terms.

98.     The INA also does not specifically define "inspected" or "inspection." Neither does federal law contain any classification of people who "h[ave] been inspected by the Federal Government since [their] unlawful entry." Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)). While the INA addresses "inspection" in various specific contexts, it does not define a general set of "people who have been inspected" after entering the country. *See id.*

99.     The failure to define a central legal term with multiple possible meanings renders Section 10 impermissibly vague, as there is no way for ordinary people to understand what specific conduct is prohibited.

100.     Additionally, Section 10 could criminalize the transport of immigrants who are lawfully present in the United States, and it fails to provide guidance on which individuals are covered or exempted.

101.     In the INA and corresponding regulations, the words "inspect," "inspected," or "inspection" are typically used to describe a process that occurs at a port of entry. Inspection upon entry is not, however, a prerequisite for immigrants to gain lawful status in the United States.

102.     There are numerous pathways to lawful status, and ultimately citizenship, for immigrants living in the United States who were never "inspected" as that term is typically used in the INA. For example, undocumented immigrants who are victims or witnesses of certain

22

crimes—including immigrants who have never had any past contact with immigration authorities—can apply to USCIS for U visas, which grant them lawful presence in the United States based upon their cooperation with law enforcement in the investigation or prosecution of these crimes.[14] Similarly, certain victims of domestic violence may seek lawful status by submitting applications to USCIS pursuant to the Violence Against Women Act.[15] Furthermore, many forms of immigration relief granted by USCIS, including U visas and VAWA status, provide legal pathways for immigrants who have been granted such relief to seek and obtain U.S. citizenship without having been inspected, as that term is typically used in the INA.

103.    Accordingly, the plain meaning of Section 10 could criminalize individuals who transport immigrants who initially entered the United States without inspection but who have since been granted lawful status or lawful presence without ever being "inspected," as that term is typically used in the INA. In fact, it could even lead to the absurd outcome of criminalizing the transport of many immigrants who are now U.S. citizens.

104.    The list of immigrants who Section 10 could apply to is vast. In addition to U and T visa holders and VAWA beneficiaries, it could apply to children who are beneficiaries of SIJS, asylees, TPS holders, and DACA recipients, among many other immigrants with lawful status or lawful presence in the United States. Immigrants in each of these categories could have entered the United States unlawfully, but later been granted lawful status or lawful presence without ever being "inspected," as the term is typically used in the INA. *See Sanchez v. Mayorkas*, 141 S. Ct. 1809, 1810 (2021) (unanimous decision finding a grant of TPS is not an admission and inspection,

---

[14] *See* U.S. Citizenship & Immigration Services, *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (last updated Mar. 20, 2023).
[15] *See* U.S. Citizenship & Immigration Services, *Abused Spouses, Children and Parents*, https://www.uscis.gov/humanitarian/abused-spouses-children-and-parents (last updated Apr. 1, 2022).

and discussing nonimmigrant categories such as the U visa for which a grant of lawful status does not require an admission and inspection).

105.    Section 10 gives no guidance as to which of these statuses or stays in the United States can trigger the statute's harsh penalties. As federal law typically uses the term, people in many of these statuses or stays have not technically been "inspected."

106.    However, applicants for immigration benefits or relief could well believe that by applying for such benefits or relief, they are submitting to inspection by federal immigration officials. These applicants must submit to a federal agency (typically USCIS) lengthy applications detailing their immigration histories, including entries into the United States and any criminal misconduct in the United States. These applications must be corroborated by supporting documents and, in many instances, official interviews with USCIS officials. Furthermore, these applicants must also submit to biometrics appointments with government agents, in which they provide fingerprints so that their immigration and criminal histories can be checked by the agency.

107.    Section 10 gives no guidance regarding its application to immigrants who have submitted applications for immigration benefits or relief to the federal government, but whose applications have not yet been adjudicated. Thus, even if "inspection" is construed broadly to include all noncitizens who have been granted immigration status, Section 10 leaves unclear whether it counts as "not inspected" those noncitizens whose immigration applications (whether for asylum, DACA, TPS, or something else) are still pending. Applications to USCIS for immigration relief can take between several months and many years to be adjudicated.

108.    Similarly, it is unclear whether people who seek immigration relief in removal proceedings, and who the federal government has not yet found removable or decided to remove from the United States, are deemed "inspected" under Section 10. And the same goes for people

who the federal government has apprehended and released without a notice to appear in immigration court. Indeed, people's immigration situations are fluid, complicated, and varied, but Section 10 leaves people with no idea who is covered and who is not.

109.     On its face, Section 10 provides no information about what subsequent immigration history leads a person to be considered "inspected" after an unlawful entry, and federal law likewise fails to provide a clear answer to this question. Once a person knows, or reasonably should know, that their passenger entered the country unlawfully, that person is effectively stuck in a definitional abyss, which could determine not only criminal culpability, but also mandatory arrest and criminal detention—a far cry from fair notice.

110.     Given the lack of clarity provided by Section 10 as to the meaning of the term "inspected," local and state law enforcement agencies across Florida's sixty-seven counties inevitably will interpret Section 10's vague and incoherent phrasing differently, leading to arbitrary and discriminatory enforcement.

