**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

THE FARMWORKER ASSOCIATION OF
FLORIDA INC., *et al.*,

        Plaintiffs,

v.

RONALD D. DESANTIS, in his official capacity as
Governor of the State of Florida, *et al.*,

        Defendants.

Case No. 23-CV-22655-RKA

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ……………………………………………………..……......1

FACTUAL BACKGROUND…………………………………………….……......1

    A.  Section 10's Enactment………………………………………….……......1

    B.  The Plaintiffs……………………………………………………….………2

        1.  Individual Plaintiffs……………………………………….……...3

        2.  Farmworker Association of Florida, Inc. and Its Members……………………4

LEGAL STANDARD…………………………………………………………4

ARGUMENT…………………………………………………………………...5

  I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS…………………..…..5

    A.  Section 10 Is Preempted…………………………………………………5

        i.  Section 10 Is Preempted by the Federal Transport and
          Harboring Regime...……………………………………….………..5

            *Field Preemption*…………………………………………….…5

            *Conflict Preemption*…………………………………………6

        ii.  Section 10 Is Preempted by the Federal Removal
           Scheme………………………………...…………………………8

        iii.  Section 10 Impermissibly Creates a
           Novel Immigration Classification……………………………………9

        iv.  Section 10 Disrupts the Adjudication of
           Immigration Applications and Removal Proceedings…………..……12

    B.  Section 10 Violates the Due Process Clause
       Because It Is Unconstitutionally Vague…………………………………13

  II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF SECTION 10 IS NOT
        PRELIMINARILY ENJOINED…………………………………………………16

  III.   THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR THE
        ISSUANCE OF AN INJUNCTION…………………………………………...18

CONCLUSION………………………………………………………………19

## **TABLE OF AUTHORITIES**

**Cases**

*ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272 (S.D. Fla. 2008) ...................................... 16

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ...................................... 9, 17

*Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017) ............................................ 10

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................ 6, 7, 9, 12

*Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295 (M.D. Fla. 2018) ...................... 16

*Bonnette v. D.C.Ct. of Appeals*, 796 F. Supp. 2d 164 (D.D.C. 2011) ......................................... 17

*Boos v. Barry*, 485 U.S. 312 (1988) ...................................................................................... 14

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011) ............................................. 9, 11

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ....................................................... 7

*Clark v. Martinez*, 543 U.S. 371 (2005) ................................................................................ 10

*Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231 (11th Cir. 2022) ............................ 12

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ........................................... 12

*Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238 (N.D. Fla. 2021) ........................................ 18

*Fuentes-Espinosa v. People*, 408 P.3d 445 (Co. 2017) ......................................................... 5

*Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) ........ 18

*Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250 (11th Cir. 2012)passim

*Gooding v. Wilson*, 405 U.S. 518 (1972) .............................................................................. 14

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................................... 13

*High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225 (11th Cir. 1982) ............................................ 13

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .......................................................................... 6, 9

*Johnson v. United States*, 576 U.S. 591 (2015) ............................................................. 13, 16

*Kansas v. Garcia*, 140 S. Ct. 791 (2020) ............................................................................. 6

*Keller v. City of Fremont*, 719 F.3d 931 (8th Cir. 2013) ...................................................... 11

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ................................. 19

*Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013) ...................................................... 6

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998) .......................................... 5

*McDonnell v. United States*, 579 U.S. 550 (2016) ............................................................... 16

*Montana Immigrant Just. All. v. Bullock*, 371 P.3d 430 (2016) ............................................. 9

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ..................................................................... 10, 12

*Palacios-Hernandez v. Meade*, No. 20-60643-CV, 2020 WL 13550207 (S.D. Fla. Apr. 8, 2020)
........................................................................................................................................... 17

*Plyler v. Doe*, 457 U.S. 202 (1982) ..................................................................................... 9

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) ...................................... 17

*Sackett v. Env't Prot. Agency*, 143 S.Ct. 1322 (2023) ......................................................... 14

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ............................................................... 19

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ............................................ passim

*United States v. Bogle*, 855 F.2d 707 (11th Cir. 1988) ........................................................ 16

*United States v. One Single Family Residence*, 894 F.2d 1511 (11th Cir. 1990) ...................... 12

*United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) ............................................. 5

*United States v. Stevens*, 559 U.S. 460 (2010) ................................................................... 16

*United States v. Texas*, 557 F. Supp. 3d 810 (W.D. Tex. 2021) ............................................ 9

*United States v. Texas*, 586 F. Supp. 3d 574 (W.D. Tex. 2022) ............................................ 8

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022) ........................................................... 7

*Valle del Sol v. Whiting*, 732 F.3d 1006 (9th Cir. 2013)................................................. 5, 8, 18

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ............................. 16

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524 (5th Cir. 2013) 7, 8, 9, 11

**Statutes**

8 U.S.C. § 1101 ................................................................................................. 10, 14

8 U.S.C. § 1158 ................................................................................................. 10, 12

8 U.S.C. § 1159 ...................................................................................................... 11

8 U.S.C. § 1182 ...................................................................................................... 10

8 U.S.C. § 1223 ...................................................................................................... 14

8 U.S.C. § 1225 ..................................................................................... 10, 12, 14, 15

8 U.S.C. § 1229 ...................................................................................................... 12

8 U.S.C. § 1229a .................................................................................................... 10

8 U.S.C. § 1229b ............................................................................................. 10, 14

8 U.S.C. § 1255 ............................................................................................... 10, 14

8 U.S.C. § 1323 ........................................................................................................ 6

8 U.S.C. § 1324 ................................................................................................ passim

8 U.S.C. § 1325 ........................................................................................................ 6

8 U.S.C. § 1327 ........................................................................................................ 6

8 U.S.C. § 1328 ........................................................................................................ 6

8 U.S.C. § 1373 ...................................................................................................... 11

8 U.S.C. § 1401 ...................................................................................................... 11

8 U.S.C. § 1431 ...................................................................................................... 12

8 U.S.C. § 1433 ...................................................................................................... 12

8 U.S.C. § 1642 ...................................................................................................... 11

Ch. 2023-40, § 10, Laws of Fla. (amending § 787.07, Fla. Stat. (2022)) ............................ passim

Ch. 2023-40, § 7, Laws of Fla. (amending § 448.095, Fla. Stat. (2022)) ................................... 13

**Regulations**

8 CFR § 103 .......................................................................................................... 12

8 CFR § 235 ..................................................................................................... 10, 11

8 CFR § 253 .......................................................................................................... 11

8 CFR § 1003 ........................................................................................................ 12

**Board of Immigration Appeals Cases**

*Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 736 (BIA 2012) ........................................... 10

*Matter of Quilantan*, 25 I. & N. Dec. 285, 293 (BIA 2010) ............................................. 10

*Matter of Rahman*, 20 I. & N. Dec. 480 (BIA 1992) ...................................................... 12

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs hereby move for a preliminary injunction enjoining Defendants from enforcing Section 10 of Senate Bill 1718 ("SB 1718"), Ch. 2023-40, Laws of Fla. (amending § 787.07, Fla. Stat. (2022)) ("Section 10").

