# Exhibit 1

# Declaration of the Farmworker Association of Florida

**Declaration of Nezahualcoyotl Xiuhtecutli**

I, Nezahualcoyotl Xiuhtecutli, declare as follows:

1. I make this declaration based on my own personal knowledge. If called as a witness, I would testify competently and truthfully to these matters.

2. I am the General Coordinator of the Farmworkers Association of Florida (FWAF), a Plaintiff in this case, *Farmworker Association of Florida, et al. v. DeSantis, et al.*, No. 1:23-cv-22655-RKA.

3. I have a PhD and Masters in anthropology from Tulane University and Bachelor of Arts and Sciences from the College of Charleston.

4. FWAF is a non-profit organization with headquarters in Apopka, Florida and offices throughout the state, including in Homestead, Fellsmere, Immokalee, and Pierson.

5. FWAF is a grassroots and community-based farmworker membership organization with nearly 12,000 members. Members pay a $20 annual fee for our services and membership card.

6. FWAF's mission is to support and build power among farmworker and rural low-income communities. FWAF's programs focus primarily on encouraging farmworkers' civic participation, building farmworker coalitions, supporting workers' rights, improving working conditions, and safeguarding farmworkers' health and safety.

7. I joined FWAF in 2016 as part of the research team. In 2018, I became research coordinator and oversaw field operations for various research projects and actively engaged both research partners and community members in the dissemination of research results through heat stress and pesticide training to educate workers on the risks of both and how to protect themselves.

1

8. I have been General Coordinator since December 2020. As General Coordinator, I function in the role of executive director of FWAF. I coordinate FWAF's programs in health and safety, workers' rights and protections, food sovereignty, and education to fulfill FWAF's mission and vision. I am responsible for leadership development, coalition building, and outreach to local media and governments to advocate for farmworkers' rights. I work with FWAF's grants manager and financial team to pursue appropriate programming and FWAF's board of directors to ensure FWAF's financial sustainability and growth.

9. FWAF has a staff of twenty-four. Our programmatic staff are divided between agroecology, climate justice, food and farmworker relief, health and safety, and organizers. Our remaining staff include administrators, a grant manager, a communications professional, facilities managers, and a clerical staff member.

10. FWAF has robust programming designed to further its mission, including agroecology; climate justice; worker health, safety, justice, civic engagement. and research.

11. FWAF's agroecology work is based on traditional agricultural practices carried out by our ancestors across the globe before our food production became industrialized and extractive. FWAF's agroecology program is part of our work on food sovereignty and environmental justice. We view the necessary change to the inequities inherent in the current food system in which we live to be rooted at the community level.

    a. As a part of our agroecology work, FWAF manages community gardens, where members of the communities we serve can decide what fruits and vegetables they would like to grow and eat, free of pesticides and chemical-laden fertilizers. FWAF uses these gardens to educate our members about traditional agricultural

   practices. We also feed the communities we serve with the food we grow. During the COVID-19 pandemic and during past hurricanes, FWAF provided food from our gardens to support our members.

  b. Until 2021, FWAF had three community gardens: one in Florida City (near our Homestead office), one in Pierson, and one in Apopka. FWAF also has small gardens behind many of its offices. In 2021, Florida City sold the land for our garden, forcing us to move many of the plantings to our smaller office gardens. This year, because we were forced to respond to the crisis brought on by SB 1718, and in particular concerns from our members about Section 10, we have struggled to maintain our garden in Pierson. We were unable to organize work crews at the Pierson garden and, as a result, in May 2023 the town of Pierson took back the land. We continue to manage a community garden in Apopka.

  c. Since the beginning of 2023, I had intended to increase our agroecology educational work through workshops. However, to do this we need to hire an agroecology coordinator to work with organizers to bring member volunteers to work in the gardens and participate in the workshops. Because our resources – both staff time and financial resources -- have been diverted to responding to SB 1718, and Section 10 in particular, I have been unable to make this hire.

12. FWAF's programming on climate justice focuses on the impact of climate change and increasing temperatures on farmworkers. FWAF intended to hire a climate justice organizer to raise awareness regarding the risks of heat stress, storms that displace workers, and the danger of drought and erosion in other states and countries which drives

migration to Florida. FWAF has not had the time to proceed with hiring for this organizer position because of the work we have had to do in response to SB 1718.

