**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Civil Case No.: 1:23-cv-22655**
**JUDGE ROY K. ALTMAN**

THE FARMWORKER ASSOCIATION OF
FLORIDA, INC., *et al.*,

        Plaintiffs,

v.

RONALD D. DESANTIS, in his official capacity
as Governor of the State of Florida, *et al.*,

        Defendants.

_____

**BRIEF OF *AMICI CURIAE* AMERICAN IMMIGRATION LAWYERS ASSOCIATION**
**AND CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Mark Andrew Prada
PRADA URIZAR DOMINGUEZ, PLLC
3191 Coral Way, Suite 500
Miami, FL 33145
Cell: (786) 238-2222
Office: (786) 703.2061
mprada@pradaurizar.com

Daniel J. Melo
CAPITAL AREA IMMIGRANTS' RIGHTS
(CAIR) COALITION
1025 Connecticut Ave. NW,
Suite 701
Washington, DC 20036
Tel.:(202) 916-8180
Daniel.Melo@caircoalition.org

## <u>TABLE OF CONTENTS</u>

STATEMENTS OF INTEREST OF AMICI CURIAE ................................................................. 1

SUMMARY OF THE ARGUMENT ....................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.   A statute is impermissibly vague when it "leav[es] the people in the dark about what the law demands and allow[s] prosecutors and courts to make it up." ......................................... 2

    II.  Federal immigration law provides no useful guide to the meaning of "inspected" in SB 1718. ......................................................................................................... 4

        A.  Noncitizens' status in the U.S. is subject to a complex set of rules............................4

        B.  "Inspection," as used in federal immigration law, generally relates to the determination of inadmissibility at a port of entry. .........................................................................6

        C.  Many people who do not appear to have been "inspected" have authorized presence in the United States, and others have authorized presence without any clear or consistent answer to the question whether they were "inspected." ............................................9

    III. SB 1718 appears not to incorporate any meaning of "inspected . . . [after] unlawful entry" derived from federal law, and it's hopelessly unclear what it means. .............................17

CONCLUSION....................................................................................................................... 19

## <u>TABLE OF CITATIONS</u>

**STATUTES**

8 U.S.C. § 1101 ............................................................................................................... 6

8 U.S.C. § 1101(a)(13)(A) ..........................................................................................5, 11

8 U.S.C. § 1101(a)(13)(C)(vi) ........................................................................................ 5

8 U.S.C. § 1101(a)(15)(T) ................................................................................... 5, 13 n.7

8 U.S.C. § 1101(a)(15)(U) ............................................................................................ 17

8 U.S.C. § 1101(a)(27)(J) ............................................................................................... 6

8 U.S.C. § 1101(a)(49) ................................................................................................... 5

8 U.S.C. § 1154(a)(1)(A)(iii) ................................................................................... 12, 13

8 U.S.C. § 1154(a)(1)(D)(i)(II) ..................................................................................... 13

8 U.S.C. § 1154(a)(1)(D)(i)(IV) .................................................................................... 13

8 U.S.C. § 1157 ............................................................................................................... 5

8 U.S.C. § 1158 ............................................................................................................... 5

8 U.S.C. § 1158(a)(1) ................................................................................................... 11

8 U.S.C. § 1158(d)(2) ................................................................................................... 13

8 U.S.C. § 1159(a) .......................................................................................................... 8

8 U.S.C. § 1182 ........................................................................................................6 n.1

8 U.S.C. § 1182(a)(9)(B)(ii) .................................................................................... 12 n.6

8 U.S.C. § 1182(d)(5)(A) ...........................................................................................5, 8

8 U.S.C. § 1182(d)(14) ................................................................................................. 17

8 U.S.C. § 1187 .............................................................................................................. 7

8 U.S.C. § 1225 .............................................................................................................. 9

8 U.S.C. § 1225(a) .......................................................................................................... 9

8 U.S.C. § 1225(a)(1) ................................................................................................... 9

8 U.S.C. § 1225(a)(3) ................................................................................................ 6, 9

8 U.S.C. § 1225(b)(1) ................................................................................................... 8

8 U.S.C. § 1225(b)(1)(A)(i) .......................................................................................... 9

8 U.S.C. § 1225a ........................................................................................................... 7

8 U.S.C. § 1225(d) ........................................................................................................ 7

8 U.S.C. § 1254a ........................................................................................................... 5

8 U.S.C. § 1254a(a)(1)(A) .......................................................................................... 16

8 U.S.C. § 1254a(a)(1)(B) .......................................................................................... 16

8 U.S.C. § 1254a(c)(1)(A) .......................................................................................... 16

8 U.S.C. § 1254a(c)(2)(A)(ii) ..................................................................................... 16

8 U.S.C. § 1254a(f)(3) ................................................................................................ 16

8 U.S.C. § 1254a(f)(4) ................................................................................................ 16

8 U.S.C. § 1255(a) ................................................................................. 5, 6, 6 n.2, 12, 13

8 U.S.C. § 1255(i) .................................................................................. 5, 6, 6 n.2, 12, 13

8 U.S.C. § 1440 ........................................................................................................... 11

8 U.S.C. § 1440(a)(1) .................................................................................................. 17

8 U.S.C. § 1711 ............................................................................................................. 7

8 U.S.C. § 1752 ............................................................................................................. 7

8 U.S.C. § 1752a ........................................................................................................... 7

8 U.S.C. §1734(a) ......................................................................................................... 7

10 U.S.C. § 504(b)(2) ............................................................................................. 11, 17

SB 1718 "An Act relating to immigration", Ch. 2023-40, § 10, 2023 Fla. Laws, 20 ............... *passim*

## REGULATIONS

8 C.F.R. § 1.3(a)(4)(vi) ................................................................ 14 n.11, 15 n.14

8 C.F.R. § 1.4(c) ............................................................................................ 14 n.12

8 C.F.R. § 204.11 ............................................................................................ 14 n.8

8 C.F.R. § 204.11(f) ...................................................................................... 14 n.10

8 C.F.R. § 208.7 .................................................................................................... 13

8 C.F.R. § 214.11(d)(6) ................................................................................ 14 n.10

8 C.F.R. § 214.14(d)(2) ............................................................................. 6, 14 n.13

8 C.F.R. § 235 ........................................................................................................ 7

8 C.F.R. § 235.1(a) ................................................................................................ 8

8 C.F.R. § 235.1(b) .............................................................................................. 16

8 C.F.R. § 235.1(f)(1) ............................................................................................ 8

8 C.F.R. § 235.1(h)(1) .......................................................................................... 16

8 C.F.R. § 235.1(h)(2) .......................................................................................... 16

8 C.F.R. § 235.2 .................................................................................................... 8

8 C.F.R. § 236.21 .......................................................................................... 6, 15 n.14

8 C.F.R. § 244.3 .................................................................................................. 16

8 C.F.R. § 245.10 ................................................................................................ 13

8 C.F.R. § 274a.12(c)(8)(i) .................................................................................. 13

8 C.F.R. § 274a.12(c)(9) ...................................................................................... 13

## FEDERAL CASES

*Arizona v. United States*, 567 U.S. 387 (2012) ................................................17

*Connally* v. *General Construction Co.*, 269 U.S. 385 (1926) ..............................2

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012) ....................2, 3, 4, 18, 19

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ................................................................. 5

*Johnson v. United States*, 576 U.S. 591 (2015) ................................................................3

