### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-22655-ALTMAN/Reid

**THE FARMWORKER ASSOCIATION
OF FLORIDA, INC.,** *et al.*,

     *Plaintiffs,*

*v.*

**ASHLEY MOODY,** *in her official capacity
as the Attorney General of the State of Florida, et al.,*[1]

     *Defendants.*

_____/

### <u>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION</u>

The Plaintiffs have filed a Motion for Preliminary Injunction under Federal Rule of Civil Procedure 65(a) (the "Motion") [ECF No. 30], along with a Memorandum in Support of that Motion for Preliminary Injunction (the "Memorandum") [ECF No. 30-1]. For the reasons we outline below, the Motion for Preliminary Injunction is **GRANTED**.[2]

### THE FACTS

On May 10, 2023, Governor DeSantis signed into law Senate Bill 1718 ("SB 1718"), which amended FLA. STAT. § 787.07 to impose criminal penalties on anyone "who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government

---

[1] This litigation was originally styled *The Farmworker Association of Florida, Inc., et al. v. Ronald DeSantis, et al.*, 23-cv-22655-ALTMAN. But, since we've dismissed Governor DeSantis from the case, we hereby **ORDER** the Clerk of Court to restyle the litigation as follows: *The Farmworker Association of Florida, Inc., et al. v. Ashley Moody, et al.*, 23-cv-22655-ALTMAN.

[2] The Motion is ripe for resolution. *See* Defendants' Response to Plaintiffs' Motion for Preliminary Injunction (the "Response") [ECF No. 50]; Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Preliminary Injunction (the "Reply") [ECF No. 67].

since his or her unlawful entry from another country." Complaint for Injunctive Relief and Declaratory Judgment (the "Complaint") [ECF No. 1] ¶¶ 65–66 (quoting FLA. STAT. § 787.07). Section 10 of SB 1718 provides, in its entirety, as follows:

(1) Except as provided in subsections (3), (4), and (5), a person who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) A person commits a separate offense for each individual he or she transports into this state in violation of this section.

(3) A person who transports a minor into this state in violation of subsection (1) commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(4) A person who commits five or more separate offenses under this section during a single episode commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(5)
   (a) A person with a prior conviction under this section who commits a subsequent violation of this section commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
   (b) As used in paragraph (a), the term "conviction" means a determination of guilt that is the result of a plea agreement or a trial, regardless of whether adjudication is withheld or a plea of nolo contendere is entered.

(6) Proof that a person knowingly and willfully presented false identification or gave false information to a law enforcement officer who is conducting an investigation for a violation of this section gives rise to an inference that such person was aware that the transported individual has entered the United States in violation of the law and had not been inspected by the Federal Government since his or her unlawful entry.

(7) A person who is arrested for a violation of this section must be held in custody until brought before the court for admittance to pretrial release in accordance with chapter 903.

*Id.* ¶ 66 (quoting FLA. STAT. § 787.07).

The Plaintiffs filed their Complaint on July 17, 2023, suing "Defendants Ronald D. DeSantis, Governor of the State of Florida, Ashley Moody, Attorney General of the State of Florida, Nicholas B. Cox, Statewide Prosecutor," and the state attorneys for all twenty of Florida's judicial circuits. *Id.* at 3. The organizational Plaintiff, the Farmworker Association of Florida, Inc. (the "Farmworker Association" or "FWAF"), is a "grassroots and community-based farmworker membership

organization" whose mission is to "support and build power among farmworker and rural low-income communities." *Id.* ¶¶ 15–16. "FWAF serves seasonal workers as well as migrant workers who travel with the seasons to harvest crops. To do so, FWAF's members travel back and forth between Florida, Georgia, and Alabama, crossing back into Florida multiple times per year." *Id.* ¶ 17. The individual Plaintiffs "belong to mixed-status families, churches, and communities." Motion to Proceed Anonymously [ECF No. 29] at 1. "Their family members include U.S. citizens, Special Immigrant Juvenile Status ('SIJS') and Deferred Action for Childhood Arrivals ('DACA') applicants, and undocumented immigrants." *Ibid.* The Plaintiffs allege that "Section 10 of [SB 1718], Ch. 2023-40, Laws of Fla. ('Section 10') unconstitutionally criminalizes the act of transporting a broad category of immigrants into Florida." Complaint ¶ 1; *see also id.* ¶ 10 ("This action challenges Section 10 to prevent imminent harm that Plaintiffs and other Floridians, including both U.S. citizens and noncitizens, will suffer as the law goes into effect and is implemented. Plaintiffs seek injunctive and declaratory relief to bar such egregious unconstitutional actions from occurring in their communities."). We dismissed Governor DeSantis from this case on December 21, 2023, because we found that (1) the Plaintiffs didn't have standing to sue him, and (2) he was immune from the claims the Plaintiffs advanced in their Complaint. *See* Order Granting Motion to Dismiss [ECF No. 84].

On February 9, 2024, we denied the Plaintiffs' Motion to Proceed Anonymously, *see* Order Denying the Motion to Proceed Anonymously [ECF No. 86], and ordered the Plaintiffs to appear on the Docket using their own names, *see* Order Requiring Certificates of Interested Parties [ECF No. 87]. After we entered our Order Denying the Motion to Proceed Anonymously, two Plaintiffs—G.D.L. and M.G.—filed Notices of Voluntary Dismissal [ECF Nos. 90–91]. The seven remaining individual Plaintiffs then appeared by name. *See* Plaintiffs' Certificate of Interested Persons and Corporate Disclosure Statement [ECF No. 92]. In this Order, therefore, we'll use the Plaintiffs' full names, even where their declarations (or the parties' papers) originally referred to them by their initials.

3

The Plaintiffs now ask us to enter a preliminary injunction enjoining the Defendants from enforcing Section 10 of SB 1718. We held a preliminary-injunction hearing on December 13, 2023, where the parties presented their oral arguments. *See* Minute Entry [ECF No. 83]; *see also* Dec. 13, 2023, Hr'g Tr. [ECF No. 85]. This Order follows.

## THE LAW

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the 'burden of persuasion' as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (cleaned up). Those four familiar factors are: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005).

A showing of irreparable injury is "the sine qua non of injunctive relief" and is the most important of the four factors. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (cleaned up). To satisfy this standard, the "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). And a showing of irreparable injury "must be neither remote nor speculative, but actual and imminent." *Ne. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990); *see also Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). Still, a district court cannot grant a preliminary injunction unless the moving party satisfies *all four* of the requirements. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("Because Wreal must meet all four prerequisites to obtain a preliminary injunction, failure to meet even one dooms [his request].").

"[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue," district courts must hold an evidentiary hearing on the propriety of injunctive relief. *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1312 (11th Cir. 1998) (citing *All Care Nursing Serv.,* 887 F.2d at 1538 (cleaned up)). At that hearing, the court sits as factfinder. *See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1211 (11th Cir. 2003) ("Where conflicting factual information places in serious dispute issues central to a party's claims and much depends upon the accurate presentation of numerous facts, the trial court errs in not holding an evidentiary hearing to resolve these hotly contested issues." (cleaned up)).

In our case, we set an evidentiary hearing on the Plaintiffs' Motion, at which all parties had the opportunity to present evidence and to advance their respective positions. Despite this opportunity, the parties decided *not* to present any evidence and to proceed *only* with their written briefings (as supplemented by lengthy oral presentations). *See* Dec. 13, 2023, Hr'g Tr. at 4:22–24 ("THE COURT: Are you going to put on any evidence at all for any of these motions? [PLAINTIFFS' COUNSEL]: No, Your Honor."); *see also id.* at 5:1 ("THE COURT [referring to defense counsel, who did not object]: So neither are you."); *id.* at 67:17–19 ("THE COURT: All right. We'll take that up— with no evidence, right, just argument? [PLAINTIFFS' COUNSEL]: Correct.").

### ANALYSIS

### I.    Standing

As a threshold matter, the Defendants contend that *all* the Plaintiffs lack standing to seek a preliminary injunction here. *See* Response at 5. We disagree. To establish his standing under Article III of the U.S. Constitution, a plaintiff must have suffered an "injury in fact" that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). "Where only injunctive relief is sought, *only one plaintiff* with standing is required." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333

(N.D. Ga. 2018) (emphasis added & cleaned up); *see also ACLU of Fla., Inc. v. Byrd*, 608 F. Supp. 3d 1148, 1153 (N.D. Fla. 2022) (Winsor, J.) ("[W]hen multiple plaintiffs seek injunctive relief, only one needs to show standing."); *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] *[a]t least one* plaintiff must have standing to seek each form of relief requested in the complaint." (emphasis added)). In our case, *at least* one Plaintiff has standing to pursue this preliminary injunction.

Take, for example, Andrea Mendoza Hinojosa. She's suffered an injury in fact because she's established "a realistic danger of sustaining direct injury" from "the statute's operation or enforcement." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1257 (11th Cir. 2012). In her Declaration, after all, she avers that she's transported undocumented immigrants (and is "100% willing to" continue transporting *at least one* undocumented immigrant) into the State of Florida, but (she says) she "believe[s] [she] should not have to risk jail time in order to get them life-saving care or to help them attend an appointment with USCIS, or for any other legitimate reason." Declaration of Andrea Mendoza Hinojosa (the "Mendoza Decl.") [ECF No. 30-4] ¶¶ 14, 17. And her reluctance to engage in conduct she would otherwise have engaged in is sufficient to show an injury in fact. *See W. Va. ex rel. Morrisey v. U.S. Dep't of the Treas.*, 59 F.4th 1124, 1137 (11th Cir. 2023) ("A plaintiff need not 'expose himself to liability' to have standing to challenge the enforcement of a law." (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007))).