111.     The INA, as amended, is the primary statute that governs immigration law. It controls who can enter and remain in the United States and on what terms, and dictates who is a United States citizen by birth, acquisition, or derivation. The statutory scheme is commonly deemed second only to the Internal Revenue Code in complexity.[16]

112.     Despite that complexity, in order to avoid being exposed to felony charges, Section 10 will require all Floridians and travelers to Florida to stay up-to-date on their friends', neighbors', co-workers', and family members' current immigration status and history. Local law enforcement will be required to act as immigration law experts. However, given the lack of clarity

---

[16] *See Castro-O'Ryan v. U.S. Dep't of Immigr. & Naturalization*, 847 F.2d 1307, 1312 (9th Cir. 1987) ("With only a small degree of hyperbole, the immigration laws have been termed 'second only to the Internal Revenue Code in complexity.' A lawyer is often the only person who could thread the labyrinth." (quoting E. Hull, *Without Justice For All* 107 (1985))).

in Section 10 as to the meaning of the term "inspected," even in-depth expertise in immigration law and a detailed knowledge of passengers' immigration history will not suffice to ensure that Floridians and travelers to Florida are safe from felony arrests and prosecutions for bringing immigrant friends, family, coworkers, and commercial passengers into the state.

113.    Additionally, under the INA, a noncitizen's immigration status may be fluid and subject to change over time. *See, e.g.*, *Sanchez*, 141 S. Ct. at 1814 (explaining how an individual who entered the country unlawfully could receive a U visa and be eligible to become an LPR). As such, law enforcement is certain to struggle to determine whether, at any given moment, a person has been inspected by federal immigration officials for purposes of the new state law, likely leading to unwarranted arrests, criminal detentions, and prosecutions.

114.    This fluidity of immigration status is a fundamental feature of the INA that reflects the careful balance struck by Congress between important national and international interests, including the nation's humanitarian and international law obligations regarding asylum seekers and refugees.

## V.    DECLARATORY AND INJUNCTIVE RELIEF

115.    An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs face an imminent threat of harm from the enforcement of Section 10.

116.    Defendants' enforcement of Section 10 constitutes an official policy of the State of Florida.

117.    In violating Plaintiffs' rights under the U.S. Constitution and federal law, Defendants have acted and will be acting under color of state law.

118.    If allowed to remain in effect, Section 10 will cause irreparable injury to Plaintiffs.

119.    Plaintiffs have no plain, speedy, and adequate remedy at law against Section 10 other than the relief requested in this Complaint.

120.    As Section 10 takes effect, Plaintiff FWAF's members will be subject to unlawful arrest, prosecution, and harassment.

121.    Section 10 violates the Supremacy Clause because Florida law enforcement agencies, officials, and prosecutors will be unilaterally carrying out the functions of federal immigration authorities without federal authorization under the INA and in conflict with the federal government.

122.    Section 10 will thwart organizational Plaintiff FWAF's mission by forcing it to divert its resources away from its regular programming and organizing in order to assist members navigating travel and employment as a result of the law's implementation. This undermines Plaintiff FWAF's ability to advance pre-existing organizational priorities, programs, and services.

123.    Section 10 will further thwart Plaintiff FWAF's mission by deterring their members, including dues-paying members, from participating in membership activities. Many of FWAF's dues-paying members have left and will continue to leave Florida, negatively impacting FWAF's revenue.

124.    Plaintiff FWAF individual members' interests that are at stake in this case are germane to FWAF's organizational purpose. Many of FWAF's individual members can and will be directly harmed by the enforcement of Section 10.

125.    In taking the actions alleged in this Complaint, Defendants will deny Plaintiffs' rights secured by the U.S. Constitution and federal law.

126.    Plaintiffs are entitled to a declaration that Section 10 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

27

## VI.    CAUSES OF ACTION

### COUNT I
### Fla. Stat. 787.07, as amended by SB 1718, Section 10
### Violates the Supremacy Clause of the U.S. Constitution
### Conflict and Field Preemption
### Declaratory and Injunctive Relief

127.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

128.    The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.

129.    The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority, or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

130.    The federal government has exclusive power over immigration law and policy. Congress has created a comprehensive system of federal laws regulating the transport and harboring of immigrants in the United States. *See generally* INA, 8 U.S.C. § 1101 *et seq*; *Arizona*, 567 U.S. 387 (2012).

131.    Section 10 departs from federal immigration law by making it a crime for anyone who "knowingly and willfully transports into" Florida an individual whom the person "knows or reasonably should know has entered the United States in violation of law and has not been

28

inspected by the Federal Government since his or her unlawful entry from another country." Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)).

132.    The inability to transport family, friends, and co-workers into Florida for the agricultural growing season without risking a felony charge makes employment limited or unavailable to members of Plaintiff FWAF, including those who may be U.S. citizens.

133.    Section 10 makes it a crime for U.S. citizens and noncitizens, including the individual Plaintiffs, to transport certain immigrants into Florida.