Section 10 is illegal under binding precedent and imposes a staggering hardship on Plaintiffs, other Floridians, and travelers to Florida, who now face criminal penalties for visiting their families, doing their jobs, seeking medical care, and engaging in other everyday activities.

Section 10 regulates the transport of immigrants: It prohibits transporting someone into Florida if the person entered the United States unlawfully and was not subsequently "inspected." But the Eleventh Circuit has squarely held that Congress has preempted the entire field of migrant transport - that states cannot enact *any* laws in this field.  That alone establishes that Section 10 is preempted and must be enjoined.  Section 10 is also preempted because it prevents immigrants from entering Florida, and because it creates a new immigration classification that does not exist in federal law.  Clear precedent establishes that both are impermissible.

The statute is also unconstitutionally vague, because it provides no clarity or notice as to which passengers will expose drivers to harsh criminal penalties.  It could even criminalize driving U.S. citizens, lawful residents, and others with federal permission to be in the country.

Section 10 is inflicting enormous harm on Plaintiffs and countless other Florida residents. It prohibits transporting people for any purpose, no matter how mundane or essential to daily life. As a result, some Plaintiffs are now separated from their loved ones in other states.  Others are threatened with being unable to feed their families or are being kept from their religious ministry. Florida has no valid basis to impose this kind of suffering on its residents.  For these reasons, the Court should enjoin Section 10.

## FACTUAL BACKGROUND

### A.  Section 10's Enactment.

Section 10 provides that a "person who knowingly and willfully transports into this state an individual whom who the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country commits a felony of the third degree[.]"  Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)).  People suspected of violating this statute are subject to mandatory detention prior to their first court appearance.  *Id.* § 787.07(7).

The law permits an inference that a suspect had the requisite knowledge of the passenger's immigration status if they present a false ID to a law enforcement officer. *Id.* § 787.07(6).

On February 23, 2023, the Governor announced an "extensive legislative proposal" to enhance penalties for "human smuggling[.]"[1]  The announcement made clear that its purpose was to oppose the federal government's immigration policy - as stated by SB 1718 bill sponsor Senator Blaise Ingoglia: "our Governor will not stand by idly. . . As a matter of fact, he will boldly push Florida as the blueprint by which other states should fight illegal immigration." *Id.*  When signing SB 1718, Governor DeSantis confirmed that the bill was intended to be a fight against federal policies: "The legislation I signed today gives Florida the most ambitious anti-illegal immigration laws in the country, fighting back against reckless federal government policies and ensuring the Florida taxpayers are not footing the bill for illegal immigration."[2]  When SB 1718's counterpart, HB 1617, was introduced in the Florida House of Representatives, the House co-sponsor, Representative Kiyan Michael, said, "[t]he federal government we know, is not, they're not doing the job.  They're not enforcing the laws.  We have to do something here, in this state..."[3]  Senator Ingoglia similarly stated that "the focus of this bill, to make sure that we are taking away as many of the incentives [to migrate] as possible in the hopes that other states like Texas and Arizona do the same and force the federal government to get off their butt and fix the problem."[4]  Other legislators made similar statements opposing federal immigration policy.  *See* ECF No. 1, p. 18-22.

---

[1] Ex. 11, Declaration of Anne Janet Hernandez Anderson ("Hernandez Decl."), Ex. A, Governor Ron DeSantis Announces Legislation to Counteract Biden's Border Crisis, https://www.flgov.com/2023/02/23/governor-ron-desantis-announces-legislation-to-counteract-bidens-border-crisis/.

[2] Ex. 11, Hernandez Decl., Ex. B, Governor Ron DeSantis Signs Strongest Anti-Illegal Immigration Legislation in the Country to Combat Biden's Border Crisis, https://www.flgov.com/2023/05/10/governor-ron-desantis-signs-strongest-anti-illegal-immigration-legislation-in-the-country-to-combat-bidens-border-crisis/.

[3] Ex. 11, Hernandez Decl., Ex. D, Fla. H. Comm. on Commerce, recording of proceedings, at 02:44:59-02:45:13 (Apr. 24, 2023 at 12:00 PM) [hereinafter H. Comm. on Commerce Debate], https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=8882 (Rep. Michael discussing proposed committee substitutes for HB 1617).

[4] Ex. 11, Hernandez Decl., Ex. E, Fla. S. Comm. on Fiscal Policy, recording of proceedings, Part Two, at 02:03:59-02:04:12 (Apr. 25, 2023 at 10:00 AM), https://thefloridachannel.org/videos/4-25-23-senate-committee-on-fiscal-policy-part-2/.

### B. The Plaintiffs.

Plaintiffs include individuals who provide and receive transport into Florida to work, visit family, and attend to numerous other facets of daily life, along with a nonprofit organization whose members provide and receive such transport.  Plaintiffs and their passengers have a wide range of immigration statuses which make them subject to arrest, detention, and prosecution under Section 10.  They include people who have had no contact with federal authorities, people with deferred action but no formal status, people with pending applications for immigration benefits, people in removal proceedings, and people who have received a wide range of immigration statuses since entering the country unlawfully without inspection.

### 1. Individual Plaintiffs.

Plaintiffs A.M. and J.L. work for nonprofit organizations, one based in Georgia and the other in Florida.  Their job duties include driving immigrants with a wide array of statuses and histories to various events and appointments in and out of Florida.  They both risk criminal charges for transporting numerous individuals as part of their work serving the immigrant community, and neither is in a position to decipher, from the law's terms, which clients and immigrants within their service may trigger criminal enforcement.  *See* A.M Decl. Ex. 2, ¶¶ 5-7, 16; J.L Decl. Ex. 3, ¶¶ 8-12.  Plaintiff R.M., a Catholic deacon, heads a small non-profit in northeast Georgia, and runs the same risks when he transports immigrants in his personal vehicle to immigration-related appointments in Jacksonville and other cities in Florida as part of his nonprofit work and religious ministry.  *See* R.M. Decl. Ex. 4, ¶¶ 11-15.