13. Much of FWAF's worker justice advocacy focuses on worker safety issues that we explore through our research. For the past ten years, FWAF has partnered with researchers at Emory University to study heat stress and conduct focus groups on its impact. FWAF uses this data to advocate through the media and directly with policymakers. We also use this data to train our members on how to identify the early signs of heat stress. Since 2019, FWAF has traveled to Tallahassee with this data to advocate for heat stress protections for workers. FWAF has also gone to Washington, DC to meet with lawmakers to discuss the need for heat stress protections for outdoor workers. This work includes FWAF's participation in the OSHA rulemaking process to make recommendations to protect outdoor workers from heat stress.

    a. FWAF's food justice program advocates with local municipalities to adopt the Good Food Purchasing Program, in which municipalities commit to obtaining food that is produced and distributed consistent with the values of the program, including a valued workforce. A valued workforce is one where the workers receive OSHA and international labor protections and have the right to organize and bargain collectively.

    b. FWAF works on access to healthcare and outreach to health clinics to make sure farmworkers receive the medical care they need. As part of this work, FWAF coordinates free clinics for members throughout the state. For some of our members, this is their only doctor's visit during the year. Due to concerns relating to SB 1718, one of these health clinics was cancelled.

4

14. In addition to FWAF's own advocacy on worker safety, FWAF works to enhance the civic engagement of its members. FWAF hosts local candidate forums, where we invite candidates to come talk to our membership and answer their questions. For larger municipalities, like Miami-Dade County, we take members to candidate forums. We also organize meetings with our members and legislators in Tallahassee, school board members, and county commissions.

15. Research has always been a core FWAF program. Our research has focused on uncovering health risks to farmworkers – in particular the risks of heat stress and pesticides – and learning how to better educate our members and farmworkers nationwide.

    a. In addition to our partnership Emory and education efforts around heat stress, we partner with Florida State University (FSU) on pesticides. We are funded to begin research with FSU and will need to build up staffing.

    b. After a delay due to lack of capacity, this summer we have begun a collaboration with the Pesticide Educational Resource Collaborative to run focus groups to evaluate what part of the Environmental Protection Agency's Worker Protection Standards training needs to be made more accessible to farmworkers.

16. FWAF serves seasonal workers as well as migrant workers who travel to Florida with the seasons to plant and harvest crops. To do so, FWAF's members travel back and forth between Florida, Georgia, and Alabama, and more northern states. This means that FWAF members often cross state lines to return to Florida multiple times per year.

17. FWAF's members include immigrants who are both documented and undocumented, including many who live permanently in Florida.

18. FWAF's members include immigrants who, if transported back into Florida following seasonal work elsewhere, would trigger a felony charge for the family member, friend, or FWAF co-worker transporting or traveling with them.

19. Many of these members entered or remained in the United States unlawfully, and now have a wide range of immigration statuses and histories. For example, FWAF members include: naturalized citizens, asylees, lawful permanent residents ("LPR"), humanitarian parole recipients, holders of a visa for temporary agricultural workers ("H-2A visa"), recipients of Deferred Action for Childhood Arrivals ("DACA"), holders of Temporary Protected Status ("TPS"), recipients of Special Immigrant Juvenile Status ("SIJS"), former unaccompanied minors who were released to relatives or sponsors and were permitted to stay in the U.S. under the custody of the Office of Refugee Resettlement ("ORR"), federal protection beneficiaries, such as persons covered under the Violence Against Women Act ("VAWA"), holders of a visa for Victims of Human Trafficking ("T visa"), holders of a visa for Victims of Criminal Activity ("U visa"), and persons possessing orders to withhold and/or defer their removal.

20. FWAF members also include people who have submitted applications for a wide range of immigration benefits that have yet to be resolved, people who are currently in removal proceedings, people who have been released from federal custody with and without federal notices to appear, and people who entered unlawfully and have not subsequently had contact with federal immigration authorities.

21. Some of these FWAF members entered the United States unlawfully and have since obtained lawful status. Others entered lawfully, such as with a visa, but are now no longer lawfully present.

22. Some members of FWAF lack the identity documents necessary to establish a presumption of lawful status or do not regularly carry these documents when traveling into Florida and are therefore at risk of lengthy detention and investigation under Section 10 of SB 1718.

23. Many of FWAF's members will be directly harmed by Section 10, as they either transport people into the state of Florida whose immigration status could trigger a felony charge under Section 10, or they themselves have the immigration status that could trigger such a felony charge, and therefore may be unable to receive transportation.