*Kolender v. Lawson*, 461 U.S. 352 (1983) ......................................................................4

*Lanier v. Att'y Gen.*, 631 F.3d 1363, 1366 (11th Cir. 2011) ........................................12

*Lanzetta v. New Jersey*, 306 U.S. 451 (1939)................................................................3

*Ortega-Lopez v. Barr*, 978 F.3d 680 (9th Cir. 2020) ...................................................6

*Ortiz-Bouchet v. Att'y Gen.*, 714 F.3d 1353 (11th Cir. 2013) ......................................12

*United States v. Sharp*, 27 F.Cas. 1041 (C.C. D. Pa. 1815)..........................................3

*United States v. Williams*, 553 U.S. 285 (2008) .............................................................3

*United States v. Batchelder*, 442 U.S. 114 (1979) ................................................... 3, 19

*Sanchez v. Mayorkas*, 141 S. Ct. 1809 (2021) ........................................................... 16

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2014) ........................................................... 4, 18

## BOARD OF IMMIGRATION APPEALS CASES

*Matter of Collado*, 21 I&N Dec. 1061 (BIA 1998) ......................................................6

*Matter of Espinosa Guillot*, 25 I&N Dec. 653 (BIA 2011) ..................................12

*Matter of Garnica Silva*, 2017 Immig. Rptr. LEXIS 21813 (BIA June 29, 2017) (unpublished).......17

*Matter of Quilantan*, 25 I&N Dec. 285 (BIA 2010) ............................................... 5, 8

*Matter of Robles*, 15 I&N Dec. 734 (BIA 1976) ................................................. 6, 8

*Matter of Rosas-Ramirez,* 22 I&N Dec. 616 (BIA 1999)........................................12

*Matter of V-X-,* 26 I&N Dec. 147 (BIA 2013)............................................... 11, 12

## OTHER AUTHORITIES

Congressional Research Service, "Temporary Protected Status and Deferred Enforced Departure," (updated July 28, 2023), p. 25, https://sgp.fas.org/crs/homesec/RS20844.pdf..............15

Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021) .......10

Executive Order 13269 of Jul. 3, 2002, 67 Fed. Reg. 45,287 (Jul. 8, 2002) ....................................11

Extending and Expanding Eligibility for Deferred Enforced Departure for Certain Hong Kong
     Residents, 88 Fed. Reg. 6,143 (Jan. 31, 2023) ...........................................................10

Extending and Expanding Eligibility for Deferred Enforced Departure for Liberians, 87 Fed. Reg.
     38,871 (Jun. 27, 2022) ................................................................................10

*The Federalist* No. 62 (James Madison) (Clinton Rossiter ed., 1961) ........................................3

*The Federalist* No. 48, (James Madison) (Clinton Rossiter ed., 1961) ..................................... 4

Implementation of Employment Authorization for Individuals Covered by Deferred Enforced
     Departure for Liberians, 87 Fed. Reg. 54,515 (Sept. 6, 2022) ...........................................10

USCIS, *Policy Manual*, About the Policy Manual, USCIS.GOV (August 1, 2023),
     https://www.USCIS.gov/book/export/html/68600 ...................................................8 n.5

USCIS, *Families of U.S. Armed Forces Members and Enlistees*, DHS.GOV (Nov. 20, 2014),
     https://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf
     .................................................................................................... 5-6
USCIS, *Policy Manual*, Vol. 3, Part B, Ch. 7, USCIS.GOV (August 1, 2023),
     https://www.USCIS.gov/policy-manual/volume-3-part-b-chapter-7................... 14 n.10

USCIS, *Policy Manual*, Vol. 3, Part C, Ch. 5, USCIS.GOV (August 1, 2023),
     https://www.USCIS.gov/policy-manual/volume-3-part-c-chapter-5 ......................... 15

USCIS, *Policy Manual*, Vol. 6, Part J, Ch. 4, USCIS.GOV (August 1, 2023),
     https://www.USCIS.gov/policy-manual/volume-6-part-j-chapter-4.............. 14 nn.8, 10

USCIS, *Policy Manual*, Vol. 7, Ch.2, Eligibility Requirements, § 3. Parole ("Paroled for Deferred
     Inspection"), USCIS.GOV (August 1, 2023), https://www.USCIS.gov/policy-
     manual/volume-7-part-b-chapter-2 .............................................................8

USCIS, *Policy Manual*, Vol. 7, Part B, Ch. 3, Unlawful Immigration Status at Time of Filing ([8 U.S.C.
     1255](c)(2)), USCIS.GOV (August 1, 2023), https://www.USCIS.gov/policy-
     manual/volume-7-part-b-chapter-3 ............................................................ 13

USCIS, *Policy Memorandum: Rescission of Matter of Z-R-Z-C- as an Adopted Decision; agency interpretation of
     authorized travel by TPS beneficiaries*, USCIS.GOV (July 1, 2022),
     https://www.USCIS.gov/sites/default/files/document/memos/PM-602-0188-
     RescissionofMatterofZ-R-Z-C-.pdf .......................................................... 16-17

USCIS, *Extension of Status for T and U Nonimmigrants (Corrected and Reissued)*, PM-602-0032.2 at 5,
     Policy Memorandum, USCIS.GOV,
     https://www.USCIS.gov/sites/default/files/document/memos/2016-1004-T-U-
     ExtensionPM-602-0032-2.pdf (last accessed August 1, 2022) ................................ 14 n.7

USCIS *Adjudicators Field Manual*, Ch. 38.2(d), Temporary Protected Status and Deferred Enforced Departure, USCIS.GOV, https://www.USCIS.gov/sites/default/files/document/policy-manual-afm/afm38-external.pdf (last accessed August 9, 2023)....................................10

USCIS, *Approximate Active DACA Recipients: As of March 31, 2020* at 9, USCIS.GOV (July 22, 2020), https://www.USCIS.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20Receipts%20-%20March%2031%2C%202020.pdf .......................................................................................................................14

USCIS, *Adjudicator's Field Manual*, Section 40.9.2(b)(3)(G), Inadmissibility Based on Prior Unlawful Presence, USCIS.GOV, https://www.USCIS.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf (last accessed August 9, 2023) ...................... 14 nn.9, 11

USCIS, *Adjudicator's Field Manual*, Ch. 21.1(c), Special Parole and Deferred Action Considerations, USCIS.GOV, https://www.USCIS.gov/sites/default/files/document/policy-manual-afm/afm21-external.pdf (last accessed August 9, 2023) ........................... 15, 15 nn.12,16

USCIS, *Matter of Z-R-Z-C-*, *Adopted Decision 2020-02*, USCIS.GOV (AAO Aug. 20, 2020), https://www.USCIS.gov/sites/default/files/document/aao-decisions/Matter-of-Z-R-Z-C-Adopted-AAO-Decision.pdf ........................................................................................... 16

USCIS, *Processing Times for I-918 Petition for U Nonimmigrant Status, Vermont Service Center*, USCIS.GOV, https://egov.USCIS.gov/processing-times/ (last accessed August 1, 2023) ......... 15 n.15

## STATEMENTS OF INTEREST OF AMICI CURIAE

The AMERICAN IMMIGRATION LAWYERS ASSOCIATION (AILA), founded in 1946, is a national, non-partisan, non-profit association with more than 16,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law. AILA seeks to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration and nationality law and practice. AILA's members practice regularly before the Department of Homeland Security, immigration courts and the Board of Immigration Appeals, as well as before the federal courts. AILA has participated as amicus curiae in numerous cases before the U.S. Courts of Appeals and the U.S. Supreme Court.