Ms. Mendoza's injury is also directly traceable to the passage of SB 1718, which she says prevents her from "do[ing] [her] job effectively" and "help[ing] people in [her] community." Mendoza Decl. ¶ 17; *see also id.* ¶¶ 5, 14, 17 ("Transporting individuals with various immigration statuses, including individuals who have never had any contact with immigration authorities, is a key part of my job . . . . SB 1718, however, has made me extremely anxious that my efforts to help [people who have not been inspected by the federal government] may result in significant jail time and prosecution

for me . . . . I operate my nonprofit on a limited budget, and I would face extreme financial hardship if forced to pay for my release on bond or for my criminal defense if I were arrested.").

Finally, Ms. Mendoza's injury would be redressed by an injunction against the enforcement of Section 10 because, with the statute enjoined, her conduct would no longer put her at risk of arrest or prosecution. *See* Order Granting Motion to Dismiss at 4 ("In many cases, 'redressability and traceability overlap as two sides of a causation coin.'" (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005))).

Carmenza Aragon has likewise established her standing to pursue this injunction. Ms. Aragon planned to drive her undocumented grandson—who has a petition pending for Special Immigrant Juvenile Status—from Florida to Georgia to visit family members who live in Georgia. *See* Declaration of Carmenza Aragon (the "Aragon Decl.") [ECF No. 30-7] ¶¶ 5–6; *see also id.* ¶ 6 ("My grandson and I traveled to Georgia for a visit with family last October, and we were planning to go again this year."). She then planned to drive her grandson back from Georgia to Florida. *Ibid.* Since the passage of SB 1718, however, Ms. Aragon "had to give up [her] trip to Georgia[.]" *Id.* ¶ 7. And this harm—not being permitted to travel with her grandson to Georgia—is ongoing: "I do not know when we will be able to go back to visit our family. Now that the transport law is in place, I am afraid to travel with my grandson. If I am traveling with him, I could be stopped and arrested for breaking the new transport law if the police believe I am transporting him. That idea fills me with panic . . . . I am getting older, and time with my loved ones is important." *Ibid.* Having felt compelled to cancel her trip to see family *because* she reasonably feared arrest under Section 10—and having been prevented from taking her grandson to Georgia at any time since—Ms. Aragon has shown that she, too, has suffered (and continues to suffer) an injury in fact, even though she hasn't put herself at risk of an actual arrest. As the Eleventh Circuit explained in *Taylor v. Polhill*:

> Taylor has sufficiently alleged an injury in fact. Taylor challenges the Pre-Sale Testing Statute's constitutionality, arguing both that the statute violates his right to due process

and that it is preempted by federal law. In his complaint, Taylor alleges that, prior to giving up his license, he was a state-licensed hearing aid specialist for thirty years and had operated his own hearing aid retail store for over twenty-six years. Taylor also alleges that "[b]ut for Florida's prohibition for dispensing hearing aids without using its required fitting procedures and equipment, [he] would immediately begin dispensing hearing aids." In other words, the only thing keeping Taylor from dispensing hearing aids is the threat of enforcement of the allegedly unconstitutional Pre-Sale Testing Statute. And, as Florida's statutory scheme for dispensing hearing aids has been enforced against Taylor in the past, the chance that it will be enforced against him in the future is not speculative. Taylor is thus put in the position of either refraining from conduct he alleges to be unconstitutionally prohibited or engaging in such conduct and exposing himself to enforcement. The Constitution does not require that Taylor expose himself to enforcement of the statute before he can challenge the statute. Hence, Taylor has properly alleged an injury in fact.

964 F.3d 975, 980–81 (11th Cir. 2020). So, too, here: But for Section 10, Ms. Aragon would be driving her grandson to visit family in Georgia. And we have no reason to think that enforcement of Section 10 is unlikely or merely speculative.[3]

A third Plaintiff, Maria Medrano Rios, has suffered an almost-identical injury in fact. In her words:

> I had planned to travel with my family to Texas, so that my children could visit their cousins and so that I could spend time with my brother and sister. I'd spoken to my brother and sister about this trip, and I told my children about it—everyone was very excited . . . .
>
> Now, though, we can't take this trip. It is just too big a risk for my children and me. [My daughter] does not have an immigration case, and does not have any immigration status, even though she has applied for DACA. So, I am scared that she is not allowed to be brought back into Florida if we leave. And I don't know whether I can be driven back into Florida either, since I don't have any official status. I have a case in immigration court, where I am working to get immigration protection, and I have a

---

[3] As we'll discuss in more detail later, the Defendants claim that these Plaintiffs lack standing because "the individuals they plan to transport have been 'inspected'" within the meaning of Section 10. Response at 9. They therefore promise that "[t]hese Plaintiffs face no credible threat of prosecution." *Ibid.* But the Supreme Court has "warn[ed] against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities.'" *Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395 (1988)). Since we're "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable *and* readily apparent," *Boos v. Barry*, 485 U.S. 312, 330 (1988) (emphasis added), we think enforcement against the individual Plaintiffs is sufficiently likely to satisfy Article III standing.

> work permit based on this case, but the case is not yet completed. Because of this, *I'm fearful* that our family could be stopped and arrested coming back home[.]

Declaration of Maria Medrano Rios (the "Medrano Rios Decl.") [ECF No. 30-8] ¶¶ 8, 10 (emphasis added). As with Ms. Aragon, the "only thing keeping [Ms. Medrano Rios] from" visiting her family outside of Florida is the looming threat of arrest under Section 10—which the Plaintiffs allege is unconstitutional. *See Taylor*, 964 F.3d at 980. Since Ms. Medrano Rios has been put in the position of either refraining from conduct she alleges to be unconstitutionally prohibited or engaging in the proscribed conduct and exposing herself to arrest and prosecution, she's established an *ongoing* injury in fact. *See* Medrano Rios Decl. ¶ 10 (noting that "I'm fearful"—present tense—"that our family could be stopped and arrested coming back home"). And both Ms. Aragon's and Ms. Medrano Rios's injuries are directly traceable to the passage of SB 1718 and would be redressed by an injunction against Section 10.

Resisting, the Defendants argue that the individual Plaintiffs lack standing because their "conduct does not violate the statute."[4] Response at 10. In support of this view, the Defendants offer the following narrowing construction of Section 10:

> Section 787.07(1) provides that "a person who knowingly and willfully transports into this state an individual whom the person knows, or reasonably should know, has

---

[4] The Defendants also contend that Ms. Mendoza *specifically* lacks standing because she "offers no *concrete* plans" to violate Section 10 in the future. Response at 10 (emphasis added). But Article III doesn't require a plaintiff to give us an *exact* date and time for her plans. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 n.2 (1992) (recognizing that "'imminence' is concededly a somewhat elastic concept"). Ms. Mendoza avers that she regularly drives "individuals who have never had any contact with immigration authorities" into Florida. Mendoza Decl. ¶ 5. She also tells us that she knows a "middle-aged undocumented woman from the state of Yucatan, Mexico," who (when Ms. Mendoza wrote her Declaration) was receiving emergency dialysis in a hospital in Georgia. *Id.* ¶¶ 11, 13. Although Ms. Mendoza was not sure "how long" this woman would be in Georgia, she was "100% willing to transport her to Florida . . . to get the care she needs." *Id.* ¶¶ 13–14. We think that's sufficiently imminent under the circumstances. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1340 (11th Cir. 2013) ("Immediacy is an elastic concept . . . . Plaintiff Houston has traveled to Miami-Dade County on a regular basis in the past and expects to do so in the near future . . . . That is enough[;] Houston has frequently visited the area near the store in the past and will maintain the same frequency in the future." (cleaned up)).

entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry" commits a felony . . . .

[T]he term "inspected" refers to any instance in which the federal government can decide whether to take action against a person. To "inspect" something is to "examine [it] officially," "to look carefully," or to "make an examination." Inspect, Webster's Third International Dictionary 1170 . . . . "Inspected" thus denotes an opportunity to examine a person, not a final decision on the person's admissibility or legal status. *Cf. Matter of G*, 3 I. & N. Dec. 136, 138 (BIA 1948) (explaining that being "inspected" means giving immigration officials an opportunity to question an alien) . . . .

Indeed, in federal law, an "inspection" is complete even if no decision is made as to admission. *See, e.g.*, 8 U.S.C. § 1225(a)(2) (discussing referring an alien for further proceedings "[u]pon inspection"); 19 U.S.C. § 1459(a), (d) (requiring individuals arriving in the United States to present themselves "for inspection"); *see also Matter of Quilantan*, 25 I. & N. Dec. 285, 293 (BIA 2010) (defining "inspected and admitted" (emphasis added)). And federal law mandates inspections even if a person is encountered in the interior years after unlawful entry. *See* 8 U.S.C. § 1225(a)(1) (defining "applicant for admission" to include "[a]n alien present in the United States who has not been admitted"); 8 U.S.C. § 1225(b) (requiring all applicants for admission to be inspected).

In light of the above, most of Plaintiffs' concerns about § 787.07 are simply misplaced. Visa holders, DACA recipients, and aliens with pending applications for asylum or removal proceedings have all been "inspected" because they have notified the federal government of their presence, and the federal government can decide whether to take immediate action. To be sure, Plaintiffs contest this reading. But in a pre-enforcement challenge, it is enough that the statute "could be read" in the manner offered by the State Defendants. *See Arizona*, 567 U.S. at 413–15[.]

*Id.* at 3–5.

The Defendants, in short, insist that the individuals our Plaintiffs want to transport into Florida *have* "been inspected under § 787.07[.]" *Id.* at 10; *see also id.* at 11 ("The person [Ms. Medrano Rios] wishes to transport across state lines is her daughter, who has a pending application with federal authorities for DACA benefits. Under § 787.07, her daughter has been 'inspected,' and [Ms. Medrano Rios's] conduct would not violate the challenged statute."); *ibid.* (same as to Ms. Aragon's grandson, "who has a pending petition with federal authorities for a change in status"). On the Defendants' reading of Section 10 of SB 1718, therefore, the conduct of these three Plaintiffs *doesn't* violate the statute—a reality that deprives them of standing.