134.    Section 10 regulates the terms and conditions under which both U.S. citizens and noncitizens alike may travel to or return to Florida.

135.    Section 10 conflicts with federal immigration laws, regulations, and policies.

136.    Section 10 is an obstacle to the accomplishment and execution of federal immigration laws, regulations, and policies.

137.    Section 10 is an impermissible state regulation of immigration, and therefore usurps powers constitutionally vested in the federal government exclusively.

138.    Section 10 is preempted under the Supremacy Clause.

139.    Section 10 imposes immigration-related burdens and penalties on U.S. citizens and legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes in violation of the Supremacy Clause.

**COUNT II**
**Fla. Stat. 787.07, as amended by SB 1718, Section 10, Violates the Due Process Clause of the 14th Amendment to the U.S. Constitution**
**(42 U.S.C. § 1983)**
**Declaratory and Injunctive Relief**

140.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs numbered 1-126 as if fully set forth herein.

141.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.

142.    Section 10 deprives persons it subjects to its criminal provisions of due process of law, in violation of the Due Process Clause of the Fourteenth Amendment.

143.    Section 10 is impermissibly vague and overbroad.

144.    Section 10 is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and because it authorizes and encourages arbitrary and discriminatory enforcement.

145.    Section 10 is unconstitutionally vague because its use of the phrase "in violation of law and has not been inspected by the Federal Government since his or her unlawful entry" is incoherent or in conflict with the INA.

146.    Section 10 is unconstitutionally vague because the term "inspected" is not defined anywhere in SB 1718; nor is this term defined elsewhere in Florida law.

147.    Section 10 exposes an individual to second- or third-degree felony charges if that person "knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from other country." The Due Process Clause does not permit subjecting any person in the United States to criminal penalties on these terms because they are indeterminate, internally incoherent, or amorphous.

148.    Such vague language authorizes and encourages arbitrary and discriminatory enforcement of Section 10 by Defendants against individuals, including members of Plaintiff organization and individual Plaintiffs.

149.    Under the vague, indeterminate, internally incoherent, and amorphous phrasing of Section 10, Floridians, including Plaintiffs, have no way of determining what conduct is prohibited, nor how state and local law enforcement will choose to enforce Section 10.

150.    Plaintiffs move for relief on this claim directly under the Constitution and under 42 U.S.C. § 1983 as an action seeking redress of the deprivation of statutory rights under the color of state law.

## VII.    PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

   a.   Assume jurisdiction over this matter;

   b.   Permit Plaintiffs A.M., J.L., R.M., C.A., M.M., D.M., A.C., G.D.L., and M.G. to maintain their identities anonymous throughout the life of this matter;

   c.   Declare Florida Statute § 787.07, as amended by SB 1718, Section 10, in its entirety, unconstitutional;

   d.   Preliminarily and permanently enjoin Defendants from enforcing Section 10 in its entirety;

   e.   Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

   f.   Grant any other relief as the Court may deem just and proper.

Dated: July 17, 2023                          Respectfully submitted,

                                              /s/ Anne Janet Hernandez Anderson
                                              *On behalf of Attorneys for Plaintiffs*

31

Evelyn Wiese (CA Bar No. 338419)*
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
(305) 573-1106
ewiese@aijustice.org

Katherine Melloy Goettel (IA Bar No. 23821)*
Emma Winger (MA Bar No. 677608)*
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7552
kgoettel@immcouncil.org
ewinger@immcouncil.org

Katherine H. Blankenship (FL Bar No. 1031234)
Daniel B. Tilley (FL Bar No. 102882)
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2700
kblankenship@aclufl.org
dtilley@aclufl.org

Amien Kacou (FL Bar No. 44302)
Maite Garcia (FL Bar No. 99770)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
(813) 288-8390
akacou@aclufl.org
mgarcia@aclufl.org

Anne Janet Hernandez Anderson (FL Bar No. 0018092)
Paul R. Chavez (FL Bar No. 1021395)
Christina Isabel LaRocca (FL Bar No. 1025528)
Felix A. Montanez (FL Bar No. 0102763)
Cassandra Charles (NY Bar No. 5540133)*
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd., Suite 3750
Miami, FL 33131-1804
(786) 347-2056
aj.hernandez@splcenter.org
paul.chavez@splcenter.org
christina.larocca@splcenter.org
felix.montanez@splcenter.org
cassandra.charles@splcenter.org

Cody Wofsy (CA Bar No. 294179)*
Spencer Amdur (CA Bar No. 320069)*
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
cwofsy@aclu.org
samdur@aclu.org

Omar Jadwat (NY Bar No. 4118170)*
Edith Sangueza (NY Bar No. 5694534)*
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
ojadwat@aclu.org
irp_es@aclu.org

*Attorneys for Plaintiffs*
*Pro hac vice applications forthcoming

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2023, I electronically served a true and correct copy of the foregoing on counsel for Defendants via transmission of a Notice of Electronic Filing generated by the Court's CM/ECF system.

By: /s/ Anne Janet Hernandez Anderson
Anne Janet Hernandez Anderson

1