Plaintiff C.A. is a U.S. citizen and longtime Florida City resident who is the legal guardian for her minor grandson, who has a pending petition for immigration relief.  *See* C.A Decl. Ex. 5, ¶ 5.  C.A. risks criminal prosecution when she transports her grandson back from visiting family in Georgia. Ex. 5, ¶ 7.  Plaintiff M.M. and her family suffer the same threat of criminal prosecution and harm, and have canceled a planned trip to visit family in Texas due to this threat.  M.M. Decl. Ex. 6, ¶¶ 8-10; A.C. Decl. Ex. 8, ¶¶ 6-9; D.M. Decl. Ex. 7, ¶¶ 5-6.  Neither Plaintiff M.M. nor her daughter, Plaintiff D.M, are in immigrant or non-immigrant status under federal law, although Plaintiff D.M.'s Deferred Action for Childhood Arrivals (DACA) application is pending and Plaintiff M.M. has a pending case in immigration court.  *See* Ex. 6, ¶ 10; Ex. 7, ¶ 4.  Plaintiff M.M. and her 19-year-old son Plaintiff A.C, a U.S. citizen, fear felony charges if they drive D.M. back home to Florida.  *See* Ex. 6, ¶ 10; Ex. 8, ¶¶ 7-9; Ex. 7, ¶ 6.  A.C. also risks felony charges for

driving his mother.  Ex. 8, ¶ 9.

Plaintiffs G.D.L. and M.G. have already experienced harm due to Section 10.  Both are farmworkers who, each year, work in Florida, Tennessee, and Georgia. Neither has had contact with immigration enforcement since entering the U.S.  Together they travel from Florida to Georgia and Tennessee with their U.S.-citizen children based on the harvest seasons.  G.D.L. Decl. Ex. 9, ¶ 5; M.G. Decl. Ex. 10, ¶¶ 6-7.  G.D.L and M.G. fear criminal enforcement and family separation for traveling across state lines together for work.  Ex. 9, ¶ 7; Ex. 10, ¶ 8.  This year, they suffered a severe loss of income due to Section 10 because they did not leave Florida for work out of fear that they would not be able to return without risking arrest, prosecution, and separation from their children.  Ex. 9, ¶¶ 7-9;  Ex. 10, ¶¶ 9-10.

### 2.  Farmworker Association of Florida, Inc. and Its Members.

Plaintiff Farmworker Association of Florida, Inc. ("FWAF") is a nonprofit organization with offices throughout Florida that supports and builds power among farmworker and rural low-income communities.  FWAF Decl. Ex. 1, ¶¶ 4-6.  FWAF's programs focus primarily on encouraging farmworkers' civic participation, building farmworker coalitions, supporting workers' rights, improving working conditions, and safeguarding farmworkers' health and safety. Ex. 1,  ¶¶ 6, 10, 11-15.

 FWAF's members have a wide range of immigration statuses and histories, with myriad paths of entry and changes of status.  Ex. 1, ¶¶ 19-22.  Many FWAF members either transport family and colleagues into Florida whose immigration status could trigger a felony charge under Section 10, or they themselves could trigger such a felony charge for their driver, and therefore may be unable to receive transportation.  Ex. 1, ¶¶ 23-29.

As an organization, FWAF has already had to divert scarce organizational resources away from its regular activities. Ex. 1, ¶¶ 11, 31. FWAF has been inundated with questions and requests for assistance relating to travel between Florida and other states, and FWAF staff are taking significant time away from regular programs and activities to train volunteers on Section 10 and its impact on their members and the broader immigrant community.  Ex. 1, ¶¶ 11-13, 32-38.

### LEGAL STANDARD

A preliminary injunction is warranted if the moving party establishes: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction

may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

**ARGUMENT**

I.  **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

   a.  **Section 10 Is Preempted.**

Section 10 is preempted for multiple reasons.  First, the Eleventh Circuit has squarely held, as a matter of both field and conflict preemption, that states cannot regulate the transport of immigrants, because federal law fully occupies that field and displaces even complementary state regulation.  That clear holding is fatal to Section 10 and sufficient to resolve this case.  Second, the law is preempted because states cannot take measures to exclude undocumented immigrants from their territory.  Third, Section 10 is preempted because it creates an immigration classification - people who have been "inspected" "since" entry - that does not appear in federal law.  And fourth, Section 10 is preempted because it prevents immigrants from attending their immigration court hearings and Immigration and Customs Enforcement (ICE) or United States Citizenship and Immigration Service (IS) appointments in Florida.

   i.  **Section 10 Is Preempted by the Federal Transport and Harboring Regime.**

**<u>Field preemption</u>.**  Section 10 defies binding precedent from the Eleventh Circuit.  It imposes criminal penalties on a person who "transports" certain undocumented immigrants into Florida.  Ch. 2023-40, § 10, at 11, Laws of Fla. (amending § 787.07(1), Fla. Stat. (2022)).  But as the Eleventh Circuit has held, "Congress has provided a full set of standards to govern the unlawful transport and movement of aliens[.] . . . [A] state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue." *Georgia Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1264 (11th Cir. 2012) (quotation marks omitted) (invalidating immigrant transport state law); *see also United States v. Alabama*, 691 F.3d 1269, 1285-88 (11th Cir. 2012) (invalidating a similar state immigrant transport law).  These same reasons have led other circuits and state courts to unanimously invalidate the other immigrant transport laws that states have enacted.  *See Valle del Sol v. Whiting*, 732 F.3d 1006, 1023-29 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 530-32 (4th Cir. 2013); *Fuentes-Espinosa v. People*, 408 P.3d 445 (Co. 2017).

The federal transport and harboring regime is contained in 8 U.S.C. § 1324 and nearby statutes, which "provide[] a comprehensive framework to penalize the transportation . . . of

unlawfully present aliens." *Georgia Latino All.*, 691 F.3d at 1263-64.  Section 1324(a)(1)(A)(ii) penalizes a person who "transports" an immigrant "within the United States," if the transport is "in furtherance" of the immigrant's illegal presence.  *See also id.* § 1324(a)(1)(A)(i) (addressing transport into the United States).  Section 1324(d) provides evidentiary rules for prosecuting transport and harboring crimes in federal court.  And § 1324(e) provides for an outreach program to educate the public on what activities do and do not violate the federal transport and harboring provisions.  Neighboring provisions govern a host of other migrant transportation issues.  *See* 8 U.S.C. §§ 1323, 1325, 1327, 1328.  As the Eleventh Circuit has held, these provisions establish "an overwhelmingly dominant federal interest in the field" of "entry, movement, and residence of aliens in the United States," which displaces "even complementary" state transport laws.  *Georgia Latino All.*, 691 F.3d at 1264; *see also Arizona v. United States*, 567 U.S. 387, 401 (2012) (field preemption "foreclose[s] *any* state regulation in the area") (relying on *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)); *Kansas v. Garcia*, 140 S. Ct. 791, 805-06 (2020) (reaffirming field preemption analysis in *Arizona* and *Hines*).[5]

Congress's comprehensive transport and harboring scheme contains one very narrow role for states: Congress empowered states to make *arrest* for violations of *federal* transport and harboring laws, *see* 8 U.S.C. § 1324(c), but did not empower them to prosecute these federal crimes, and it certainly did not allow them to create their own.  Accordingly, in the field of immigrant transport, the Eleventh Circuit has explained that "the role of the states is limited to arrest for violations of federal law."  *Georgia Latino All.*, 691 F.3d at 1264; *see also Lozano v. City of Hazleton*, 724 F.3d 297, 316-17 (3d Cir. 2013) (finding field preemption for the same reasons).  Section 10 is indefensible under these principles.  It explicitly regulates the exact field - "transport[ing]" undocumented immigrants, Ch. 2023-40, § 10, Laws of Fla. (amending § 787.07, Fla. Stat. (2022)) - where, under binding precedent, Congress has prohibited states from creating new crimes.  This alone is sufficient to enjoin Section 10.