24. One FWAF member, a U.S. citizen, regularly transports fellow members (mostly co-workers) into Florida to obtain work during the planting and harvesting seasons. This U.S. citizen member regularly transports another member who initially entered the United States unlawfully and has since obtained lawful immigration status. This member obtained lawful immigration status without ever being "inspected," as that term is typically used in the INA, and is now lawfully present in the United States. The FWAF member now fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

25. Another FWAF member also regularly transports fellow members out of and into Florida based on the harvest seasons. This member regularly transports another member who initially entered the United States unlawfully several years ago and has had no contact at all with any immigration officials since his unlawful entry. The FWAF member now

fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

26. Another FWAF member also regularly transports fellow members, and others, into Florida to obtain work during the planting and harvesting seasons. This member regularly transports another member who entered the United States unlawfully and is currently in removal proceedings. The FWAF member now fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges.

27. Another FWAF member regularly travels back and forth across the Florida/Georgia state line with his mixed immigration status family to visit other family members, shop, and vacation. The family now fears taking these regular trips will expose this FWAF member to felony charges.

28. Another FWAF member, a United States citizen, lives in Florida with her mixed status family. The family often travels to North Carolina to work, and then returns home to Florida.

29. This FWAF member typically drives her parents, both of whom are also FWAF members, back into Florida. Both parents entered the United States unlawfully and are in the process of obtaining legal status through a U visa The family now fears taking these trips to and from North Carolina for work will expose this member to felony charges.

30. Not only are individual FWAF members harmed by Section 10, but FWAF as an organization has and will continue to suffer harm because of Section 10.

31. The passage of SB 1718 has already substantially diverted scarce organizational resources away from FWAF's regular activities.

32. FWAF has been inundated with questions and requests for assistance relating to travel between Florida, Georgia, and Alabama that members undertake several times a year to obtain work based on the planting and harvesting seasons.

33. FWAF staff has devoted additional time outside of their regular activities and objectives to training existing volunteers and new volunteers on Section 10 and its impact on our members and the broader immigrant community.

34. Since SB 1718 passed, and even before Section 10 went into effect, FWAF began providing Know Your Rights presentations to specifically prepare for and educate our members on the impacts of SB 1718, including Section 10. FWAF has conducted twelve Know Your Rights presentations thus far. FWAF has also held member meetings regarding SB 1718, including Section 10, and sent out information and communications to its members and the immigrant community. These efforts are outside FWAF's regular activities and have consumed valuable resources. These efforts are also ongoing and continue to drain valuable resources from FWAF that would otherwise go to our core programs encouraging farmworkers' civic participation, advancing and educating the

community on agroecology, building farmworker coalitions, supporting worker's rights, improving working conditions, and safeguarding farmworkers' health and safety.

35. FWAF staff received more calls each day since SB 1718 passed than we received prior to its passage, including calls with questions and concerns regarding travel to Florida and/or travel back into Florida, taking up significant staff member time, delaying and, in some instances, preventing staff members from completing other work necessary to the organization. Our receptionist answers the calls, but diverts them to whomever is available – most often an area coordinator. Staff have been forced to spend time on calls rather than their normal work, which has resulted in delayed Medicaid applications, food stamps applications, and applications for U.S. Department of Agriculture Farm and Food Worker Relief.

36. The increase in FWAF staff's time and focus on Section 10 is driven by the needs of FWAF's membership.

37. FWAF lacks the funds to increase its staffing to educate the community on Section 10 and its consequences. FWAF must now divert even more resources to fundraising in an attempt to address this deficit.

38. I anticipate that the community impact of Section 10, including arrests and detentions, will continue to divert FWAF's resources from its core mission of strengthening farmworker communities through its different programs and normal organizing work.

10

39. Approximately 600 families that include dues-paying FWAF members left Florida at the end of the harvest season in May 2023. Most of these members are from the Immokalee and Fellsmere areas, who travel back and forth between Florida and northern states based on the growing season. Typically, these members would return in September 2023 for the squash, zucchini, chili pepper, tomatoes, lettuce, and other vegetable planting season. However, based on based on our organizers' conversations with members, I anticipate that approximately 100 member families will not return if SB 1718 remains in effect, because they do not want to risk a felony charge.  These same member families are unlikely to return for the vegetable harvesting seasons in the Florida winter and spring. FWAF will lose many of these members, the dues from those members, and the critical in-kind donations from those members that help run FWAF's programs.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

Executed in Apopka, Florida on August __4__ , 2023.

_____
NEZAHUALCOYOTL XIUHTECUTLI