CAPITAL AREA IMMIGRANTS' RIGHTS COALITION (CAIR Coalition) is a nonprofit organization that provides legal services to indigent noncitizens, across the U.S., including the 11th Circuit. CAIR Coalition runs know-your-rights presentations, conducts pro se workshops, and provides legal advice and assistance to individuals in immigration detention. It further provides in-house direct representation, secures pro bono representation, and brings impact litigation on behalf of noncitizens, primarily those in detention. It also provides in-house direct representation, secures pro bono representation, and brings impact litigation on behalf of noncitizens. Each year CAIR Coalition represents hundreds of children and adults in detention who are pursuing humanitarian relief before EOIR, the BIA, and the Courts of Appeals. CAIR Coalition has an interest in ensuring that noncitizens and their families can move freely within the U.S. without fear of facing arbitrary or erroneous arrest based on state authorities' misapprehension of the inherent complexities of federal immigration law. This amicus brief is filed with the consent of the parties.

## SUMMARY OF THE ARGUMENT

Under section 10 of SB 1718, whether a person will face criminal liability for transporting a noncitizen who entered the U.S. without authorization depends on whether the noncitizen "has been inspected by the Federal Government since his or her unlawful entry." Fla. SB 1718, § 10 (2023). To understand this rule, a Florida resident needs to know what it means to have been "inspected . . . since . . . unlawful entry." But who has been "inspected" after entering the U.S. without authorization and is therefore safe to transport, and who has not been "inspected," so that transporting them is a felony?

The answer to that question is not clear, even to experienced immigration lawyers. Section 10 of SB 1718 appropriates a federal immigration-law term that is not clearly defined in federal law and – to the extent it is defined – is not applicable in this context. Federal immigration law generally focuses on migrants' inspection by government agents at the border and does little to answer the question of when a person who crosses the border without authorization may later be deemed "inspected." Instead, federal immigration law provides for a bewildering array of situations in which a person who entered the U.S. without inspection, and who may have never been "inspected" under any definition plausibly derived from federal law, may nonetheless have legal status or may be residing in the U.S. in a period of "authorized stay," including with federal work authorization. People in these statuses include asylees, Temporary Protected Status holders, military service member family members who have received "parole in place," people with Deferred Enforced Departure status, crime victims who have received U visas, Special Immigrant Juveniles, and persons who have merely applied for one of these benefits and are waiting for their applications to be processed. They may even include naturalized U.S. citizens. In some of those situations, these individuals may have met face-to-face with an immigration official. In others, they will not have. In some of those cases, such as for people with Deferred Enforced Departure, they may have never even applied for an immigration benefit.

Florida residents living under SB 1718, and wishing to conform their conduct to the law, need to know who has been "inspected." But federal law does not provide any clear definition of "inspected . . . [after] unlawful entry," and SB 1718 provides nothing in its place.

As such, SB 1718 is unconstitutionally vague. It is a bedrock principle of constitutional law that criminal laws must not leave citizens to guess at their meaning. They may not, in Justice Gorsuch's words, leave "the people in the dark about what the law demands and allow[] prosecutors and courts to make it up." Yet that is what SB 1718 does.

## ARGUMENT

### I.   A statute is impermissibly vague when it "leav[es] the people in the dark about what the law demands and allow[s] prosecutors and courts to make it up."

It is "the first essential of due process of law" that any law must give fair notice of what it is that it commands or forbids. *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012) (quoting the leading case of *Connally* v. *General Construction Co.*, 269 U.S. 385, 391 (1926)). That means that a

statute may not "forbid . . . the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.*

American law has recognized the invalidity of vague statutes from the beginning of our history. James Madison warned that democratic government was pointless if "the laws be so incoherent that they cannot be understood." The same would be true if the law required such judicial revision that "no man, who knows what the law is to-day, can guess what it will be to-morrow." *The Federalist* No. 62, at 383 (James Madison) (Clinton Rossiter ed., 1961).

In that spirit, Justice Bushrod Washington heard an early case which persons were criminally charged under a 1790 statute forbidding "any seaman [to] make a revolt in the ship." Defendants protested that "revolt" was undefined, and Justice Washington agreed. "If we resort to definitions given by philologists, they are so multifarious, and so different, that I cannot avoid feeling a natural repugnance, to selecting from this mass of definitions, one, which may fix a crime upon these men" – after all, "by making a different selection, it would be no crime at all, or certainly not the crime intended by the legislature." The charge could not go forward. "Laws which create crimes, ought to be so explicit in themselves, or by reference to some other standard, that all men, subject to their penalties, may know what acts it is their duty to avoid." *United States v. Sharp*, 27 F.Cas. 1041, 1043 (C.C. D. Pa. 1815).

When key terms in a criminal statute have neither statutory definition, narrowing context, nor settled legal meaning, so that prosecutors and judges must simply make the definitions of those terms up, then the statute is vague. *United States v. Williams*, 553 U.S. 285, 306 (2008). In such a case, members of the public cannot know what the statute prohibits them from doing. That violates a bedrock principle of our law: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *United States v. Batchelder*, 442 U.S. 114, 123 (1979) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)).

A statute may be struck down as vague notwithstanding the existence of *some* fact-situation straightforwardly falling within its language. *See Johnson v. United States*, 576 U.S. 591, 602-03 (2015) (Scalia, J.). In *Lanzetta*, *supra*, for example, one of the elements of a criminal prohibition was being "a member of a gang." The Court held that statute to be impermissibly vague; the legislature had supplied no adequate basis for deciding who was and was not in a "gang." 306 U.S. at 454-55. But the fact that there might be some hypothetical group of criminals that could reasonably be characterized as a "gang" did not save the statute from vagueness, for that fact did not supply the definition or specificity that its language lacked.

Vague statutes, the Court has stressed, have two fatal flaws. First, they fail to give notice to the individual. Second, because they provide no clear-cut standards, they enable – or encourage – discriminatory enforcement in which "policemen, prosecutors, and juries [may] pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *see also FCC*, 567 U.S. at 253. As Justice O'Connor observed tartly in *Lawson*: "The concern of our citizens with curbing criminal activity is certainly a matter requiring the attention of all branches of government. As weighty as this concern is, however, it cannot justify legislation that would otherwise fail to meet constitutional standards for definiteness and clarity." 461 U.S. at 361.

Justice Gorsuch, perhaps, put it best: Vague laws, he said, invite arbitrary power by "leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up." *Sessions v. Dimaya*, 138 S.Ct. 1204, 1224 (Gorsuch, J., concurring in part and concurring in the judgment). Without an assurance that laws supply fair notice, he continued, the rest of the Constitution risks becoming only a "parchment barrie[r]" against arbitrary power. *Id.* at 1227 (quoting *The Federalist* No. 48, at 308 (James Madison) (Clinton Rossiter ed. 1961)). Where the relevant law, abetted by traditional tools of statutory interpretation, fails to provide answers as to what a statutory term means – so that the law "leaves the people to guess about what the law demands and leaves judges to make it up" – then the Constitution demands that it be struck down. *Id.* at 1232.