But the Defendants cannot use their own (narrow) construction of Section 10 to defeat the Plaintiffs' standing. In *Morrisey*, for instance, thirteen states "sued the Treasury Secretary and related officials to challenge a tax offset provision in the American Rescue Plan Act, a coronavirus stimulus package passed by Congress in 2021." 59 F.4th at 1131–32. The Secretary argued that the "States lack standing to challenge the offset provision because the Secretary has not initiated a recoupment action against any of them." *Id.* at 1135. According to the Secretary, "the offset provision does not proscribe the States' conduct because 'its text makes clear' that States may cut taxes so long as they 'pay' for a tax cut without using Rescue Plan funds." *Id.* at 1137. In the Eleventh Circuit's view, however, "[t]his argument—that the offset provision is clear—goes to the merits of the States' claims, not their standing to raise them." *Ibid.* "When we assess standing," the court explained, "we 'must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.'" *Ibid.* (quoting *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016)). Applying this principle, the Circuit came to the same conclusion we reach here:

> Reviewing the text of the statute for standing purposes, we believe the States have shown that the offset provision *arguably* proscribes their conduct. The offset provision prohibits states from using federal funds to "either directly or indirectly offset a reduction in the[ir] net tax revenue" resulting from a change in state law "during the covered period that reduces any tax . . . or delays the imposition of any tax or tax increase." 42 U.S.C. § 802(c)(2)(A). Money is fungible. By prohibiting both direct and "indirect" offsets, the provision *arguably* proscribes a state from accepting the money if it enacts any tax cut.

*Id.* at 1137–38 (emphases added).

And that's consistent with the way courts in our Circuit have treated similar attempts by attorneys general to undermine a plaintiff's standing by offering narrowing interpretations of a statute. *See, e.g., Shen v. Simpson*, 2023 WL 5517253, at *1, 4 (N.D. Fla. Aug. 17, 2023) (Winsor, J.) (emphasis added & cleaned up) ("The challenged law, codified at Florida Statutes § 692.201–.204, . . . . restricts land purchases by any '[f]oreign principal,' which it defines to include anyone 'who is domiciled in a

foreign country of concern and is not a citizen or lawful permanent resident of the United States.' . . . . The State [d]efendants argue that as a matter of Florida law, none [of the plaintiffs] is domiciled in China because each intends to reside in Florida indefinitely. The relevant issue, though, is whether [p]laintiffs' conduct is '*arguably* . . . proscribed by' the new law . . . . And [plaintiffs] Shen, Wang, and Liu have shown that they are arguably domiciled in China and risk violating §§ 692.203 and 692.204. The new law, which does not independently define 'domicile,' 'sweeps broadly,' . . . and arguably applies to [p]laintiffs." (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014))); *cf. Stenberg*, 530 U.S. at 940 ("We cannot accept the Attorney General's narrowing interpretation of [a state] statute. This Court's case law makes clear that we are not to give the Attorney General's interpretative views controlling weight."). As these cases make plain, the government cannot, in its response to a preliminary-injunction request, introduce a novel, narrowing construction of a statute and then demand that we make standing determinations based on that untested, non-binding interpretation. On the contrary, when standing is challenged, we must "assume that on the merits the plaintiffs would be successful in their claims." *Morrisey*, 59 F.4th at 1137.

Nor are the Defendants right to say that, "in a pre-enforcement challenge, it is enough that the statute 'could be read' in the manner offered by the State Defendants." Response at 5 (quoting *Arizona v. United States*, 567 U.S. 387, 413 (2012)). In *Arizona*, the Supreme Court invoked the constitutional-avoidance doctrine in resolving *the merits* of an injunction—*not* (as here) in assessing the petitioners' *standing* contentions. *See Arizona*, 567 U.S. at 413–14 ("Some who support the challenge to § 2(B) argue that, in practice, state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status . . . . But § 2(B) could be read to avoid these concerns. To take one example, a person might be stopped for jaywalking in Tucson and be unable to produce identification. The first sentence of § 2(B) instructs officers to make a 'reasonable' attempt

12

to verify his immigration status with ICE if there is reasonable suspicion that his presence in the United States is unlawful."). The standard the Court applied in *Arizona* is therefore inapposite here.

In fact, as we've said, when it comes to standing, a plaintiff need only show that his "intended future conduct is *arguably* proscribed by the statute." *Susan B. Anthony List*, 573 U.S. at 162 (emphasis added & cleaned up); *see also Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) ("The Supreme Court's opinion in *Susan B. Anthony List* makes clear that courts are to consider whether the plaintiff's intended conduct is 'arguably proscribed' by the challenged statute, not whether the intended conduct is *in fact* proscribed."); *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 217–18 (5th Cir. 2023) ("[The plaintiff] has standing if its intended action—continuing with its 'plant-based' labels that use meat-esque words—is arguably proscribed. And here, it is: the Act arguably sweeps broadly enough to capture [the plaintiff's] conduct . . . . While [the plaintiff's] interpretation may not be the best interpretation, the test doesn't require that.").

As we've suggested, the conduct of the three Plaintiffs we've discussed above is at least *arguably* proscribed by Section 10. The Defendants counter that these individual Plaintiffs lack standing because the people they "wish[ ] to transport across state lines" have "pending application[s] with federal authorities," and "Visa holders, DACA recipients, and aliens with pending applications for asylum or removal proceedings have all been 'inspected'" within the meaning of SB 1718. Response at 4, 11. Specifically, the Defendants suggest that individuals with pending immigration applications have "been 'inspected' because they have notified the federal government of their presence, and the federal government can decide whether to take immediate action." *Id.* at 4. But it's not clear to us that the Defendants' interpretation of Section 10 is the correct one.

As the Defendants concede, "[t]o 'inspect' something is to 'examine [it] officially,' 'to look carefully,' or to 'make an examination.'" *Id.* at 3 (quoting *Inspect*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1170 (1993)). And other dictionaries similarly define the verb "inspect"

13

to mean (1) "to view closely in critical appraisal"; and (2) "to examine officially." *Inspect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/inspect (last visited May 21, 2024). "Absent a legislatively supplied definition," as the Defendants note, "we give [words their] 'plain and ordinary meaning' at the time of the statute's enactment, and we often look to contemporaneous dictionaries for evidence of that meaning." Response at 4 (quoting *Tsuji v. Fleet*, 366 So. 3d 1020, 1028 (Fla. 2023)). That's a problem for the Defendants here because, as each of these definitions makes clear, the word "inspect" focuses on the actions of (and denotes some examination by) the inspector. He, after all, is the subject who must "*examine* officially," "*look* carefully," "*make* an examination," "*view* closely," etc. By any of these definitions, then, a person who submits an application to the USCIS *without* any evidence that some inspector actually "*examined* [it] officially," "*looked* [at it] carefully," or "*viewed* [it] closely" would appear not to have been "inspected."

To circumvent the plain meaning of the word "inspect," our Defendants add words and phrases that don't appear in any of the available definitions. So, for instance, they say that the word "'[i]nspected' . . . denotes an *opportunity* to examine a person, not a final decision on the person's admissibility or legal status." Response at 4 (emphasis added). But we've seen no definition of "inspect" that includes "an *opportunity* to examine"—and it's not our role to "add[ ] to what the text states or reasonably implies (*casus omissus pro omisso habendus est*)." A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012). Had the Florida legislature intended to exclude from the statute's coverage *both* people who had been inspected *and* those who had given the examiners an *opportunity* to inspect them, then the Defendants' arguments would have some merit. But it's our job to interpret the law as it was actually written—not the one the Defendants wish the legislature had promulgated. *See Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where [the legislature] knows how to say something but chooses not to, its silence is controlling." (cleaned up)); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume

that [the legislature] has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when [the legislature] has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *cf. Savage Servs. Corp. v. United States*, 25 F.4th 925, 935 (11th Cir. 2022) (refusing to read into the Oil Pollution Act a waiver of sovereign immunity because the legislature "knows how to waive sovereign immunity when it wants to"). Given that the plain meaning of the word "inspect" denotes careful or official examination, we cannot agree with the Defendants that simply giving USCIS the *opportunity* to review an application qualifies as an "inspection."[5]

Since we're here addressing the Defendants' claim that the individual Plaintiffs lack standing—and given the Plaintiffs' plausible reading of the law—we think these three Plaintiffs' conduct is *arguably* proscribed by Section 10 of SB 1718. We also think that the Farmworker Association has standing to challenge Section 10. "[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008). In *Browning*, the Eleventh Circuit held that the organizational plaintiff had standing because it made a "sufficient showing" that it "will have to divert personnel and time to educating volunteers and voters on compliance with Subsection 6 and . . . [t]hese resources would

---

[5] The Plaintiffs separately note that the Board of Immigration Appeals ("BIA") has interpreted the word "inspect" to require an *in-person* interaction with immigration officials. In *Matter of Quilantan*, for example, the BIA held that "an alien who *physically presents* herself for questioning and makes no knowing false claim to citizenship [has been] 'inspected[.]'" 25 I. & N. Dec. 285, 293 (BIA 2010) (emphasis added); *see also In the Matter of G-*, 3 I & N Dec. 136, 138 (BIA 1948) ("[W]e have always held that an alien who *physically presents* himself for questioning is 'inspected' even though he volunteers no information and is asked no questions by the immigration authorities." (emphasis added)). While these passages aren't dispositive on the meaning of the word "inspection" as it appears in *our* statute, they do (like the dictionary definitions quoted above) cast doubt on the Defendants' claim that "aliens with pending applications" have been "inspected" simply "because they have *notified* the federal government of their presence[.]" Response at 4.

otherwise be spent on registration drives and election-day education and monitoring." 522 F.3d at 1165–66. Similarly, in *Common Cause*, the Circuit found that the NAACP had standing because it "divert[ed] resources from its regular activities to educate and assist [affected individuals] in complying with the [challenged] statute[.]" *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009). And, in *Georgia Latino*, the court held that the organizational plaintiffs had standing because they "diverted resources to educate their members, staff, and volunteers on the consequences of the [challenged] law." 691 F.3d at 1260; *see also ibid.* ("The enactment of H.B. 87 caused [the plaintiff] [Coalition of Latino Leaders] to receive an increased number of inquiries about the law, forcing it to divert volunteer time and resources to educating affected members of the community and fielding inquiries. As a result, CLL has cancelled citizenship classes to focus on these effects. According to CLL, 'these problems will only get worse if the bill goes into effect.'" (cleaned up)).