**Conflict preemption**.  Section 10 is also conflict preempted under *Georgia Latino Alliance*

---

[5] The Court in *Kansas* upheld a state's enforcement of its general identity-theft laws, but did not address the main issues in the present case.  *Kansas* did not involve or address the field of migrant transport and harboring, nor did it involve a state crime like section 10 that explicitly regulates immigration matters.  Rather, the Kansas identity-theft law addressed matters that were "*fundamentally unrelated* to the federal" employment scheme at issue, and it prevented harms that had "no connection with immigration law."  140 S. Ct. at 804-05.

and *Alabama*, which held that state transport laws conflict with the federal scheme when they "create[] a new crime unparalleled in the federal scheme." *Georgia Latino All.*, 691 F.3d at 1266; *see Alabama*, 691 F.3d at 1287-88 (rejecting "untenable expansion of the federal harboring provisions"). Novel state transport laws conflict with § 1324 because they "threaten the uniform application of the INA." *Georgia Latino All.*, 691 F.3d at 1266. Here, too, Section 10 does exactly what the Eleventh Circuit rejected, creating a new transport crime that does not exist in federal law. Most critically, federal law only prohibits transport "in furtherance of" an immigrant's illegal presence, 8 U.S.C. § 1324(a)(1)(A)(ii) - in other words, transport for the purpose of helping an immigrant who is not lawfully present evade federal detection. *See United States v. Zhong*, 26 F.4th 536, 561-62 (2d Cir. 2022) (collecting cases). !

Section 10 omits this "in furtherance" element, and instead bars transport no matter its purpose or effect. It thus criminalizes a much wider swath of immigrant transport than § 1324, including transport for the most ordinary purposes like work, school, camp, church or synagogue, visiting family, grocery shopping, medical care, and everything else. Section 10 criminalizes things like "driving an unlawfully present alien to the supermarket" underscores its conflict with federal law. *Georgia Latino All.*, 691 F.3d at 1265; *see Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 531 (5th Cir. 2013) (finding preemption in part because provision "criminaliz[ed] conduct that does not have the effect of evading federal detection").

Section 10 differs from § 1324 in other important respects as well. Section 10 applies to a different set of immigrant passengers than federal law: those who "ha[ve] not been inspected" since entry - a category that is absent from § 1324 and does not appear anywhere in the INA. *See infra* Part I.A.iii. Because this category does not exist in federal law, state police, prosecutors, judges, and juries applying Section 10 will have to decide for themselves whether a person's immigration history means they have been "inspected" "since" entry. Yet courts have uniformly held that state officials are preempted from making those kinds of complex immigration-status determinations on their own. *See e.g.*, *Arizona*, 567 U.S. at 409-10 ("Decisions of this nature touch on foreign relations and must be made with one voice."); *City of El Cenizo v. Texas*, 890 F.3d 164, 188-89 (5th Cir. 2018); *Farmers Branch*, 726 F.3d at 536. Section 10's enforcement thus requires state officials to make unilateral status determinations that are preempted. *See United States v. Texas*, 586 F. Supp. 3d 574, 584 (W.D. Tex. 2022) (discussing state transport law).

To address these "significant complexities" in § 1324 prosecutions, Congress imposed

"statutorily limited categories of *prima face* evidence" which are used to determine a person's immigration status. *Farmers Branch*, 726 F.3d at 531 (citing 8 U.S.C. § 1324(d)). But Section 10 omits these evidentiary rules as well, leaving state judges and juries to assess people's immigration histories without the procedural safeguards Congress mandated.

Yet another difference is that Section 10 discards the federal statute's safe harbor for certain religious activities, 8 U.S.C. § 1324(a)(1)(C) (addressing "travel"), an omission that "clearly poses an obstacle" to Congress's objective "to protect certain religious activities from prosecution." *Valle del Sol*, 732 F.3d at 1028.

These many differing provisions in Section 10 "cannot coexist with § 1324(a)." *Alabama*, 691 F.3d at 1287-88 (finding conflict preemption based on "substantive differences between the federal and state laws"). It would upend the federal scheme if states could impose "fifty individual attempts to regulate immigration-related matters" like transportation. *Georgia Latino All.*, 691 F.3d at 1266.

### ii.   **Section 10 Is Preempted by the Federal Removal Scheme.**

Section 10 is field preempted because it attempts to prevent undocumented immigrants from entering and living in Florida. As the Eleventh Circuit has held, states cannot "unilaterally determine that an[] alien unlawfully present in the United States cannot live within the state's territory." *Alabama*, 691 F.3d at 1295. Yet that is exactly what Section 10 attempts to do. In an interview, Representative Randy Fine, who voted in favor of the law, said, "The purpose of the law is to get illegal immigrants to stop coming to Florida and to get those who are here to leave."[6] Bill sponsor Senator Ingoglia likewise made it clear that the law was about disincentivizing migration to Florida by taking away the incentives to come to Florida.[7] The Alabama law that the Eleventh Circuit invalidated sought to do this indirectly, by making certain contracts by undocumented immigrants unenforceable. *Id.* at 1293. Section 10 has no such subtlety. It seeks to exclude undocumented immigrants directly, by flatly prohibiting their transport into the State.

---

[6] Ex. 11, Hernandez Decl., Ex. C, Miriam Jordan, *New Florida Immigration Rules Start to Strain Some Businesses*, NEW YORK TIMES (Aug. 4, 2023), available at: https://www.nytimes.com/2023/08/04/us/florida-immigration-law-businesses.html?smid=nytcore-ios-share&referringSource=articleShare

[7] Ex. 11, Hernandez Decl., Ex. E, Fla. S. Comm. on Fiscal Policy, record of proceedings, at 02:03:59-02:04:12  (Apr. 25, 2023 at 10:00 AM), https://thefloridachannel.org/videos/4-25-23-senate-committee-on-fiscal-policy-part-2/.

The Eleventh Circuit has rejected this in clear terms.  Florida has no power to "decide[] that unlawfully present aliens cannot be tolerated within its territory."  *Id.* at 1295.  Doing so "conflicts with Congress's comprehensive statutory framework governing alien removal."  *Id.* at 1294.  It also conflicts with the federal government's "power to exclude" noncitizens, which under the Constitution is "an exclusively federal power."  *Id.* at 1293.  Florida simply does not get to decide which immigrants can and cannot enter its territory.  If every state could make that decision for itself, "the immigration scheme would be turned on its head."  *Id.* at 1295 n.21.