## II.     Federal immigration law provides no useful guide to the meaning of "inspected" in SB 1718.

Under section 10 of SB 1718, whether a person will face criminal liability for transporting a noncitizen who entered the U.S. without authorization will depend on whether the noncitizen "has been inspected by the Federal Government since his or her unlawful entry." The apparent simplicity of the word "inspected" in that provision is deceptive, though. Noncitizens' status in the U.S. is subject to a complex set of rules, and the federal Immigration and Nationality Act (INA) provides no useful guide to the meaning of "inspected" as employed in SB 1718. Many classes of people who may have not been "inspected" in the senses in which that term appears in federal law nonetheless have legal status in the United States, or otherwise have authorization from the federal government to stay and work here.

### A. Noncitizens' status in the U.S. is subject to a complex set of rules.

Politicians and members of the public often erroneously believe that a noncitizen's status can simply be "legal" or "illegal." However, the INA outlines a far more complex system, codified at

8 U.S.C. and involving several cabinet-level agencies including the Department of Homeland Security (DHS), Department of Justice, Department of Labor, and Department of Health and Human Services. The INA anticipates several ways that noncitizens physically enter the United States and allows dozens of classifications of permanent, temporary, humanitarian, and diplomatic statuses, many of which require neither "inspection" nor a lawful entry as prerequisites.

A noncitizen can physically enter the United States in one of several ways. She may be "inspected and admitted" by a DHS officer at a port of entry, such as an airport or border checkpoint. 8 U.S.C. § 1101(a)(13)(A). This process usually involves an individual with a valid visa. However, this category also includes "procedurally regular" admissions where a person is admitted with falsified documents, or indeed with no documents at all. *See, e,g.*, *Matter of Quilantan*, 25 I&N Dec. 285, 293 (BIA 2010) (holding that a noncitizen who is "waved through" by an immigration official at a port of entry is deemed to have been "inspected and admitted," even if the noncitizen never spoke to the official or displayed any entry documents).

Alternatively, a noncitizen may present herself at a port of entry and be allowed to enter the United States despite not being "admitted." This includes cases in which individuals are granted parole under 8 U.S.C. § 1182(d)(5)(A) or are released by U.S. immigration officials without an explicit grant of parole. *See Jennings v. Rodriguez*, 138 S.Ct. 830, 844 (2018).

A noncitizen may enter without being "inspected and admitted" by walking across the border between checkpoints, *see* 8 U.S.C. § 1101(a)(13)(C)(vi), or by stowing away an aircraft or vessel, *see* 8 U.S.C. § 1101(a)(49). In those circumstances, however, her status may change after entry. She may be eligible to "adjust" her status to that of lawful permanent resident. *See, e,g.*, 8 U.S.C. § 1255(a) (self-petitioners under the Violence Against Women Act (VAWA)); 8 U.S.C. § 1255(i) (governing adjustments under the Legal Immigration Family Equity (LIFE) Act). She may receive humanitarian relief such as asylum, *see* 8 U.S.C. §§ 1157, 1158; Temporary Protected Status, for individuals from countries designated by the President as undergoing conflicts or other emergencies, *see* 8 U.S.C. § 1254a; or Deferred Enforced Departure, again for certain classes of persons designated by the President, *see infra* p. 17. If she has close family in the armed services, she may apply for "parole-in-place" after her unlawful entry, *see, e,g.*, "Families of U.S. Armed Forces Members and Enlistees" (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf. She may receive lawful status via "U" and "T" nonimmigrant visas designed to assist victims of trafficking and violent crimes. *See* 8 U.S.C. 1101(a)(15)(T), (U). She may receive Deferred Action for

Childhood Arrivals (DACA) or other "deferred action" status from a federal agency. *See* 8 C.F.R. §
236.21; *id.* § 214.14(d)(2). If she is a minor, she may receive status as a Special Immigrant Juvenile
who for reasons of abuse, abandonment, or neglect, cannot be reunited with a parent. *See* 8 U.S.C. §
1101(a)(27)(J). She may also be granted work authorization by the federal government and treated as
"lawfully present" by virtue of the fact that she has applied for one of the statuses above and is
waiting for that application to be processed. *See infra* pp. 20-21. In all of these cases, though, the
INA yields no definitive answer regarding whether the noncitizen has or has not been "inspected,"
and if so, when that inspection took place.

**B. "Inspection," as used in federal immigration law, generally relates to the
determination of inadmissibility at a port of entry.**

The INA does not define the term "inspected" or "inspection." *See* 8 U.S.C. § 1101; *Matter of
Robles*, 15 I&N Dec. 734, 735 (BIA 1976) ("The term 'inspection' is not defined in the Act."). Nor
does immigration law set out a particular status of persons who have been "inspected." Instead,
"inspection" in the INA is generally tied to the legally significant process of "admission." That is,
inspection can be part of the process used to determine if someone is lawfully admissible to the
United States and should be admitted.[1] *See* 8 U.S.C. § 1101(13)(A) (defining "admission" as the
"lawful entry" of a noncitizen into the United States "after inspection and authorization by an
immigration officer").

Under the INA, it is highly significant whether a noncitizen has been "admitted." Admission
is a component of most – though not all – routes to becoming a lawful permanent resident (LPR).
*See* 8 U.S.C. § 1255(a).[2] Whether one has been admitted affects one's procedural and substantive
rights after entering the U.S. *See generally Ortega-Lopez v. Barr*, 978 F.3d 680, 682 (9th Cir. 2020); *Matter
of Collado*, 21 I&N Dec. 1061, 1063–64 (BIA 1998). The words "inspection" and "inspected" are
generally used in the INA, federal regulations, and caselaw in reference to the process of
determining whether a person should be admitted, typically at a port of entry. *See* 8 U.S.C. §
1225(a)(3) (providing that noncitizens "who are . . . seeking admission . . . shall be inspected by

---

[1]     The INA defines various factors that may make an individual "inadmissible." In some
circumstances, noncitizens can secure waivers of inadmissibility. *See generally* 8 U.S.C. § 1182.
[2]     In some circumstances, people can secure LPR status without having been admitted. These
include people who have been paroled into the United States, *see* 8 U.S.C. § 1255(a); victims of
domestic abuse who can self-petition under VAWA, *see id.*; persons eligible to adjust status under the
LIFE Act*, see* 8 U.S.C. § 1255(i); and others.

immigration officers"). But the status of having been inspected, standing alone, has no legal significance under the INA.

The term "inspection" is thus repeatedly found in the INA in the context of provisions that govern the admission process at a port of entry. *See, e.g.*, 8 U.S.C. § 1752a (providing for "model points of entry" to be established including "enhanced queue management in the Federal Inspection Services area leading up to primary inspection"); 8 U.S.C. § 1187 (requiring data sharing under visa waiver program for officers "conducting inspections at ports of entry"); 8 U.S.C. §1225a (setting forth rules governing "preinspection" that may take place in foreign airports prior to boarding).[3] *See also* U.S.C. § 1225(d) (titled "Authority relating to inspections," and providing that immigration officers may board and search "any vessel, aircraft, railway car, or other vehicle in which they believe aliens are being brought into the United States"). There are also numerous provisions governing the staffing, training, and compensation of officers involved in inspections at ports of entry. *See, e.g.*, 8 U.S.C. § 1752 (addressing staffing levels at ports of entry to meet "flow and inspection time objectives within 45 minutes of passenger's presentation for inspection"); 8 U.S.C. §1734(a) (requiring training for consular officers "conducting inspections of applicants for admission into the US at ports of entry"); 8 U.S.C. § 1711 (salary provisions for staff including "inspectors" and "inspections assistants").[4]

Federal regulations define in more detail how an inspection at a port of entry should proceed. *See* 8 C.F.R. § 235 ("Inspection of Persons Applying for Admission"). The regulations provide that an application "to lawfully enter the United States shall be made in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection . . . ." 8 C.F.R. §

---

[3]   *See also* 8 U.S.C. § 1356 (establishing fees that can be charged for inspection services to those entering at international airports or land borders); 8 U.S.C. § 1223 (authorizing the Attorney General to enter into contracts with transportation lines for "the inspection and admission of aliens coming to the United States from foreign territory or from adjacent islands"); 8 U.S.C. § 1753(a) (authorizing "joint United States-Canada inspections projects on the international border between the two countries"); 8 U.S.C. § 1365b (rules regarding biometric exit and entry data systems in use "located at primary or secondary inspection areas"); 8 U.S.C. § 1379 (establishing biometrics identity standards for applications for visa that all "federal inspection agents at U.S. Border inspection points" can access); 8 U.S.C. § 1284 (provisions governing inspections of crewmen on vessels or aircraft).