As with the organizational plaintiffs in these cases, the Farmworker Association has shown, through a sworn Declaration from its General Coordinator, that it's had to divert resources away from its regular activities to educate and assist affected individuals in their efforts to comply with Section 10 of SB 1718. *See* Declaration of Nezahualcoyotl Xiuhtecutli (the "Xiuhtecutli Decl.") [ECF No. 30-3] ¶ 11(c) ("Since the beginning of 2023, I had intended to increase our agroecology educational work through workshops. However, to do this we need to hire an agroecology coordinator . . . . Because our resources—both staff time and financial resources—have been diverted to responding to SB 1718, and Section 10 in particular, I have been unable to make this hire."); *id.* ¶ 34 ("FWAF has [ ] held member meetings regarding SB 1718, including Section 10, and sent out information and communications to its members and the immigrant community. These efforts are outside FWAF's regular activities and have consumed valuable resources. These efforts are [ ] ongoing and continue to drain valuable resources from FWAF that would otherwise go to our core programs encouraging farmworkers' civic participation, advancing and educating the community on agroecology, building

16

farmworker coalitions, supporting worker's rights, improving working conditions, and safeguarding farmworkers' health and safety."); *id.* ¶ 38 ("I anticipate that the community impact of Section 10, including arrests and detentions, *will continue* to divert FWAF's resources from its core mission of strengthening farmworker communities through its different programs and normal organizing work." (emphasis added)). Given that the Farmworker Association "claim[s] injuries analogous to those present in *Common Cause* and *Browning*, we are satisfied that [it] meet[s] the minimum requirements of Article III." *Ga. Latino*, 691 F.3d at 1260.[6] We're therefore satisfied that *at least* one Plaintiff has standing to challenge the constitutionality of Section 10.

## II.     Substantial Likelihood of Success on the Merits

### a.     Due Process

The Plaintiffs say that they're likely to succeed on the merits for two main reasons. *First*, they argue that "Section 10 [of SB 1718] is preempted" in several ways. Memorandum at 9. *Second*, they contend that "Section 10 violates the Due Process Clause because it is unconstitutionally vague." *Id.* at 17. We'll begin our analysis with the Plaintiffs' due-process argument, which (as we've suggested) we "find to be [their] least persuasive argument[.]" Dec. 13, 2023, Hr'g Tr. at 80:11–12.

The Plaintiffs insist that Section 10 violates the Due Process Clause of the Fourteenth Amendment "because it fails to provide ordinary citizens with notice of the conduct it prohibits and invites arbitrary and discriminatory enforcement." Memorandum at 17. In their view:

> Section 10 makes it a felony to transport into Florida a passenger who "has not been inspected by the Federal Government since his or her unlawful entry." Ch. 2023-40, § 10, at 11-12, Laws of Fla. (amending § 787.07(1), (3)-(5)(a), Fla. Stat. (2022)). But Section 10 does not define what it means to be "inspected" "since" entry. The legislative history of Section 10 indicates that lawmakers sought to use the terms as they are understood in immigration law, but as explained above, immigration law does not contain that category or say what it means. *Supra* Part I.A.iii. And since people's

---

[6] The Defendants advance several additional arguments about the Farmworker Association's alleged injury, *see* Response at 6–9, which apply with equal force to the irreparable-harm prong of the preliminary-injunction test. So, we'll address—and reject—those arguments in that section below.

immigration pathways can take hundreds of different forms, Section 10 leaves Floridians guessing as to which pathways show an "inspection" "since" entry and which ones do not . . . .

[C]itizens of ordinary intelligence and law enforcement officers charged with enforcing this law are left with no hope of understanding what Section 10 prohibits and to whom it applies. This, alone, is unconstitutional. But the extremely high stakes of Section 10 - which impose mandatory pre-trial criminal detention and felony culpability - make the law's vagueness even more constitutionally intolerable.

*Id.* at 17, 20. We disagree.

Even accepting that the words "inspected" and "since" are subject to *some* interpretation, we cannot conclude that the Plaintiffs are *likely* to succeed on the merits of their due-process claim because "[t]he mere fact that a statute requires interpretation does not necessarily render it void for vagueness." *Barr v. Galvin*, 626 F.3d 99, 108 (1st Cir. 2010). And, while "the Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties, . . . absolute precision in drafting laws is not demanded." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982). Instead, "[u]nconstitutionally vague statutes are those which are not subject to reasonable interpretation" whatsoever. *United States v. Vincent*, 2022 WL 1401463, at *12 (N.D. Ga. May 3, 2022) (cleaned up); *see also Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013) ("[F]acial vagueness occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct . . . . [I]f persons of reasonable intelligence can derive a core meaning from a statute, then the enactment may validly be applied to conduct within that meaning and the possibility of a valid application necessarily precludes facial invalidity." (cleaned up)).

As we've suggested, Section 10 has *at least* one reasonable interpretation—that "a person is inspected . . . if he physically presents himself for questioning." Reply at 10 (cleaned up). On this interpretation, the Plaintiffs maintain that merely mailing (or emailing) an "application for an immigration benefit" to USCIS does not "mean[ ] a person has 'been inspected.'" *Id.* at 10 & n.8.

Because we agree with the Plaintiffs that theirs is a reasonable interpretation of Section 10, we have trouble concluding that the statute is so vague that it fails to put reasonable people on notice of its meaning. *See United States v. Williams*, 553 U.S. 285, 304 (2008) (holding that a law is "void for vagueness" if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement"). In any event, without guidance from Florida's state courts (much less the Florida Supreme Court) on the meaning of Section 10, we hesitate to declare the statute vague—and, therefore, invalid. *See Wainwright v. Stone*, 414 U.S. 21, 22–23 (1973) ("The judgment of federal courts as to the vagueness or not of a state statute *must* be made in the light of prior state constructions of the statute. For the purpose of determining whether a state statute is too vague and indefinite to constitute valid legislation we must take the statute as though it read precisely as the highest court of the State has interpreted it." (emphasis added & cleaned up)).[7]

More importantly, the Plaintiffs concede that their own conduct has been criminalized by Section 10. *See* Motion to Proceed Anonymously at 13 ("[The Plaintiffs] engage in and, in the future, intend to engage in activity that Florida has newly criminalized—that is, driving or traveling with their noncitizen family members or members of the communities they serve into Florida . . . . Under Section 10 of SB 1718, this activity exposes them to mandatory arrest and detention [and] prosecution on

---

[7] The Plaintiffs add that "Florida legislators rejected numerous amendments that would have replaced 'inspected' with clearer language," including language that would have replaced the phrase "has not been inspected by the Federal Government" with the phrase "has not contacted an official or office of the United States government in person, virtually or by telephone or email." Memorandum at 18–19. They say that the "statutory history and legislative history of Section 10 further highlight the incoherence of 'inspected' in this statute." *Id.* at 18. But this presumes that the Defendants' interpretation of the statute—as proscribing the interstate travel only of individuals who *either* have been inspected *or* have given the government an *opportunity* to inspect them—is the correct one. As we've indicated, we're quite skeptical of this construction. In any event, the fact that the Florida legislature *could* have "chosen clearer and more precise language equally capable of achieving [its objective] does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 94 (1975) (cleaned up).

felony charges[.]"); Memorandum at 20 ("Individual Plaintiffs and FWAF members transport into Florida family members, co-workers, and others who entered unlawfully and who likely have not been 'inspected' for purposes of Section 10, in possible violation of the law . . . . Under the broad language of Section 10, Plaintiffs and FWAF members face arrest, prosecution, mandatory detention, and family separation."). Since the "statutory provision at issue clearly proscribes *some* conduct in which the challenger[s] engage[ ]"—at least according to the Plaintiffs—"the challenger[s] cannot complain of the statute's vagueness." *Case v. Ivey*, 542 F. Supp. 3d 1245, 1270 (M.D. Ala. 2021) (emphasis added) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)).

And that makes sense. If the Plaintiffs are confident that their family members and colleagues "*likely* have not been 'inspected' for purposes of Section 10," Memorandum at 20 (emphasis added), they cannot simultaneously say that the statute is so vague as to be "incoherent," *id.* at 19. And no one seems to be disputing the statute's application to the transportation of illegal immigrants who've *never* encountered the federal government. *See* Response at 1 ("The challenged statute prohibits knowingly transporting individuals across state lines . . . when the federal government has had no opportunity to inspect them following an illegal border crossing."); *see also Ala. Educ. Ass'n v. State Superintendent of Educ.*, 746 F.3d 1135, 1140 (11th Cir. 2014) (reversing district court's grant of a preliminary injunction on vagueness grounds because "[s]ome of [the challengers'] conduct indisputably falls within the [a]ct's definition of political activity, and therefore the challengers cannot bring a facial challenge arguing the term is vague based on other applications"); *J&B Social Club, No. 1, Inc. v. City of Mobile*, 920 F. Supp. 1241, 1247 (S.D. Ala. 1996) ("As for the plaintiffs' claim of facial vagueness, the ordinance clearly is not vague *in all of its applications*. There is no question that it prohibits topless female dancing in a bar such as the one owned and operated by the plaintiffs." (emphasis added)).