### iii.  Section 10 Impermissibly Creates a Novel Immigration Classification.

Section 10 is further flawed as states may not attach criminal or other consequences based on an immigration "classification that does not exist in federal law."  *Farmers Branch,* 726 F.3d at 534.  Section 10 does exactly that by criminalizing transport if the passenger has not been "inspected" "since" entry, a designation that does not exist in the INA.  *See supra* Part I.A.i.

"The federal government alone . . . has the power to classify non-citizens," *id.* at 536, because immigration classifications are bound up with foreign policy and border control, over which the federal government has sole authority, *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982); *Hines*, 312 U.S. at 66-67; *Arizona*, 567 U.S. at 401-02.  State-created immigration classifications place state officials in the "impermissible position" of enforcing state law "based on their immigration status determinations without federal direction and supervision."  *Farmers Branch*, 726 F.3d at 532 (quoting *Arizona*, 567 U.S. at 413); *see supra* Part I.A.i (consensus that this is preempted).  For this reason, courts have repeatedly found that attempts by states to legislate their own immigration categories are preempted.  *See, e.g.*, *Farmers Branch*, 726 F.3d at 532-35 (category of "not lawfully present" noncitizens); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1073 (9th Cir. 2014) (Christen, J., concurring) (state-created definition of "authorized presence"); *United States v. Texas*, 557 F. Supp. 3d 810, 816-17 (W.D. Tex. 2021) (similar); *Montana Immigrant Just. All. v. Bullock*, 371 P.3d 430, 441 (2016) (similar).  States may consider an individual's immigration status in certain contexts, but they must rely on federal determinations of status.  *See Plyler*, 457 U.S. at 219 n.19; *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 601 (2011); *Farmers Branch*, 726 F.3d at 532-34.

Section 10 impermissibly creates a new immigration category of people who have not been "inspected . . . since [their] unlawful entry from another country," Ch. 2023-40, § 10, at 11, Laws

of Fla. (amending § 787.07(1), Fla. Stat. (2022)), and imposes criminal penalties for transporting them. Like other impermissible state classifications, Florida's statute creates this category out of whole cloth. Whether a person has been "inspected" "since" entry is simply not a concept that exists in the INA, and it has no bearing on a person's immigration status, as explained below.

The INA sets out a complex and fluid scheme governing immigration status, and the concept of "inspection" plays a specific and limited role in that framework. The INA primarily describes inspection as a process that occurs *at the border* (including airports and other ports of entry) before a person is admitted or paroled into the United States. *See* 8 U.S.C. § 1225; *Clark v. Martinez*, 543 U.S. 371, 373 (2005); *see also* 8 U.S.C. § 1101(a)(13)(A). In the context of border admission, "inspection" typically refers to the examination and questioning of a noncitizen who has physically presented themselves to an immigration officer. *Matter of Quilantan*, 25 I. & N. Dec. 285, 293 (BIA 2010).

Notably, some noncitizens are not inspected at the border - namely those who enter irregularly between ports of entry, referred to as "entry without inspection." *See, e.g.*, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1225, 8 CFR § 235.3(b); *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 736 (BIA 2012). For those noncitizens, future immigration status and contact with immigration authorities can take a wide range of forms. They may apply for a long list of immigration benefits or for immigration relief, either affirmatively or as a defense to removal in immigration court. *See* 8 U.S.C. §§ 1101(a)(15)(A)-(V), 1101(a)(27)(A)-(M) (listing various forms of nonimmigrant and special immigrant status); 1158(a) (asylum); 1229a(c)(4) (procedures governing applications for relief in immigration court); 1229b (cancellation of removal); 1255 (adjustment of status); *see also Padilla v. Kentucky*, 559 U.S. 356, 379-80 (2010) (Alito, J., concurring) (discussing complexity of immigration statuses). In addition, immigration authorities may choose to forego immigration enforcement by declining to initiate removal proceedings, administratively closing proceedings, or granting deferred action or parole. *See, e.g.*, *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 967-68 (9th Cir. 2017) (discussing deferred action and other forms of agency discretion).

Critically, for almost all of these post-entry situations, the INA does not say at what point, if ever, a person has been "inspected." The concept of post-entry inspection plays no role in whether a person will be permitted to remain in the United States, and so the concept is not defined or elaborated in federal law. For example, has a U visa or DACA recipient been "inspected" after entry? What about a person whose removal proceedings or benefits application has yet to be

adjudicated?  Or a person without any pending application or removal proceedings, whom federal officials encountered but declined to arrest?  Or a naturalized U.S. citizen who adjusted their status based on their U visa or other form of relief that does not require admission or parole?  Federal law does not say whether any of these involve "inspection" after an unlawful entry because it does not matter in the federal scheme.[8]

Because the INA does not answer whether a person has been "inspected" "since" entry, Section 10 puts state and local officials in the untenable position of determining this classification themselves.  To enforce Section 10, Florida police, prosecutors, judges, and juries would have to examine a passenger's entire immigration history, and then determine whether that history includes "inspection" "since" entry, without any federal definition to consult.  There is no federally issued document that confirms whether a person has been "inspected" since entry.  There is no federal official to call, because federal officials cannot determine whether a person meets a classification that does not exist in federal law.  *See Farmers Branch*, 726 F.3d at 533 (federal official's testimony that DHS could not answer inquiries about "lawful presence or not" since that is not a meaningful category in federal law); *Keller v. City of Fremont*, 719 F.3d 931, 945 (8th Cir. 2013) (ordinance required local officials to assess immigration status exclusively by asking federal officials to make the determination); *Whiting*, 563 U.S. at 591-92 (same); 8 U.S.C. §§ 1373(c), 1642(a) (federal responses to inquiries about people's citizenship, immigration status, and benefits eligibility).

Without federal guidance, Florida officials enforcing Section 10 will have to independently review people's arrest and custody records, entry and exit paperwork, applications for immigration benefits, immigration court documents, and even their family members' migration and naturalization history to determine a status that does not exist in federal law.  *See* 8 U.S.C. §§ 1401, 1431, 1433 (rules for derivative and acquired citizenship).  Florida Highway Patrol officers, state judges and juries, and other state actors are in no position to parse these "significant complexities"

---

[8]  The INA and regulations do indicate a few instances where "inspection" may take place at a time distinct from the time of entry into the United States. For example, some passengers arriving by aircraft may be "pre-inspected" before ever arriving in and being admitted to the United States, while other noncitizens may be paroled into the United States and inspected later, at a different port of entry. *See* 8 U.S.C. § 235A, 8 CFR § 235.5 (pre-inspection); 8 CFR §§ 253.1(a), 235.2 (deferred inspection); *see also* 8 U.S.C. § 1159(a) (certain refugees adjusting status). But these few exceptions prove the rule, which is that for everyone else, federal law is silent on whether, and if so, when a person has been inspected since entry.

on their own, because they generally receive no federal "training in the enforcement of immigration law." *Arizona*, 567 U.S. at 408-09; *Padilla*, 559 U.S. at 379-80 (Alito, J., concurring) (describing complexities).  Even if state authorities had such federal training, they could not apply it to enforce an immigration classification made up by the Florida legislature.  Thus, Florida is preempted from creating and enforcing its own immigration classification in Section 10.