[4]   *See also* 8 U.S.C. § 1353b (provisions to compensate officers ordered to report for duty "whether the actual inspection or examination of passengers or crew takes place or not"); 8 U.S.C. § 1776 (provision regarding training of border and immigration officials and consular officials who "inspect or review travel or identity documents"); 8 U.S.C. § 1777 (addressing staffing of "human smuggling and trafficking center" with personnel experienced in "border inspection").

235.1(a). They provide that each person "seeking admission at a United States port-of-entry must present whatever documents are required and must establish to the satisfaction of the inspecting officer that the alien is not subject to removal . . . and is entitled . . . to enter the United States." 8 C.F.R. § 235.1(f)(1). The Board of Immigration Appeals (BIA) has explained that, in an inspection at the border, "[t]he inspecting officer must be afforded a full and fair opportunity to question" the noncitizen. *Robles*, 15 I&N Dec. at 735. Thus, at a port of entry, a noncitizen "who physically presents herself for questioning and makes no knowing false claim to citizenship is 'inspected.'" *Quilantan*, 25 I&N Dec. at 293.

Federal law incorporates only limited references to "inspection" in any context other than that of the port of entry. First, federal regulations provide that if an inspection at the port of entry cannot be completed, it can be "deferred" and occur after one's entry on parole if additional time is required. *See* 8 C.F.R. § 235.2 (authorizing immigration officials to grant parole for deferred inspection). Deferred inspection, like an inspection at a port of entry, is tied to the inquiry into "admission." *See id.*; *see also* 8 U.S.C. § 1182(d)(5) (parole authority); U.S. Citizenship & Immigration Services (USCIS) *Policy Manual*, Ch. 2, Eligibility Requirements, Section 3. Parole ("Paroled for Deferred Inspection"), *available at* https://www.USCIS.gov/policy-manual/volume-7-part-b-chapter-2.[5]

In addition, federal statutes and regulations provide for reinspection after entry in the specific case of a noncitizen who entered the United States as a designated refugee, but failed to apply for LPR status within one year. In such circumstances, they "shall . . . return or be returned to the custody of [DHS] for inspection and examination for admission to the United States as an immigrant." 8 U.S.C. § 1159(a). The focus of this provision is again ultimately on whether the individual should be "admitted."

Beyond that, 8 U.S.C. § 1225 contemplates the possibility of inspections occurring outside ports of entry. First, 8 U.S.C. § 1225(b)(1), titled "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," authorizes the process of

---

[5]     The USCIS Policy Manual is "the agency's centralized online repository for USCIS' immigration policies. The Policy Manual is replacing the Adjudicator's Field Manual, the USCIS Immigration Policy Memoranda site, and other USCIS policy repositories." *See* USCIS, *Policy Manual*, "About the Policy Manual," (2023) (available at https://www.USCIS.gov/book/export/html/68600). Because USCIS is still updating and consolidating the Policy Manual, citations throughout this brief are made to it or to the still-current section of the prior Adjudicator's Field Manual or other policy memoranda in force.

expedited removal. Expedited removal may be applied to persons encountered at lawful border ports of entry, but also may be applied to persons arrested within the United States a short distance from the border, within a short time after their unlawful entry. If an immigration officer determines that an individual falling within § 1225(b)(1) is inadmissible due to a misrepresentation or a lack of a valid visa or travel document, this provision authorizes the officer to "order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." Id. § 1225(b)(1)(A)(i). Again, this inspection process is tied to determining whether someone is admissible and should be admitted.

Finally, there is a much broader sense in which 8 U.S.C. § 1225 contemplates inspections occurring outside ports of entry. The section as a whole is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." Section 1225(a)(1) defines an "alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival[])" as an "applicant for admission." Then, § 1225(a)(3) provides that persons "who are applicants for admission or otherwise seeking admission [to] the United States shall be inspected by immigration officers." These § 1225(a) provisions are not limited by their text to ports of entry. Rather, their language indicates that persons who are present in the interior of the United States, after entering the U.S. without authorization, could "be inspected by immigration officers." 8 U.S.C. § 1225(a)(3).

However, nothing in the statute or regulations makes clear where, when, or how such an inspection might take place. No legal rights turn on the answer to that question. Ultimately, as the next section of this brief will make plain, federal immigration law does not supply any clear or consistent answers as to who has been "inspected" after an unlawful entry into the U.S.

**C. Many people who do not appear to have been "inspected" have authorized presence in the United States, and others have authorized presence without any clear or consistent answer to the question whether they were "inspected."**

Many people who are authorized by statute and regulation to remain and to work in the United States have not been "inspected" in any of the senses in which federal law uses that term. Such individuals may have had numerous contacts with the federal government or may have applications for various immigration statuses pending with or granted by the federal government, but federal immigration law does not use the term "inspected" to apply to them. There is thus significant uncertainty as to how Florida officials may choose to apply Section 10 to these individuals.

9

People who have "deferred enforcement departure" ("DED") status provide a particularly salient example. USCIS described DED's legal foundation in a recent Federal Register notice:

> The authority to extend DED arises from the President's constitutional authority to conduct the foreign relations of the United States. The President can authorize DED for any reason related to this authority . . . individuals covered by DED are not subject to removal from the United States, usually for a designated period of time. Furthermore, the President may direct that certain benefits, such as employment authorization or travel authorization, be available to the noncitizens covered by the DED directive.

*See* Implementation of Employment Authorization for Individuals Covered by Deferred Enforced Departure for Liberians, 87 Fed. Reg. 54,515, 54,516 (Sept. 6, 2022); 8 C.F.R. § 1.3(a)(4)(v) (explaining that persons under DED pursuant to a decision made by the President are "lawfully present in the United States" for purposes of applying for Social Security benefits). Former President Bush first implemented DED for Liberian citizens present in the U.S. in 2007, and that decision has been extended by every President since then. *See* Extending and Expanding Eligibility for Deferred Enforced Departure for Liberians, 87 Fed. Reg. 38,871 (Jun. 27, 2022). Presidents Trump and Biden also extended DED protections to certain Venezuelans and certain residents of Hong Kong, respectively. *See* Extending and Expanding Eligibility for Deferred Enforced Departure for Certain Hong Kong Residents, 88 Fed. Reg. 6,143 (Jan. 31, 2023); Deferred Enforced Departure for Certain Venezuelans, 86 Fed. Reg. 6,845 (Jan. 25, 2021).