Similarly, in our case, the Plaintiffs concede—in fact, they insist—that Section 10 prohibits at least *some* of their conduct. *See, e.g.*, Reply at 7 ("Defendants bizarrely suggest that Section 10 only

'indirectly' 'discourage[s]' undocumented immigrants 'from entering the State.' . . . . But Section 10 flatly prohibits their transport into the state, and criminalizes providing it."). We thus cannot agree that persons of reasonable intelligence would be unable to derive a "core meaning" from Section 10. S*ee* Motion to Proceed Anonymously at 1 ("Plaintiffs bring this lawsuit challenging a law that will criminalize their families' and friends' travel into Florida[.]"). The Plaintiffs, in short, haven't shown that they're likely to succeed on the merits of their due-process claim.

    **b. Preemption**

    The Plaintiffs' preemption arguments are far stronger. As the Plaintiffs see it, "the Eleventh Circuit has squarely held, as a matter of both field and conflict preemption, that states cannot regulate the transport of immigrants, because federal law fully occupies that field and displaces even complementary state regulation. That clear holding is fatal to Section 10 and [is] sufficient to resolve this case." Memorandum at 9. In their view, because the "federal transport and harboring regime [ ] contained in 8 U.S.C. § 1324 . . . . establish[es] 'an overwhelmingly dominant federal interest in the field' of 'entry, movement, and residence of aliens in the United States,'" *id.* at 9–10 (quoting *Ga. Latino*, 691 F.3d at 1264), "field preemption 'foreclose[s] *any* state regulation in the area,'" *id.* at 10 (quoting *Arizona*, 567 U.S. at 401).

    There are three ways in which federal law can preempt state law. *First*, "express 'pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law.'" *Nat'l Ass'n of State Util. Consumer Advos. v. FCC*, 457 F.3d 1238, 1252 (11th Cir. 2006) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986)). *Second*, "conflict preemption occurs 'when there is outright or actual conflict between federal and state law.'" *Ibid.* (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 368). *Third*, "[f]ield preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Browning*, 522 F.3d at 1167 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). But, as

the Supreme Court has explained, "the categories of preemption are not rigidly distinct," and "field pre-emption may be understood as a species of conflict pre-emption[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000). In other words, a state law that's field preempted necessarily "conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990). We'll therefore address the Plaintiffs' arguments on field and conflict preemption together.

The Eleventh Circuit has been clear that, through the Immigration and Nationality Act ("INA"), Congress "provided a full set of standards to govern the unlawful transport and movement of aliens." *Ga. Latino*, 691 F.3d at 1264 (cleaned up). In our Circuit's view, therefore, "a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue." *Ibid.* As the Circuit has explained (reviewing a Georgia law that placed prohibitions on transporting undocumented immigrants):

> [S]ection 7 [of the Georgia law] creates three distinct state criminal violations: (1) transporting or moving an illegal alien, O.C.G.A. § 16–11–200(b); (2) concealing or harboring an illegal alien, *id.* § 16–11–201(b); and (3) inducing an illegal alien to enter the state of Georgia, *id.* § 16–11–202(b). Each of these offenses requires that the accused also be engaged in another criminal activity, and each further requires that the accused know of the illegal status of the subject. The State Officials argue that the district court erred in finding that section 7 is preempted by the criminal provisions of the INA, particularly 8 U.S.C. § 1324. We disagree.

> To determine the intent of Congress, we first look to the text of the relevant federal statutes. The INA provides a comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens. Pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv), it is a federal crime for any person to transport or move an unlawfully present alien within the United States; to conceal, harbor, or shield an unlawfully present alien from detection; or to encourage or induce an alien to "come to, enter, or reside in the United States." Any person who conspires or aids in the commission of any of those criminal activities is also punishable. *Id.* § 1324(a)(1)(A)(v). Section 1324(c) permits local law enforcement officers to arrest for these violations of federal law, but the federal courts maintain exclusive jurisdiction to prosecute for these crimes and interpret the boundaries of the federal statute. *See id.* § 1329. Subsection (d) of § 1324 further dictates evidentiary rules governing prosecution of one of its enumerated offenses, and subsection (e) goes so far as to mandate a community outreach program to "educate the public in the United States and abroad about the penalties for bringing in and harboring aliens in violation of this section." Rather than

authorizing states to prosecute for these crimes, Congress chose to allow state officials to arrest for § 1324 crimes, subject to federal prosecution in federal court. *See id.* §§ 1324(c), 1329. In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law . . . .

We are further convinced that section 7 presents an obstacle to the execution of the federal statutory scheme and challenges federal supremacy in the realm of immigration. By confining the prosecution of federal immigration crimes to federal court, Congress limited the power to pursue those cases to the appropriate United States Attorney. *See* 8 U.S.C. § 1329; *Arizona*, 132 S.Ct. at 2503 (explaining that if the state provision came into force, states would have "the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies"). Indeed, the State Officers have taken the position that an individual driving an unlawfully present alien to the supermarket could be prosecuted under section 7 and under the similar provisions of the INA . . . . This contention illustrates the State Officers' misunderstanding of the nature of federal immigration law and the reach of state authority in the realm of immigration-related law enforcement.

*Id.* at 1263–66. In other words, outside of the states' congressionally bestowed authority to make arrests for violations of federal immigration law, the states are "prohibited from enacting concurrent state legislation in this field of federal concern." *United States v. Alabama*, 691 F.3d 1269, 1285 (11th Cir. 2012). This framework allows the federal government to retain "control over enforcement" of the INA and protects the "integrated scheme of regulation created by Congress." *Ga. Latino*, 691 F.3d at 1266.

In *Alabama*, the Eleventh Circuit examined an Alabama statute that "create[d] state crimes for (1) concealing, harboring, or shielding an unlawfully present alien from detection, or attempting to do so; (2) encouraging or inducing an unlawfully present alien to 'come to or reside in' Alabama; (3) transporting, attempting to transport, or conspiring to transport an unlawfully present alien, including an alien's conspiracy to be transported; and (4) harboring an unlawfully present alien by entering into a rental agreement with that alien." 691 F.3d at 1285. As we've said, citing *Georgia Latino*, the *Alabama* Court held that "Alabama is prohibited from enacting concurrent state legislation in this field of federal concern." *Id.* at 1287.

And several other circuits have come out the same way. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025–26 & n.17 (9th Cir. 2013) (holding that an Arizona law that was "virtually indistinguishable" from "[t]he Georgia law in [*Georgia Latino*]" was field preempted because of the "comprehensive nature of § 1324, its place within the INA's larger structure governing the movement and harboring of aliens, and § 1324(c)'s explicit but limited provision for state involvement"); *United States v. South Carolina*, 720 F.3d 518, 530–31 (4th Cir. 2013) ("Sections 4(B) and (D) of the Act make it a state felony to 'transport, move or attempt to transport' or 'conceal, harbor or shelter' a person 'with intent to further that person's unlawful entry into the United States' or to help that person avoid apprehension or detection . . . . We find the Eleventh Circuit's reasoning persuasive. Sections 4(B) and (D) of the Act are field preempted because the vast array of federal laws and regulations on this subject . . . is so 'pervasive that Congress left no room for the States to supplement it.' . . . . Furthermore, the sections are conflict preempted because 'there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" (cleaned up & quoting *Arizona*, 567 U.S. at 399)); *Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3rd Cir. 2013) ("We agree with the Eleventh Circuit and other courts that have held that 'the federal government has clearly expressed more than a "peripheral concern" with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.'" (quoting *Ga. Latino*, 691 F.3d at 1264)). As the Defendants themselves recognize, the federal circuit courts have uniformly ruled that "prohibitions on the transportation, harboring, and inducement of unlawfully present aliens" fall into a "preempted field." Response at 15 (quoting *Ga. Latino*, 691 F.3d at 1266).

Still, the Defendants argue that Section 10 is neither field nor conflict preempted because it regulates *a bit more* than just the transportation of undocumented immigrants. That's because, in their view, the phrase "has not been inspected by the Federal Government since his or her unlawful entry

from another country" could refer to "alien[s] or citizen[s]." *Ibid.* In other words, according to the Defendants, "[Section] 787.07 does not regulate aliens, and it does not turn on a person's unlawful presence. Rather, whether alien or citizen, legally present or illegally present, individuals may not be transported into Florida unless the federal government has had the opportunity to 'inspect' them." *Id.* at 15–16. The Plaintiffs, they add, "present no argument that Congress has exclusively occupied the field of 'transporting individuals who have not been inspected across state lines.'" *Id.* at 16.

We're not persuaded. For one thing, common sense dictates that the category of uninspected *citizens*—as opposed to uninspected *aliens*—covers a relatively small (and statistically insignificant) subset of people. At our preliminary-injunction hearing, the Defendants agreed that this group would be composed of "U.S. citizens" coming back from, say, "the Bahamas with a bunch of people on [a] boat, or drugs[.]" Dec. 13, 2023, Hr'g Tr. at 97:16–19. This is undoubtedly a "miniscule category[.]" Reply at 6. For another, the Supreme Court has made clear that, "[w]here Congress occupies an entire field, . . . even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. This is because "[f]ield preemption reflects a congressional decision to foreclose *any* state regulation in the area, even if it is parallel to federal standards." *Ibid.* (emphasis added); *see also KVUE, Inc. v. Moore*, 709 F.2d 922, 931 (5th Cir. 1983) ("If preempted, a complementary or supplementary state regulation is as invalid as one directly conflicting with the federal scheme, for preemption forbids state regulation either to advance or to retard the federal purpose."). In this case, it'd be difficult to argue that Section 10 is not at least complementary to the federal immigration scheme: The parties agree that, under Eleventh Circuit precedent, states may not enact laws that regulate the "unlawful transport and movement of aliens,"[8] *Ga. Latino*, 691 F.3d at 1264, and Section 10—by its own terms—regulates the

---

[8] *See* Response at 15 ("The first step in evaluating field preemption is to identify a field . . . . Yet Plaintiffs do not clearly indicate the applicable field. Instead, they cite [*Georgia Latino*] ad nauseum . . . . In that case, however, the preempted field was 'prohibitions on the transportation, harboring, and inducement of *unlawfully present aliens*.'").