### iv.   Section 10 Disrupts the Adjudication of Immigration Applications and Removal Proceedings

Section 10 is also preempted because it "obstructs" and "frustrates" federal objectives, by disrupting the operations of federal agencies that rely on immigrants' ability to cross state lines. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 366 (2000); *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022); *United States v. One Single Family Residence*, 894 F.2d 1511, 1517 (11th Cir. 1990).

To adjudicate removability and benefits applications, the INA requires immigrants to participate in court hearings, attend appointments with federal agencies, and supply an address where they will receive mail.  *See, e.g.*, 8 U.S.C. §§ 1229(a)(1)(F)(i), 1229(a)(2)(A) (requiring immigrants to travel to the address where removal proceedings are venued); 8 U.S.C. § 1158(d) (asylum application procedure); 8 U.S.C. § 1255 (governing adjustment of status to lawful permanent residence).  Many applicants for immigration benefits are also required to travel in order to provide fingerprints so that the federal government can perform background and security checks.  *See* 8 CFR § 103.16(1) (describing collection and use of biometrics information).  Section 10 frustrates this system by preventing immigrants from being transported to their home addresses, court hearings, and appointments in Florida.  For instance, it obstructs asylum seekers who must go from the Southwest border to Florida where their cases are venued.  *See* 8 CFR § 1003.11, 1003.20; *Matter of Rahman*, 20 I. & N. Dec. 480 (BIA 1992) (explaining venue).  It obstructs people from all over the country whose immigration cases change venue to Orlando or Miami.  It obstructs people who live in Georgia but are required to appear for their USCIS appointments in Florida.  *See* Compl. at ¶ 79.  USCIS' asylum offices also assume the availability of transportation for interstate travel.  The Miami Asylum Office, for example, conducts asylum interviews of South Florida residents, as well as residents of the Commonwealth of Puerto Rico and the Virgin Islands. Section 10, however, would threaten someone chaperoning an asylum applicant on her flight from St. Thomas to Miami, Florida with a felony charge.

Transport is essential for the federal system to function.  Many noncitizens do not have their own vehicle or lack the immigration documents needed to obtain a driver's license in Florida, forcing them to rely on friends and relatives for transportation.  Section 10 threatens to criminalize these arrangements and chill noncitizens' participation and compliance with the federal immigration system.  It thus frustrates the federal scheme and is preempted.

### b. Section 10 Violates the Due Process Clause Because It Is Unconstitutionally Vague.

The Due Process Clause prohibits a law that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "[N]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes."  *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982) (cleaned up).  Section 10 violates these principles because it fails to provide ordinary citizens with notice of the conduct it prohibits and invites arbitrary and discriminatory enforcement.

Section 10 makes it a felony to transport into Florida a passenger who "has not been inspected by the Federal Government since his or her unlawful entry."  Ch. 2023-40, § 10, at 11-12, Laws of Fla. (amending § 787.07(1), (3)-(5)(a), Fla. Stat. (2022)).  But Section 10 does not define what it means to be "inspected" "since" entry.  The legislative history of Section 10 indicates that lawmakers sought to use the terms as they are understood in immigration law, but as explained above, immigration law does not contain that category or say what it means.  *Supra* Part I.A.iii.  And since people's immigration pathways can take hundreds of different forms, Section 10 leaves Floridians guessing as to which pathways show an "inspection" "since" entry and which ones do not.  *Id.* (listing examples).[9]  Between that and Section 10's confused statutory and legislative history, there is no "reasonable and readily apparent" construction that can save Section 10 from unconstitutional vagueness.  *Boos v. Barry*, 485 U.S. 312, 330 (1988); *see Gooding v.*

---

[9] This failure is particularly notable in light of the Florida Legislature's decision to establish elsewhere in SB 1718 that specific terms have the same meaning as in the INA, but not to do so for "inspect," which counsels against importing its INA definition to Section 10.  *See* Ch. 2023-40, § 7(1)(f) (amending § 448.095(1)(f), Fla. Stat. (2022) to state that the term "unauthorized alien" has the same meaning "as described in 8 U.S.C. s. 1324a(h)(3)").

*Wilson*, 405 U.S. 518, 520-21 (1972).[10]  Instead, Section 10 "sweep[s] so broadly as to render criminal a host of what might otherwise be considered ordinary activities."  *Sackett v. Env't Prot. Agency*, 143 S.Ct. 1322, 1342 (2023).

The INA reveals that, to the extent "inspect" is a term of art within the immigration field, it is one whose usage could likely make unwitting felons out of individuals who transport U.S. citizens and lawful permanent residents into Florida.  The INA repeatedly refers to "inspection" as a precursor to being granted, or denied, admission or parole into the United States.  *See, e.g.*, 8 U.S.C. §§ 1101(a)(13)(A), 1223, 1225.  Importantly though, the INA does not require "inspection" to gain lawful immigration status in the U.S., including for immigrants who entered the country unlawfully.  *See, e.g.*, 8 U.S.C. § 1229b (establishing the requirements for cancellation of removal and adjustment of status for certain non-lawful permanent residents ("LPRs") and certain battered spouse or child self-petitioners under the Violence Against Women Act ("VAWA")); 8 U.S.C. § 1255(h) (Special Immigrant Juveniles may adjust status without having been inspected and admitted or paroled); 8 U.S.C. § 1255(m) (U-visa holders may adjust status regardless of having been admitted).  Thus, importing "inspection" as it is used in the INA into Section 10 could lead to the perverse outcome of making it a felony to transport certain U.S. citizens, among others with lawful status, into Florida.

The statutory history and legislative history of Section 10 further highlight the incoherence of "inspected" in this statute.  Florida legislators rejected numerous amendments that would have replaced "inspected" with clearer language.  One rejected House amendment sought to replace "has not been inspected by the Federal Government" with "has not contacted an official or office of the United States government in person, virtually or by telephone or email."  Ex. 11, Hernandez

---

[10] The plain meaning of "inspected" leaves open the question of what it means to be examined or viewed closely by federal or immigration officials after having entered the country illegally. *See* Antonin. Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69 (1st Ed. 2012) ("The ordinary-meaning rule is the most fundamental semantic rule of interpretation."); *see id.* ("One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise."). Merriam Webster defines "inspect" as "to view closely in critical appraisal : look over," and, alternatively, "to examine officially." *Inspect,* MERRIAM WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ inspect (last visited July 26, 2023). The Oxford English Dictionary defines "inspect" as "to look carefully into; to view closely and critically; to examine (something) with a view to find out its character or condition." *See Inspect,* OXFORD ENGLISH DICTIONARY, https://www.oed.com/search/dictionary/?scope=Entries&q=inspect (last visited July 26, 2023).