Because DED is rooted in the President's constitutional powers, its eligibility requirements are set within the Presidential designation or memorandum. *See* USCIS *Adjudicators Field Manual*, Ch. 38.2(d). In the case of Liberia, so long as a Liberian has been present in the U.S. since May 20, 2017, they receive protection from removal automatically, without the need to apply for it. *See* 87 Fed. Reg. 54,515 ("[T]here is no DED application form required for an individual to be covered by DED"). This is so regardless of whether they originally entered the U.S. unlawfully. *See id.* at 54,518. Thus, a Liberian who was never "inspected" by an immigration officer but who meets the eligibility criteria would be considered "lawfully present" and not subject to removal during the duration of the DED authorization period, even absent *any* affirmative act from the noncitizen, including filing an application or otherwise presenting themselves for inspection.

Nor is that the only circumstance in which a person who entered without inspection can become a U.S. citizen without federal law ever supplying a clear answer to the question whether they were "inspected." By statute, the U.S. military may accept the enlistment of a noncitizen who has

not been lawfully admitted for permanent residence despite restrictions that would otherwise prohibit this.

> [T]he Secretary concerned may authorize the enlistment of [such] a person . . . if the Secretary determines that such person possesses a critical skill or expertise—
> (A) that is vital to the national interest; and
> (B) that the person will use in the primary daily duties of that person as a member of the armed forces.

10 U.S.C. § 504(b)(2). That service member then can be naturalized as a U.S. citizen, *see* 8 U.S.C. § 1440(a)(1), so long as he serves during a time of "military hostilities." Military hostilities have existed for this purpose since September 11, 2001, according to an executive order of President George W. Bush. See E.O. 13269 of Jul. 3, 2002, 67 Fed. Reg. 45,287 (Jul. 8, 2002). But federal law does not use the term "inspection" or "inspected" to describe any portion of that process.

Another salient example of people authorized to remain in the United States, although there is no clear answer to the question whether they were inspected, involves asylees. A person who entered the U.S. surreptitiously may apply to USCIS seeking asylum. See 8 U.S.C. § 1158(a)(1) (providing that persons in the U.S. may apply for asylum "whether or not [they arrived] at a designated port of arrival and . . . irrespective of [their] status"). If a grant of asylum were an "admission," it would be reasonable to conclude that the USCIS process leading up to that grant was "inspection," because it was the process leading up to the admission decision.

But the BIA held to the contrary in Matter of V-X-, 26 I&N Dec. 147 (BIA 2013). It referenced the INA definition of "admission" at 8 U.S.C. § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean . . . the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."), and on that basis, it held that a grant of asylum is not an admission at all. Inspection and admission, in this contemplation, are generally undertaken by enforcement agents at the border. They are not implicated by an asylum grant by USCIS officials.

The BIA's holding in Matter of V-X- that an asylum grant does not constitute an admission, in other words, suggests that adjudication of an asylum application may not be an "inspection." In fact, the BIA itself noted that federal regulations "clarif[y] that a grant of asylum does not require a threshold inspection for admissibility, the sine qua non of an 'admission,' either at a port of entry or through adjustment of status. On the contrary, 8 C.F.R. § 1208.14(c) contemplates that an inspection for inadmissibility will occur only '[i]f the asylum officer does *not* grant asylum.'" 26 I&N Dec. at 151 n.3. Thus, to the extent that inspection is the process undergone by an applicant for admission – and if successful in an inspection, an applicant for admission will be admitted – it

appears to follow from Matter of V-X- that if a successful applicant for some benefit was not admitted, then that successful applicant was not inspected.

We see a similar problem when it comes to other classes of people who can become lawful permanent residents, and ultimately U.S. citizens, through the process of adjustment of status under 8 U.S.C. § 1255. Federal law supplies no clear answer as to whether they have been inspected – and Eleventh Circuit law suggests that they have not. A self-petitioner under VAWA, *see* 8 U.S.C. § 1154(a)(1)(A)(iii), or an adjustment applicant who is covered by the LIFE Act due to the filing of a visa petition on or before April 30, 2001, can adjust status to lawful permanent residence without previously being admitted or paroled. *See* 8 U.S.C. § 1255(a); *id.* § 1255(i). If that adjustment of status is an "admission," then, to the extent that inspection is the process leading up to admission, we might consider that adjudication of that person's application for adjustment of status must involve "inspection."

The BIA has held that, at least for certain purposes, adjustment of status is an admission. See, e.g., Matter of Espinosa *Guillot*, 25 I&N Dec. 653 (BIA 2011); *Matter of Rosas-Ramirez*, 22 I&N Dec. 616 (BIA 1999). The Eleventh Circuit, however, has held to the contrary. In *Lanier v. Att'y Gen.*, 631 F.3d 1363, 1366 (11th Cir. 2011), it explained that the "term 'admitted' has expressly been defined by Congress as 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer,'" and that that "definition is limited, and does not encompass a post-entry adjustment of status." *See also Ortiz-Bouchet v. Att'y Gen.*, 714 F.3d 1353, 1356 (11th Cir. 2013). Thus, it is at best unclear whether one who enters the United States without being inspected at a port of entry, and then adjusts status as a VAWA self-petitioner or under § 1255(i), has been inspected by the time they become an LPR. In the Eleventh Circuit, it appears that they have not. Moreover, even if such a person later become a U.S. citizen via naturalization, that answer will not change.

Nor is that the end of it. There are many classes of people who we cannot say were ever "inspected," but who nonetheless have legal authorization to reside or be employed in the United States. Such persons are protected against removal during their period of "authorized stay." *See* USCIS, *Policy Manual*, Vol. 7, Part B, Ch. 3 "Unlawful Immigration Status at Time of Filing ([8 U.S.C. 1255](c)(2))."[6]

---

[6]    This distinction, between those in "lawful status" and in a period of "authorized stay," derives from 8 U.S.C. § 1182(a)(9)(B)(ii) which construes unlawful presence in part as presence "after the expiration of the period of stay authorized by the Attorney General."

Some of those persons are individuals who, after entering without inspection, filed applications for immigration relief, and who received employment authorization documents from the federal government enabling them to work while their applications are pending. Imagine, for example, a person with a pending application for asylum. She initially entered the United States unlawfully and without inspection, and her application to USCIS for asylum has been pending for more than 180 days. DHS, with explicit statutory authorization, has promulgated regulations under which it may issue employment authorization to such an asylum applicant. *See* 8 U.S.C. § 1158(d)(2); 8 C.F.R. § 208.7; *id.* § 274a.12(c)(8)(i). But that applicant likely has not been "inspected." Those 180 days began to run when USCIS received the asylum application in the mail. Applicants are never interviewed or questioned by an immigration official, nor do they need to present themselves for an interview or questioning, to be eligible for or receive employment authorization.

Alternatively, a person who entered the U.S. without inspection might apply for lawful permanent residence as a VAWA self-petitioner, in circumstances including battery or extreme cruelty by that person's U.S. citizen or LPR spouse. *See* 8 U.S.C. §§ 1154(a)(1)(A)(iii) & 1255(a). While that application is pending, the U.S. government may grant such a person employment authorization under 8 C.F.R. § 274a.12(c)(9). Congress has explicitly provided that certain victims of domestic abuse are eligible for both deferred action and work authorization. 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV). Yet those people may never have been "inspected" in any sense suggested by federal immigration law. A person might apply for lawful permanent resident status under 8 U.S.C. § 1255(i) as the beneficiary of petitions or applications for labor certification filed before April 30, 2001, *see* 8 C.F.R. § 245.10. That person too is entitled to work authorization while his petition is pending, even if never "inspected."