"knowing[ ] and willful[ ] transport[ ] into this state [of] an individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country," Complaint ¶ 66 (quoting FLA. STAT. § 787.07(1)). It's thus preempted under *Georgia Latino*—even if the Defendants are right that, in addition to regulating uninspected aliens, the law *also* targets the small number of *citizens* who might fall within its ambit.

As to the Defendants' claim that "[section] 787.07 does not regulate aliens," Response at 15, the Plaintiffs are right that SB 1718, "[t]he bill that enacted Section 10[,] is titled 'An act relating to immigration.'" Reply at 7. The day he signed SB 1718, Governor DeSantis announced in a press release that "[t]he legislation I signed today gives Florida the most ambitious anti-illegal immigration laws in the country, fighting back against reckless federal government policies and ensuring the Florida taxpayers are not footing the bill for illegal immigration." Press Release [ECF No. 30-13] at 9. Senator Blaise Ingoglia, who sponsored the bill, echoed that sentiment: "Our Southern Border has been dealing with a manmade crisis under the ineptness of President Biden, allowing more than 6.3 million illegal immigrants to flood our border . . . . Today, under the leadership of Governor Ron DeSantis, Florida made history signing into law the strongest state-led anti-illegal immigration bill ever brought forth." *Ibid.* And the Defendants themselves concede that "the statute may have some effect on the transportation of unauthorized aliens[.]" Response at 16. It therefore stretches credulity for the Defendants to suggest that Section 10 "does not directly regulate the transportation of illegal aliens" and "merely overlaps with federal law in *some* of its applications[.]" *Id.* at 17 (emphasis added).

In any event, we've found no precedent for the Defendants' view that a party can circumvent field or conflict preemption by marginally expanding a regulation to cover a small, additional category of situations (or people). The Defendants, recall, say that, "[w]hile the statute may have some effect on the transportation of unauthorized aliens," it could also affect "citizen[s]" who have not been

"inspected" by the federal government. *See id.* at 15–16. But our courts have routinely rejected similar arguments. The state law in *Fuentes-Espinoza v. People*, for example, provided that a person commits a class 3 felony "if, for the purpose of assisting another person to enter, remain in, or travel through the United States or the state of Colorado in violation of immigration laws, he or she provides or agrees to provide transportation to that person in exchange for money or any other thing of value." 408 P.3d 445, 447 (Colo. 2017). Like our law, this Colorado statute regulated a broader set of people than just undocumented immigrants—*viz.*, anyone who violated the immigration laws. Still, the Supreme Court of Colorado held, citing *Georgia Latino*, that the law was preempted by the INA "under the doctrine of field preemption." *Id.* at 452. The court reasoned that Congress has "evince[d] [an] intent to maintain a uniform, federally regulated framework for criminalizing and regulating the transportation, concealment, and inducement of unlawfully present aliens, and this framework is so pervasive that it has left no room for the states to supplement it." *Id.* at 452.

Similarly, in *Valle del Sol*, the Arizona law at issue "swe[pt] more broadly than its federal counterpart by adding a new category of prohibited activities." 732 F.3d at 1028. Specifically, the Arizona law "criminalize[d] encouraging or inducing an alien to come to or reside in Arizona," while the federal harboring statute, 8 U.S.C. § 1324, "criminalizes encouraging or inducing an alien to come to or reside in the United States but [ ] does not penalize encouraging or inducing aliens, already in the United States, to travel from state to state or into any particular state." *Ibid.* Nonetheless, the Ninth Circuit held that the state law was preempted because, "although it shares some similar goals with 8 U.S.C. § 1324, it 'interfere[s] with the careful balance struck by Congress with respect to' the harboring of unauthorized aliens." *Id.* at 1026 (quoting *Arizona*, 567 U.S. at 406); *see also id.* at 1027 ("[The Arizona law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes . . . . As the Eleventh Circuit explained: '[I]nterpretation of [state harboring] crimes by state courts and enforcement by state prosecutors unconstrained by federal law threaten the

uniform application of the INA.'" (quoting *Ga. Latino*, 691 F.3d at 1266)). We agree. As these cases demonstrate, broadening a state law to complement (or to extend just beyond) the federal immigration-transport scheme doesn't shield that state law from field preemption.

Like the laws in *Georgia Latino*, *Alabama*, *Valle del Sol*, *South Carolina*, *Lozano*, and *Fuentes-Espinoza*, Section 10 is both field and conflict preempted. Congress has established an "overwhelmingly dominant federal interest in the field" of unlawfully transporting aliens. *Ga. Latino*, 691 F.3d at 1264. And our Circuit has said unambiguously that *only* the federal government—through the INA—can regulate the unlawful transportation of aliens within that field. *See ibid.* ("Like the federal registration scheme addressed in *Arizona*, Congress has provided a 'full set of standards' to govern the unlawful transport and movement of aliens . . . . The INA comprehensively addresses criminal penalties for these actions undertaken within the borders of the United States, and a state's attempt to intrude into this area is prohibited because Congress has adopted a calibrated framework within the INA to address this issue." (quoting *Arizona*, 567 U.S. at 401)). Under Section 10, however, "an individual driving an unlawfully present alien to the supermarket could be prosecuted" by the Office of Statewide Prosecution and the state attorney—a scenario that, in the words of the *Georgia Latino* Court, "illustrate[d] the State Officers' misunderstanding of the nature of federal immigration law and the reach of state authority in the realm of immigration-related law enforcement." *Id.* at 1265–66. And the Defendants' chief objection—that Section 10 *might* also apply to a tiny swathe of U.S. citizens who haven't been "inspected" after an illegal border crossing—cannot override the Eleventh Circuit's clearly stated view that "criminal acts of harboring and transporting unlawfully present aliens constitute an impermissible 'complement' to the INA that is inconsistent with Congress's objective of creating a comprehensive scheme governing the movement of aliens within the United States." *Id.* at 1266; *see also Hines v. Davidowitz*, 312 U.S. 52, 66–67 (1941) ("[W]here the federal government, in the exercise of its superior authority in [a] field, has enacted a complete scheme of regulation, . . . states

cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.").

By making it a felony to transport into Florida someone who "has not been inspected by the Federal Government since his or her unlawful entry," Section 10 extends beyond the state's authority to make *arrests* for violations of federal immigration law and, in so doing, intrudes into territory that's preempted. *See Ga. Latino*, 691 F.3d at 1264 ("In the absence of a savings clause permitting state regulation in the field, the inference from these enactments is that the role of the states is limited to arrest for violations of federal law [governing the transport or movement of an unlawfully present alien within the United States]."); *Lozano*, 724 F.3d at 316–17 (rejecting the argument that, "by authorizing state and local officials to arrest individuals guilty of harboring, *see* 8 U.S.C. § 1324(c), Congress specifically invited state and local governments into this field"). For all these reasons, we hold that the Plaintiffs are likely to succeed on the merits of their conflict- and field-preemption claims.[9]

### III.   Irreparable Injury

For the second prong of the preliminary-injunction test, the party seeking the injunction must show that "irreparable injury will be suffered unless the injunction issues[.]" *Schiavo*, 403 F.3d at 1231. The individual Plaintiffs contend that, if we don't enjoin Section 10, they will "suffer irreparable harm by being placed at immediate risk of arrest, detention, and prosecution[.]" Memorandum at 20. They add that some "[i]ndividual Plaintiffs and FWAF members transport into Florida family members, co-workers, and others who entered [the United States] unlawfully and who likely have not been

---

[9] Because we've found that the Plaintiffs are likely to succeed on the merits of their conflict- and field-preemption claims, we needn't reach the Plaintiffs' other preemption arguments—*viz.*, that Section 10 is preempted because it conflicts with the "federal removal scheme," Memorandum at 12, because it "impermissibly creates a novel immigration classification," *id.* at 13, or because it "disrupts the adjudication of immigration applications and removal proceedings," *id.* at 16.

'inspected' for purposes of Section 10, in possible violation of the law . . . . Under the broad language

of Section 10, Plaintiffs and FWAF members face arrest, prosecution, mandatory detention, and family

separation . . . . The threat of pre-trial detention and subsequent felony prosecution is severe harm

that cannot be undone." *Ibid.*

Having reviewed the declarations of the three individual Plaintiffs who have established their

standing to sue, we think that these three Plaintiffs have also shown that, absent an injunction, they

would suffer irreparable injury. Ms. Mendoza, for instance, attests that she is willing to continue

engaging in illegal conduct—thus risking actual or imminent criminal prosecution:

> Transporting individuals with various immigration statuses, including individuals who
> have never had any contact with immigration authorities, is a key part of my job[.]
> Currently, I spend about 30% of my time assisting people with transportation. In the
> past ten years, I have driven individuals into Florida dozens of times. These
> transportation services include taking people in my personal vehicle from Georgia to
> Florida for various reasons, including to see medical specialists in Jacksonville, Florida.
>
> I also personally transport [undocumented immigrants] to appointments with [USCIS]
> for fingerprinting and other services. Some immigrants in my nonprofit's area are
> directed to attend USCIS appointments in Jacksonville, even though they reside in
> Georgia . . . .
>
> One of the women in my community was released from the hospital a week or so ago
> after being admitted for renal failure. Her stomach had been getting bloated and she
> had no idea how close to death she was. She is a middle-aged undocumented woman
> from the state of Yucatan, Mexico . . . . I am 100% willing to transport her to Florida
> or anywhere else she needs to go to get the care she needs. SB 1718, however, has
> made me extremely anxious that my efforts to help this woman may result in
> significant jail time and prosecution for me.