Decl., Ex. F, House Floor (Amendment 132085), May 1, 2023 at 1:42:54.[11]  Another rejected House amendment would have provided a list of lawful immigration statuses (including U.S. citizens, LPRs, and various visa holders) and pending applications that would make Section 10 not apply to passengers.  *Id.*, House Floor (Amendment 239391), May 1, 2023 at 1:49:56.[12]  The Florida Senate rejected a similar amendment, which likewise would have made clear that Section 10 does not apply to categories of immigrants including U.S. citizens, LPRs and certain visa holders, as well as those with pending applications.  *See* S.B. 1718, Amendment 613072, 2023 Leg., 125th Reg. Session (Fla. 2023).  When given the chance to clarify to whom Section 10 applied, legislators repeatedly elected not to do so.

Indeed, the legislators who sponsored and passed Section 10 held incoherent - and conflicting - views as to the meaning of "inspected."  Senator Ingoglia initially interpreted "inspected" as "processed by the federal government" but then expressed uncertainty as to whether the law would apply to DACA beneficiaries - a class of noncitizens whose detailed applications are adjudicated by USCIS.  *See* Ex. 11, Hernandez Decl., Ex. E, S. Comm. on Fiscal Policy, Part Two, April 25, 2023 at 01:35:24, 01:36:50.  Conversely, Representative Berny Jacques stated that the law applies to persons who are in direct contact with CBP and are released from federal custody after being given notices to appear in immigration court.  Ex. 11, Hernandez Decl., Ex. D, H. Commerce Comm., April 24, 2023 at 2:53:13.[13]  House co-sponsor Representative Kiyan Michael, meanwhile, contended that "inspected" means "they have been checked in the system whether their immigration status, whether their immigration status is American or not."  *Id.* at 2:51:01.

[11] The sponsor of this amendment indicated that the purpose of this amendment was to ensure Section 10 clearly defined who the law applies to, as he found that it did not.  He stated that the amendment "is asking for you to clarify Section 10 of the bill, because it fails to define the term "inspected" and as written does not align with federal immigration law and what happens at the border...All I'm asking from you is be clear on the message that you are putting out…" *Id.* at 1:44:32.

[12] "My amendment would add some clarity to this bill.  The bill sponsors have stated multiple times that the category of immigrants addressed in this bill are only undocumented immigrants.  Or, in other words, these are immigrants that are not on the radar of the federal government.  The actual language of the bill, however, does not match this understanding, and once again, creates a dangerous loophole [wherein Section 10 could apply to persons with lawful immigration status]."  Ex. 11, Hernandez Decl., Ex. F, H. Floor (Amendment 239391), May 1, 2023 at 1:49:56.

[13] Notably, Representative Jacques' definition means that Section 10 would apply to a person who *has* been subject to inspection by federal immigration officers pursuant to the INA. *See* 8 U.S.C. § 1225(b)(1)(A)(ii).

In sum, citizens of ordinary intelligence and law enforcement officers charged with enforcing this law are left with no hope of understanding what Section 10 prohibits and to whom it applies. This, alone, is unconstitutional. But the extremely high stakes of Section 10 - which impose mandatory pre-trial criminal detention and felony culpability - make the law's vagueness even more constitutionally intolerable. *See Johnson*, 576 U.S. at 602; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,* 455 U.S. 489, 498-499 (1982); *McDonnell v. United States*, 579 U.S. 550, 576 (2016) ("[W]e cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'") (quoting *United States v. Stevens*, 559 U.S. 460, 480 (2010)).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF SECTION 10 IS NOT PRELIMINARILY ENJOINED

Absent an injunction, Plaintiffs will suffer irreparable harm by being placed at immediate risk of arrest, detention, and prosecution for carrying on essential life activities and other travel across state lines. Individual Plaintiffs and FWAF members "are under the threat of state prosecution for crimes that conflict with federal law." *Georgia Latino All.*, 691 F.3d 1250, 1268-69 (11th Cir. 2012) (irreparable harm on this basis); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008) ("The threat of criminal prosecution [] constitutes irreparable harm."). Individual Plaintiffs and FWAF members transport into Florida family members, co-workers, and others who entered unlawfully and who likely have not been "inspected" for purposes of Section 10, in possible violation of the law. *Supra* Factual Background, Part B. Under the broad language of Section 10, Plaintiffs and FWAF members face arrest, prosecution, mandatory detention, and family separation. *See* Ch. 2023-40, § 10(7), Laws of Fla. (amending § 787.07, Fla. Stat. (2022)). The threat of pre-trial detention and subsequent felony prosecution is severe harm that cannot be undone. *See Georgia Latino All.*, 691 F.3d at 1268-69; *United States v. Bogle*, 855 F.2d 707, 710-11 (11th Cir. 1988) ("[U]nnecessary deprivation of liberty clearly constitutes irreparable harm.").

For many individual Plaintiffs, Section 10 interferes with their ability to go about their daily lives. M.G. and G.D.L. cannot safely drive their daughter to her medical appointments. M.G. Decl. Ex. 10, ¶ 12; *see Blaine v. N. Brevard Cnty. Hosp. Dist.*, 312 F. Supp. 3d 1295, 1306-07 (M.D. Fla. 2018) (finding inability to access necessary medical appointments to be irreparable harm). Section 10 prevents M.M., A.C., and D.M. from going on their long-planned trip to visit