Noncitizens who do not appear to have been inspected, but who are nonetheless remaining in the U.S. in a period of authorized stay with federal employment authorization, include victims of human trafficking seeking "T visa" immigration protection,[7] Special Immigrant Juveniles,[8] and

---

[7]     *See* 8 U.S.C. § 1101(a)(15)(T); *see also* USCIS, *Extension of Status for T and U Nonimmigrants (Corrected and Reissued),* PM-602-0032.2 at 5, Policy Memorandum, Vol. 6, Part J, Ch. 4 (establishing the availability of https://www.USCIS.gov/sites/default/files/document/memos/2016-1004-T-U-ExtensionPM-602-0032-2.pdf (last accessed August 1, 2022); 8 C.F.R. § 274a.12(c)(9) (work authorization for T-visa adjustment applicants).

[8]     *See generally* 8 C.F.R. § 204.11; USCIS, *Policy Manual*, Vol. 6, Part J, Ch. 4 (establishing the availability of "deferred action for a noncitizen with SIJ classification if the person cannot apply for adjustment of status solely because an immigrant visa number is not immediately available. Deferred

holders of Temporary Protected Status,[9] see infra pp. 15-17. Applications for all of these benefits can be approved without an interview by an immigration officer, and as a matter of course, often are.[10] Once granted, the noncitizen is authorized to remain in the U.S. and seek a work permit from USCIS.

Recipients of deferred action are in the same position. DACA beneficiaries are one set of persons in deferred action status,[11] and they are a sizeable group: as of March 2020, nearly 25,000 active DACA recipients were living in Florida. USCIS, "Approximate Active DACA Recipients: As of March 31, 2020" at 9, (July 22, 2020) (available at https://www.USCIS.gov/sites/default/files/document/data/Approximate%20Active%20DACA%20Receipts%20-%20March%2031%2C%202020.pdf). There are also beneficiaries of the deferred action program for certain family members of U.S. military personnel,[12] and persons whose U visas have been approved, but who are trapped on the years-long U visa waitlist.[13]

---

action is an act of prosecutorial discretion that defers proceedings to remove a noncitizen from the United States for a certain period of time. . . A separate request for deferred action is not required, nor will it be accepted . . . .").

[9]       USCIS Adjudicator's Field Manual, Section 40.9.2(b)(3)(G), available at: https://www.USCIS.gov/sites/default/files/document/policy-manual-afm/afm40-external.pdf (listing applicants for temporary protected status as not accruing unlawful presence while their TPS application is pending).

[10]       *See e.g.*, USCIS, *Policy Manual*, Vol. 3, Part B, Ch. 7 (citing 8 C.F.R. § 214.11(d)(6): "USCIS has discretion to interview applicants for T nonimmigrant status for purposes of adjudicating the application . . . USCIS generally does not require an interview if the record contains sufficient and evidence to approve the application without an in-person assessment."); 8 C.F.R. § 204.11(f) ("USCIS *may* interview a petitioner for special immigrant juvenile classification." (emphasis added); USCIS, *Policy Manual*, Vol. 6, Part J, Ch. 4 ("USCIS recognizes the vulnerable nature of SIJ petitioners and generally conducts interviews of SIJ petitioners only when an interview is deemed necessary. USCIS generally does not require an interview if the record contains sufficient information and evidence to approve the petition without an in-person assessment.").

[11]       *See* 8 C.F.R. § 1.3(a)(4)(vi) (noncitizens in deferred action are "lawfully present" for the purposes of certain benefits). *See also* USCIS, *Adjudicators Field Manual*, 40.9.2 (individuals granted deferred action are considered to be in a period of authorized stay and thus do not accrue unlawful presence).

[12]       USCIS may also grant some noncitizen family members of military service members, who were never inspected and admitted, what is known as "parole-in-place." *See* USCIS, *Adjudicator's Field Manual*, Ch. 21.1(c). Parole in place may be issued without an interview. Recipients, however, receive a Form I-94, which is issued in other circumstances as a record of admission or parole following inspection. *See* 8 C.F.R. § 1.4(c) (defining Form I-94 with reference to a "record of admission or arrival/departure by DHS following an inspection performed by an immigration officer").

[13]       *See* 8 C.F.R. § 214.14(d)(2) (USCIS will grant deferred action or parole to victims of criminal activity and their qualifying members who are on the "waitlist" for a U visa to become available, and they do not accrue unlawful presence during that time).

While deferred action conveys authorized presence and eligibility for work authorization,[14] noncitizens seeking deferred action—including ones without lawful inspection—are not required to have any contact with an immigration officer beyond filing their paperwork. *See, e.g.*, USCIS, *Policy Manual*, Vol. 3, Part C, Ch. 5 (describing the process for granting deferred action and employment authorization to waitlisted U visa recipients); *see generally* USCIS, *Adjudicator's Field Manual*, Ch. 21.1(c), Special Parole and Deferred Action Considerations, USCIS.GOV, https://www.USCIS.gov/sites/default/files/document/policy-manual-afm/afm21-external.pdf (last accessed August 9, 2023) (describing the process of requesting deferred action for certain family members of military service members).

In consequence, none of the following people have necessarily been "inspected" in any plausible sense in which federal law uses the term: A DACA recipient who has remained in the U.S. with DACA since 2012. A victim of domestic violence who has been told to wait years before receiving her and her family's U visa.[15] The elderly noncitizen parent of a U.S. service member, who was granted deferred action pursuant to an executive-branch policy choice to support the Department of Defense and support military members, veterans, and their families.[16]

Temporary Protected Status (TPS) raises even more thorny questions. As of March 2023, nearly 200,000 people living in Florida have TPS. *See* Congressional Research Service, "Temporary Protected Status and Deferred Enforced Departure," (updated July 28, 2023), p. 25, *available at* https://sgp.fas.org/crs/homesec/RS20844.pdf. To qualify for TPS, a noncitizen must satisfy several requirements, including (1) being a national of a country designated for TPS, (2) having been continuously physically present and continuously residing in the U.S. since the effective date of the most recent designation date of their country of origin, (3) being admissible as an immigrant (with certain inadmissibility waivers available), and (4) filing for TPS during the designated registration or

---

[14] *See* 8 C.F.R. §§ 236.21-25 (regulations codifying DACA, noting that deferred action is a form of enforcement discretion and a temporary forbearance from removal and are considered "lawfully present"); 8 C.F.R. 1.3(a)(4)(vi) (deferred action holders are considered "lawfully present" for purposes of Social Security benefits).

[15] USCIS completes roughly 80 percent of U visa cases within five years. See USCIS, I-918 Petition for U Nonimmigrant Status, Vermont Service Center (last accessed August 1, 2023) (available at https://egov.USCIS.gov/processing-times/).