Mendoza Decl. ¶¶ 5–6, 11, 14.

Ms. Mendoza is likely to suffer irreparable injury because "[t]he threat of criminal prosecution

. . . constitutes irreparable harm" for purposes of a preliminary injunction. *ABC Charters, Inc. v. Bronson*,

591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008) (Gold, J.); *see also Ga. Latino*, 691 F.3d at 1269 (affirming

the "district court's conclusion that [p]laintiffs have met their burden to enjoin enforcement of section

7" because the "[p]laintiffs are under the threat of state prosecution for crimes that conflict with

federal law, and . . . enforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable"); *Valle del Sol*, 732 F.3d at 1029 (holding that the individual plaintiff had "established a likelihood of irreparable harm" by "demonstrat[ing] a credible threat of prosecution under the statute"). So too here. Ms. Mendoza has established, through a sworn filing, that she faces a kind of Hobson's choice—between engaging in conduct she views as unconstitutionally proscribed (and facing a credible threat of prosecution under Section 10) and refraining from conduct she believes to be lawful. That's sufficient to establish irreparable harm under our precedents.

As for Mmes. Aragon and Medrano Rios, their declarations suggest that they're now too afraid to travel in and out of Florida with their undocumented friends or family members—for fear of being arrested or prosecuted or of having their family members deported. These Plaintiffs allege that Section 10 has effectively prevented them from seeing their family members who live outside of Florida, leading to prolonged periods of separation. Ms. Aragon, for instance, says that:

> I fled to the United States from Nicaragua during the civil war in the 1980s, and I became a U.S. citizen more than twenty years ago. My daughter came to the United States many years later with my grandson, when he was less than a year old. To the best of my knowledge, my daughter and grandson crossed the border into the United States without ever being stopped or processed by immigration agents . . . .

> I have a niece and other family members who live in Georgia and a very close family friend who lives in Washington, D.C.—she is like another daughter to me. I usually go to visit her and her family about every year. My grandson and I traveled to Georgia for a visit with family last October, and we were planning to go again this year . . . .

> Because we are afraid of everything [that] could happen as a result of the new law, my grandson and I had to give up our trip to Georgia this year. I do not know when we will be able to go back to visit our family. Now that the transport law is in place, I am afraid to travel with my grandson. If I am traveling with him, I could be stopped and arrested for breaking the new transport law if the police believe I am transporting him. That idea fills me with panic. It also makes me feel sad to be separated from my family and friends who live in other states. I am getting older, and time with my loved ones is important. I also do not want to travel by myself, because I don't want to leave my grandson alone now. I want my grandson to have a relationship with his other family members, and I feel terrible that his world is limited because of the transport law.

Aragon Decl. ¶¶ 4, 7. And Ms. Medrano Rios similarly avers that:

I had planned to travel with my family to Texas, so that my children could visit their cousins and so that I could spend time with my brother and sister. Now, though, we can't take this trip. It is just too big a risk for my children and me. [My daughter] does not have an immigration case, and does not have any immigration status, even though she has applied for DACA. So, I am scared that she is not allowed to be brought back into Florida if we leave. And I don't know whether I can be driven back into Florida either, since I don't have any official status.

I feel trapped not being able to take this trip, and I hated having to tell my family that it won't happen. It made me feel awful because finally after 6 years of being apart, my family was so close to finally being together again.

Medrano Rios Decl. ¶¶ 8, 10–11.

Mmes. Aragon and Medrano Rios have thus likewise demonstrated irreparable harm in the form of "indefinite family separation," which many courts around the country have "recognized . . . as a form of irreparable injury." *Make the Road N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 268 (S.D.N.Y. 2020); *see also Milligan v. Pompeo*, 502 F. Supp. 3d 302, 321 (D.D.C. 2020) ("[S]eparation from family members is an important irreparable harm factor." (cleaned up)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (same); *Palacios-Hernandez v. Meade*, 2020 WL 13550207, at *4 (S.D. Fla. Apr. 8, 2020) (Smith, J.) (finding that the irreparable-injury factor weighed in favor of the plaintiffs "because of the prolonged separation of [the individual plaintiff] from his family"). Of course, if these Plaintiffs were to ignore Section 10 and visit their family members, they would then risk arrest and prosecution under the statute.

The Farmworker Association will also suffer irreparable harm if Section 10 is not enjoined. Courts frequently find that organizational plaintiffs will suffer irreparable harm where these plaintiffs show "ongoing harms to their organizational missions as a result of [a] statute." *Valle del Sol*, 732 F.3d at 1029; *see also Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (holding that the organizational plaintiffs "will also suffer irreparable injury distinct from the injuries of eligible voters" because their "organizational missions, including registration and mobilization efforts, will continue to be frustrated and organization resources will be diverted to assist with the

citizenship mismatch issue"); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1339 (S.D. Fla. 2006) (Seitz, J.) (finding irreparable harm in part because the challenged statute forced the organizational plaintiffs to "halt[ ] or significantly scale[ ] back their voter registration operations").

Here, the Plaintiffs argue that Section 10 has "diverted . . . scarce resources" away from the Farmworker Association's "regular, core activities," Memorandum at 22, and that it has impeded the Association's mission of providing transportation to migrant workers who "travel with the seasons to harvest crops, . . . back and forth between Florida, Georgia, and Alabama, crossing back into Florida multiple times per year," Complaint ¶ 17. In a Declaration, the General Coordinator of the Farmworker Association tells us that "FWAF has been inundated with questions and requests for assistance relating to travel between Florida, Georgia, and Alabama," forcing staff to "devote[ ] additional time outside of their regular activities and objectives to training existing volunteers and new volunteers on Section 10 and its impact on our members and the broader immigrant community." Xiuhtecutli Decl. ¶¶ 32–33. "Staff have been forced to spend time on calls rather than their normal work, which has resulted in delayed Medicaid applications, food stamps applications, and applications for U.S. Department of Agriculture Farm and Food Worker Relief." *Id.* ¶ 35. Mr. Xiuhtecutli concludes, based on his experience, that the "impact of Section 10, including arrests and detentions, will continue to divert FWAF's resources from its core mission of strengthening farmworker communities through its different programs and normal organizing work." *Id.* ¶ 38.

Trying to parry, the Defendants say that the "Association has not explained how § 787.07 '*forc[es]*' the organization to divert resources to counteract' illegal acts." Response at 7 (quoting *Browning*, 522 F.3d at 1165). The Defendants also argue that the Association hasn't "show[n] 'what harm [it] is seeking to counteract and how its diversion of resources is aimed' at preventing that harm." *Id.* at 8 (quoting *Cousins v. Sch. Bd. of Orange Cnty.*, 2023 WL 5836463, at *6 (M.D. Fla. Aug. 16, 2023) (Berger, J.)). But the Association *has* described that harm. For example, Mr. Xiuhtecutli declared that:

> Approximately 600 families that include dues-paying FWAF members left Florida at the end of the harvest season in May 2023. Most of these members are from the Immokalee and Fellsmere areas, who travel back and forth between Florida and northern states based on the growing season. Typically, these members would return in September 2023 for the squash, zucchini, chili pepper, tomatoes, lettuce, and other vegetable planting season. However, based on . . . our organizers' conversations with members, I anticipate that approximately 100 member families will not return if SB 1718 remains in effect, because they do not want to risk a felony charge. These same member families are unlikely to return for the vegetable harvesting seasons in the Florida winter and spring. FWAF will lose many of these members, the dues from those members, and the critical in-kind donations from those members that help run FWAF's programs.

Xiuhtecutli Decl. ¶ 39. He also explains that the Association *specifically* diverted resources to prevent these harms, noting that staff has devoted additional time—*outside of their regular activities*—to provide "information and communications to [the Association's] members," who have "inundated [the Association] with questions and requests for assistance relating to travel between Florida, Georgia, and Alabama." *Id.* ¶¶ 32, 34; *see also id.* ¶ 34 ("Since SB 1718 passed, and even before Section 10 went into effect, FWAF began providing Know Your Rights presentations to specifically prepare for and educate our members on the impacts of SB 1718, including Section 10. FWAF has conducted twelve Know Your Rights presentations thus far."). Finally, on the Defendants' claim that the Association hasn't been *forced* to divert its resources, *see* Response at 7, we think this argument parses the matter a bit too finely. As the Eleventh Circuit held in *Georgia Latino*, "an organizational plaintiff suffer[s] cognizable injury when it [is] forced to divert resources from its regular activities to educate and assist affected individuals in complying with the challenged statute." 691 F.3d at 1260 (cleaned up). That's precisely what Mr. Xiuhtecutli alleges in his Declaration. *See, e.g.*, Xiuhtecutli Decl. ¶ 35 ("Staff have been *forced* to spend time on calls rather than their normal work, which has resulted in delayed Medicaid applications, food stamps applications, and applications for U.S. Department of Agriculture Farm and Food Worker Relief." (emphasis added)); *id.* ¶ 11.b. ("Until 2021, FWAF had three community gardens: one in Florida City (near our Homestead office), one in Pierson, and one in Apopka. In 2021, Florida City sold the land for our garden, forcing us to move many of the plantings to our smaller

34

office gardens. This year, because we were *forced* to respond to the crisis brought on by SB 1718, and in particular concerns from our members about Section 10, we have struggled to maintain our garden in Pierson." (emphasis added)).