family in Texas and is keeping C.A. and her grandson from seeing family in Georgia, by restricting travel back home to Florida. Ex. 7, ¶¶ 5-6; Ex. 6,  ¶¶ 7-10; Ex. 8,  Decl. ¶¶ 5-9; Ex. 5, ¶¶ 6-7); *see Palacios-Hernandez v. Meade*, No. 20-60643-CV, 2020 WL 13550207, at *4 (S.D. Fla. Apr. 8, 2020) (finding prolonged family separation constitutes irreparable harm).  Section 10 diminishes individual Plaintiffs' opportunities to make a living by preventing travel necessary for work or education.   A.M's nonprofit is impeded from arranging transportation for an undocumented woman who recently suffered from kidney failure.  Ex. 2,¶¶ 9-14.  A.M in the past traveled to Florida to obtain potentially life-saving care for an undocumented man in Georgia who was referred to a cardiologist in a suburb of Jacksonville.  *See* Ex. 2,  ¶¶ 9-10. J.L. fears that traveling back to Florida after an out-of-state professional conference or health clinic may subject her, her co-workers, and volunteers to prosecution in Florida courts.  Ex. 3, ¶¶ 11-14. J.L. cannot transport immigrants - a key part of their nonprofit or organizing work; G.D.L., M.G., and many FWAF members cannot continue necessary travel to pursue farm work (or are prevented from returning to Florida for future planting and harvesting seasons); and D.M. cannot continue her education out of state.  *See* Ex. 2, ¶¶ 5-6, 17; Ex. 3, ¶ 15; Ex. 9, ¶ 7; Ex. 10, ¶ 8; Ex. 7, ¶ 9; Ex. 1, ¶¶  23-29; *see Arizona Dream Act Coal.*, 757 F.3d at 1068 (holding restrictions on driver's licenses irreparably harmed plaintiffs by "diminish[ing] their opportunity to pursue their chosen professions"); *Bonnette v. D.C.Ct. of Appeals*, 796 F. Supp. 2d 164, 186 (D.D.C. 2011) (finding "[t]he lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation").  In the case of R.M., a U.S. Army veteran and Catholic deacon of fifteen years who transports immigrants from Georgia into Florida for immigration appointments, court appearances, and medical visits as part of his ministry, Section 10 burdens his religious expression. Ex. 4, ¶¶ 9, 17*; see Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  (internal quotation marks and citation omitted)).   Furthermore, all individual Plaintiffs are enduring significant fear and anxiety because Section 10 criminalizes their movements. Ex. 2, ¶ 15; Ex. 6., ¶¶ 10-11; Ex. 7, ¶¶ 7-9; Ex. 8, ¶  9; Ex. 10, ¶¶ 13-14; Ex. 5, ¶¶ 8-9.

FWAF, as an organization, will suffer irreparable harm if Section 10 is not enjoined, because its "mission[] . . . will continue to be frustrated and organization resources will be diverted," and regular programming and activities delayed or impeded in order to respond to the harm caused by Section 10.  *Georgia Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d

1251, 1268 (N.D. Ga. 2018); *see Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1284-85 (N.D. Fla. 2021) (finding irreparable harm where plaintiff organization was, inter alia, forced "to divert their scarce resources from organizing around other issues to educating their members and the public" about the challenged law); *see also Valle del Sol*, 732 F.3d at 1029 (finding irreparable harm based on "ongoing harms to [plaintiffs'] organizational missions" in challenge to statute criminalizing the harboring and transporting of certain immigrants).

FWAF staff have been and are being forced to devote time training volunteers on Section 10 and its impact on the migrant farmworker community at the heart of FWAF's membership, which is outside of normal staff duties and roles. Ex. 1, ¶ 33. FWAF staff have been fielding requests for assistance related to travel for the growing seasons. Ex. 1, ¶¶ 32, 35. In response, staff and volunteers have been conducting Know Your Rights presentations to prepare members for Section 10's impact on members' seasonal travel between Florida and other states. Ex. 1, ¶ 34. FWAF does not have funding to increase staffing to address these new needs. Ex. 1, ¶ 37. Section 10 has thus diverted FWAF's scarce resources away from its regular, core activities. Ex. 1, ¶¶ 10-15, 31, 34, 35, 37-38. Moreover, Section 10 is likely to cause many FWAF dues-paying members not to return to Florida, which will result in a loss of funds and in-kind donations that keep FWAF's programs alive. Ex. 1, ¶ 39. Section 10 undermines FWAF's ability to pursue its organizational mission - a harm that cannot be remedied. *See Georgia Coal.*, 347 F. Supp. 3d at 1268; *Valle del Sol*, 732 F.3d at 1029.

### III. THE BALANCE OF HARMS AND PUBLIC INTEREST STRONGLY FAVOR THE ISSUANCE OF AN INJUNCTION

"[T]he equities favor enjoining enforcement of section[] 10." *Alabama*, 691 F.3d at 1301; *Georgia Latino All.*, 691 F.3d at 1269 (same). Any interest the State may have in enforcing this statute pending resolution of the merits in this case is dramatically outweighed by the harms it imposes on the Plaintiffs and the public.

Indeed, the vagueness of Section 10 increases its harm to the public interest, because members of the public generally do not understand whose transportation is criminalized under its terms; the result will inevitably be the chilling of various lawful activities by the Plaintiffs and other similarly situated members of the public.

Moreover, the requested injunction is intended to prevent the further implementation of a new law that would upset the longstanding allocation of authority between state and federal government regarding the regulation of immigration.   Section 10 intrudes on the federal government's ability to regulate immigration, and it imposes irreparable harm on Plaintiffs and the public.  *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("the public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law"); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

## CONCLUSION

The Court should grant the motion and issue a preliminary injunction.


Dated:  August 8, 2023                                    Respectfully submitted,

                                                         /s/ Anne Janet Hernandez Anderson
                                                         *On behalf of Attorneys for Plaintiffs*

Evelyn Wiese (CA Bar No. 338419)*
AMERICANS FOR IMMIGRANT JUSTICE
6355 NW 36 Street, Suite 2201
Miami, FL 33166
(305) 573-1106
ewiese@aijustice.org

Katherine Melloy Goettel (IA Bar No. 23821)*
Emma Winger (MA Bar No. 677608)*
AMERICAN IMMIGRATION COUNCIL
1331 G St. N.W., Suite 200
Washington, DC 20005
(202) 507-7552
kgoettel@immcouncil.org
ewinger@immcouncil.org

Katherine H. Blankenship (FL Bar No. 1031234)
Daniel B. Tilley (FL Bar No. 102882)
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2700
kblankenship@aclufl.org
dtilley@aclufl.org

Amien Kacou (FL Bar No. 44302)
Maite Garcia (FL Bar No. 99770)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
(813) 288-8390
akacou@aclufl.org
mgarcia@aclufl.org

Anne Janet Hernandez Anderson (FL Bar No. 0018092)
Paul R. Chavez (FL Bar No. 1021395)
Christina Isabel LaRocca (FL Bar No. 1025528)
Felix A. Montanez (FL Bar No. 0102763)
Cassandra Charles (NY Bar No. 5540133)*
SOUTHERN POVERTY LAW CENTER
2 South Biscayne Blvd., Suite 3750
Miami, FL 33131-1804
(786) 347-2056
aj.hernandez@splcenter.org
paul.chavez@splcenter.org
christina.larocca@splcenter.org
felix.montanez@splcenter.org
cassandra.charles@splcenter.org

Spencer Amdur (CA Bar No. 320069)*
Cody Wofsy (CA Bar No. 294179)*
ACLU Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770
samdur@aclu.org
cwofsy@aclu.org

Omar Jadwat (NY Bar No. 4118170)*
Edith Sangueza (NY Bar No. 5694534)*
ACLU Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
ojadwat@aclu.org
irp_es@aclu.org

*Attorneys for Plaintiffs*
*Admitted Pro hac vice