[16] USCIS has described this policy as supporting the Department of Defense in several ways including 1) "building on existing USCIS and DoD initiatives and policies"; 2) "facilitating military morale and readiness"; and 3) "Ensuring consistent support for our military personnel and veterans, who have served and sacrificed for our nation, and their families." *See* USCIS, *Adjudicator's Field Manual*, Ch. 21.1(c).

re-registration period. *See* 8 U.S.C. § 1254a(c)(1)(A). TPS holders cannot be removed from the U.S. while in TPS status. 8 U.S.C. § 1254a(a)(1)(A). They are eligible for employment authorization. 8 U.S.C. § 1254a(a)(1)(B). They are also eligible to request travel authorization (allowing them to temporarily leave the U.S. and return with a USCIS-issued travel document) and are considered as being in lawful status while they have TPS. 8 U.S.C. § 1254a(f)(3)-(4). As should be clear by now, a person need not have been "inspected" in any sense in which the word is used in federal law, to have Temporary Protected Status. *See* § 1254a(c)(2)(A)(ii); 8 C.F.R. § 244.3 (unlawful entry into the United States will usually not preclude a TPS grant).

In *Sanchez v. Mayorkas*, the Supreme Court held that – as with asylum – a grant of TPS does not qualify as an "admission." 141 S. Ct. 1809, 1812–13 (2021). Like the BIA in *V-X-*, the Court relied on the fact that a TPS recipient may not have been inspected upon his entry to the United States, and on the INA's definition of "admission" as "the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." *Id.* at 1813-14.

TPS illustrates some of the uncertainty surrounding inspection in federal immigration law, though, as demonstrated by the controversy over whether TPS holders who have traveled with advanced parole and re-entered the U.S. pursuant to that lawful travel authorization have been "inspected and . . . paroled." Entry with a parole document at a port of entry typically involves inspection by an immigration officer. *See* 8 C.F.R. §§ 235.1(a), (b), (h)(1)-(2). However, in August 2020, USCIS announced that it would consider TPS holders who traveled and re-entered with advanced parole to be returning to the "same immigration status the [TPS holder] had at the time of departure." *Matter of Z-R-Z-C-*, Adopted Decision 2020-02 (AAO Aug. 20, 2020). This meant that TPS holders who had originally entered the U.S. without inspection would continue to be treated as having re-entered without inspection, despite having actually been inspected. *Id.* USCIS rescinded *Matter of Z-R-Z-C-* in 2022, s*ee* USCIS Policy Memorandum, "Rescission of Matter of Z-R-Z-C- as an Adopted Decision; agency interpretation of authorized travel by TPS beneficiaries," (July 1, 2022), *available at* https://www.USCIS.gov/sites/default/files/document/memos/PM-602-0188-RescissionofMatterofZ-R-Z-C-.pdf, but a new Presidential administration could easily reverse course again. In the meantime, there is no way for even a sophisticated observer (much less a lay person) to say reliably whether TPS holders who have traveled on advanced parole have, or have not, been inspected.[17]

---

[17]     The same ambiguity exists for DACA holders, who are also eligible to request travel authorization in the form of advanced parole.

Some of the same uncertainty plagues U visa holders, who are survivors of serious crimes committed in the U.S. who have assisted with the detection, investigation, and/or prosecution of those crimes. *See generally* § 1101(a)(15)(U). Persons may receive U nonimmigrant status even if they entered the country without inspection, *id.; see also* § 1182(d)(14), and may become lawful permanent residents under a special route set out in 8 U.S.C. § 1255(m). There thus exists a substantial number of U visa holders—and, potentially, former U visa holders who are now LPRs or even U.S. citizens—who originally entered the U.S. without inspection and may never have been inspected.

But the BIA has held, in an unpublished decision that post-dates *V-X-* while predating *Sanchez*, that the grant of a U nonimmigrant visa is an admission. *Matter of Garnica Silva*, 2017 Immig. Rptr. LEXIS 21813, *12-13, *22 (BIA June 29, 2017). The Board reasoned that the statute and regulations generally treat holders of nonimmigrant visas – of which the U visa is one – as "admitted." *Id.* at *20. Does this mean that, by implication, the BIA has held that U visa holders have also been inspected? Or has the Board's unpublished decision been overruled by the Supreme Court's dicta in *Sanchez*? Nobody knows.

### III. SB 1718 appears not to incorporate any meaning of "inspected . . . [after] unlawful entry" derived from federal law, and it's hopelessly unclear what it means.

If one were to try to read Section 10 of SB 1718 as incorporating a meaning of "inspection" extrapolated from federal law, the results would be ludicrous. As explained above, many people who are authorized by federal statute and regulation to remain in the United States, and to work in the United States, do not appear to have been "inspected" in any sense suggested by federal law. Florida cannot possibly intend to obstruct federal law and federal determinations by barring the transportation of any such person.

For example, as noted above, we cannot say that individuals granted asylum have been "inspected" as a matter of federal law.  Yet SB 1718 appears to make it illegal to transport them. Florida has no constitutional authority to bar from transportation those whom the federal government, in accordance with a validly enacted statute implementing international treaties, has determined should be protected from persecution in their home countries. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (state law will be preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). The same is true for the other categories of individuals described above, including, say, an immigrant who entered the United States unlawfully, was granted asylum, enlisted in the U.S. military under 10 U.S.C. § 504(b)(2), and who later became a U.S. citizen under 8 U.S.C. § 1440. If this were the case, it would

be a criminal offense to transport such a military veteran within Florida. To state this proposition should be to refute it.

In the absence of a definition drawn from federal law, what does SB 1718 mean, and who is covered? Does a person gain "inspected" status, under Florida law, only if she has been questioned by a federal immigration officer (something not true of many of the classes of persons we have described)? Is she "inspected" if she has filed a document with the federal government by postal mail? If the federal government has sent a document back? Would such a rule exclude DED beneficiaries, who need not have made any application at all? Indeed, how is a law enforcement officer to know what an individual's DED classification is?

None of these questions have answers. There are persons in a bewildering array of federal immigration statuses who might be thought either to have been "inspected," or not to have been "inspected," as SB 1718 uses the term. Federal law provides no clear answer. Immigration attorneys would not know how to answer -- let alone ordinary people subject to the law, or the local police officers who would be called upon to enforce it. No reasonable person could be expected to parse all these nuances when deciding to give a friend a ride to Florida, and a law enforcement officer could not reasonably determine what kind of immigration classification someone had during a traffic stop, on pain of criminal sanctions.

Section 10 of SB 1718, in other words, has no core of fixed meaning. People "of common intelligence must necessarily guess at its meaning and differ as to its application." *FCC*, 567 U.S. at 253. It gives no guidance allowing "the ordinary person [to] intelligently choose, in advance, what course it is lawful for him to pursue." *Connally*, 269 U.S. at 393. It violates the rule that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Batchelder*, 442 U.S. at 123. It "leav[es] the people in the dark about what the law demands and allow[s] prosecutors and courts to make it up." *Sessions*, 138 S.Ct. at 1224 (Gorsuch, J., concurring in part and concurring in the judgment). It is irreparably vague.

18

## CONCLUSION

For all these reasons, *amici* urge the Court to grant Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

**s/ Mark Andrew Prada**
Fla. Bar No. 91997
PRADA URIZAR DOMINGUEZ, PLLC
3191 Coral Way, Suite 500
Miami, FL 33145
Cell: (786) 238-2222
Office: (786) 703-2061
mprada@pradaurizar.com
*Counsel for American Immigration Lawyers Association*

Daniel J. Melo
N.C. Bar No. 48654
CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION
1025 Connecticut Ave. NW, Suite 701
Washington, DC 20036
Tel.: (202) 916-8180
Daniel.Melo@caircoalition.org
*Counsel for Capital Area Immigrants' Rights (CAIR) Coalition*
(Pro hac vice admission forthcoming)