The Defendants also note that SB 1718 contains provisions outside of Section 10, and they contend that "many of the Association's allegations tie its diversion to the *entirety* of SB 1718, not merely" Section 10. Response at 8. They take issue, for example, with Mr. Xiuhtecutli's attestation that the Association has begun providing "Know Your Rights presentations . . . on the impacts of SB 1718, including [Section 10]." *Ibid.* (quoting Xiuhtecutli Decl. ¶ 34). They also point to Mr. Xiuhtecutli's claims that the Association has "held member meetings regarding SB 1718, including Section 10," and that "staff received more calls each day since SB 1718 passed than we received prior to its passage." *Ibid.* (quoting Xiuhtecutli Decl. ¶ 35). We're not so troubled by these passages. There's no question that Mr. Xiuhtecutli's Declaration is focused *specifically* on the impact of Section 10. *See, e.g.*, Xiuhtecutli Decl. ¶ 30 ("Not only are individual FWAF members harmed by Section 10, but FWAF as an organization has and will continue to suffer harm because of Section 10."); *id.* ¶ 36 ("The increase in FWAF staff's time and focus on Section 10 is driven by the needs of FWAF's membership."); *id.* ¶ 37 ("FWAF lacks the funds to increase its staffing to educate the community on Section 10 and its consequences. FWAF must now divert even more resources to fundraising in an attempt to address this deficit."). The vast majority of the references by Xiuhtecutli (a non-lawyer) to SB 1718 as a whole *either* use the term as a metonym for Section 10, *see id.* ¶ 39 ("I anticipate that approximately 100 member families will not return if SB 1718 remains in effect, because they do not want to risk a felony charge."), *or* expressly cabin the language to "Section 10 in particular," *id.* ¶ 11(c). We therefore find that the Farmworker Association will suffer irreparable harm as an organization if Section 10 of SB 1718 is not enjoined.

Outside of their standing arguments, the Defendants advance just one argument for their position that the Plaintiffs *aren't* suffering irreparable injury: The Plaintiffs (the Defendants say) moved too slowly to "properly serve the pending motion on the State Defendants"—and this delay (the Defendants contend) suggests that "they are not seriously concerned about irreparable harm." Response at 18–19. We disagree. Governor DeSantis signed SB 1718 into law on May 10, 2023; it went into effect in early July; and the Plaintiffs filed this lawsuit on July 17, 2023. *See generally* Complaint. All the Defendants were served by August 22, 2023. *See generally* Docket. While it's true that a plaintiff concerned about irreparable harm "would and should act swiftly to protect itself," *Car Body Lab Inc. v. Lithia Motors, Inc.*, 2021 WL 2652774, at *10 (S.D. Fla. June 21, 2021) (Goodman, Mag. J.), *report and recommendation adopted*, 2021 WL 3404040 (S.D. Fla. Aug. 4, 2021) (Moreno, J.), we don't think a week or two between a statute's enactment and the filing of the lawsuit challenging it constitutes unreasonable delay. And, given that the Plaintiffs filed their Motion for Preliminary Injunction on August 24, 2023—just two days after the last Defendant was served—we don't think they took too long to serve their motion either.

## IV.    Equitable Factors

The final two factors of the preliminary-injunction test are whether the "threatened injury outweighs the harm the relief would inflict on the non-movant" and whether the "entry of th[at] relief would serve the public interest." *Schiavo*, 403 F.3d at 1225–26. These two factors "merge when, as here, the government is the opposing party." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020) (cleaned up). The Defendants imply that an injunction against Section 10 will harm Florida's "interest in ensuring individuals in its territory are inspected[.]" Response at 19. Such an injunction (the Defendants fear) would prevent the state from identifying "drug traffickers [who] are successfully smuggling mass quantities of deadly illicit fentanyl past federal agents, wreaking havoc on Florida's citizens." *Ibid.* (cleaned up). We're unmoved.

For one thing, the Defendants never actually argue that their interest in rooting out drug traffickers *outweighs* the threatened injury to the Plaintiffs. They simply say that "Florida's interest in ensuring individuals in its territory are inspected is certainly legitimate." *Ibid.* But even a "legitimate" governmental interest can be outweighed by the harm the challenged statute imposes on the Plaintiffs and the public. *See, e.g., Ron Grp., LLC v. Azar*, 2021 WL 5576616, at *7 (M.D. Ala. Nov. 29, 2021) (holding that the "balance of harms weigh[ed] in favor of granting the preliminary injunction," even though "the state and the public certainly have an interest" in recouping a portion of the plaintiff's Medicaid claims); *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) (finding that the "hardship faced by [p]laintiff"—"the loss of his right to demonstrate in a traditional public forum"— outweighed the city's interest in "maintaining peace and order in the community, preventing violence, and avoiding congestion," which are "[u]ndoubtedly . . . legitimate governmental interests" (cleaned up)).

For another, we've already determined that the Plaintiffs are likely to succeed on the merits of their preemption claim, and a state "has 'no legitimate interest' in enforcing an unconstitutional law." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006)); *see also Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute."); *Ga. Latino*, 691 F.3d at 1269 ("[E]nforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable."); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation."). In other words, if a state law is preempted, then the state can suffer no harm from a court order that enjoins that law. Indeed, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Ibid.* In this case, any harm the state may suffer from an injunction is

outweighed by the harm Section 10 poses *both* to the Plaintiffs *and* to the United States, which has the ultimate interest in protecting federal supremacy in the realm of immigration.

The Defendants proffer one final argument on the equities: that the "Plaintiffs come to this Court with unclean hands." Response at 19. The Supreme Court has long adhered to the age-old maxim that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The Defendants' theory is that the Plaintiffs have unclean hands because their goal in requesting this preliminary injunction is to facilitate "illegal conduct such as driving without a license, working without authorization, and avoiding detection for criminal illegal entry." Response at 19. But this argument—alluring at first glance—fails on closer inspection because the Defendants haven't met the elements of the unclean-hands defense. "To assert an unclean hands defense," after all, "a defendant must show that (1) the plaintiff's wrongdoing is directly related to the claim, and (2) the defendant was personally injured by the wrongdoing." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015). The party seeking equitable relief must also have committed an "unconscionable act." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933).

The Defendants never argue that *all* the Plaintiffs—some of whom are U.S. citizens—are engaged in wrongdoing. Ms. Mendoza, for instance, is a "U.S. citizen" who "ha[s] been a resident of Georgia for nearly forty years." Mendoza Decl. ¶ 2. The Defendants never suggest that Ms. Mendoza is driving without a license, working without authorization, or avoiding detection for criminal illegal entry. *See generally* Response. Nor do the Defendants allege that they were "personally injured" by *any* of the Plaintiffs' wrongdoing—or that the Plaintiffs' wrongful conduct (*e.g.*, driving without a license or working without authorization) comes anywhere near constituting an "unconscionable act." Where the party invoking the unclean-hands doctrine fails to establish a "close nexus" between "the 'unconscionable act' and the pending issue," the court "cannot apply unclean hands against [the]

[p]laintiffs." *Stewart v. Hooters of Am., Inc.*, 2007 WL 1752843, at *2 (M.D. Fla. June 18, 2007) (Kovachevich, J.).

*       *       *

In a Notice of Supplemental Authority [ECF No. 97], the Plaintiffs "inform the Court of a decision . . . by the Fifth Circuit, holding that a Texas immigration law is likely preempted." *Id.* at 1. In *United States v. Texas*, the Fifth Circuit held that SB 4—a Texas statute prohibiting noncitizens from illegally entering or reentering the state—was "likely field preempted," affirming the district court's conclusion that "the federal government has both a dominant interest and a pervasive regulatory framework to control immigration into the United States, precluding state regulation in the area." 97 F.4th 268, 278, 288 (5th Cir. 2024). That holding, of course, is consistent with our Circuit's decision in *Georgia Latino*—and, by extension, with our decision today. In dissent, however, Judge Oldham cautioned that "[t]he Supreme Court has never extended field preemption to any part of the immigration laws beyond alien registration." *Id.* at 298 (Oldham, J., dissenting). Judge Oldham may well be right: The Supreme Court, after all, seems never to have squarely held that the INA's framework for regulating the transportation, concealment, or harboring of aliens preempts the entire field. And we're sympathetic to Judge Oldham's admonition against "extend[ing] field preemption beyond the INA's alien-registration provisions." *Ibid.*

Without express guidance from the Supreme Court, however, we remain bound by the pronouncements of *our* Circuit, which *has* held that the "unlawful transport and movement of aliens" is a fully preempted field. *Ga. Latino*, 691 F.3d at 1264; *see also United States v. Files*, 63 F.4th 920, 923 (11th Cir. 2023) ("Under our [Circuit's] prior-panel-precedent rule, an earlier panel's holding is controlling 'unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." (quoting *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008))); *NLRB v. Datapoint Corp.*, 642 F.2d 123, 129 (5th Cir. Unit A Apr. 1981) ("Without a *clearly*

*contrary* opinion of the Supreme Court or of this court sitting *en banc*, we cannot overrule a decision of a prior panel of this court[.]" (emphasis added)). In our Circuit's view, "[g]iven the federal primacy in the field of enforcing prohibitions on the transportation, harboring, and inducement of unlawfully present aliens, the prospect of fifty individual attempts to regulate immigration-related matters cautions against permitting states to intrude into this area of dominant federal concern." *Ga. Latino*, 691 F.3d at 1266. Bound by Eleventh Circuit precedent, we hold that the Plaintiffs are likely to prevail on their claim that Section 10 of SB 1718 is preempted by federal law—and that they have satisfied each of the other elements of their preliminary-injunction request.

CONCLUSION

We therefore **ORDER and ADJUDGE** as follows:

1. The Motion for Preliminary Injunction [ECF No. 30] is **GRANTED**.

2. FLA. STAT. § 787.07 is **PRELIMINARILY ENJOINED**.

3. The Defendants must take no steps to enforce FLA. STAT. § 787.07 until otherwise ordered. This preliminary injunction binds the Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with them—who receive actual notice of this injunction by personal service or otherwise.

**DONE AND ORDERED** in the Southern District of Florida on May 22, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record