UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-22655-RAR

THE FARMWORKER ASSOCIATION
OF FLORIDA, INC., *et al.*,

        Plaintiffs,

v.

JAMES UTHMEIER, *in his official capacity
as Attorney General of the State of Florida*, *et al.*,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION AND GRANTING IN PART PLAINTIFFS' MOTION FOR RECONSIDERATION

**THIS CAUSE** comes before the Court on Defendants' Motion for Reconsideration of the Order Granting Plaintiffs' Motion for Preliminary Injunction ("Defendants' Motion for Reconsideration"), [ECF No. 106], and Plaintiffs' Motion for Reconsideration of the Order on Scope of Preliminary Injunction ("Plaintiffs' Motion for Reconsideration"), [ECF No. 136]. The Court having reviewed Plaintiffs' Motion for Reconsideration, Defendants' Motion for Reconsideration, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Reconsideration, [ECF No. 106], is **DENIED**, and Defendants' Motion for Reconsideration, [ECF No. 136], is **GRANTED in part** for the reasons stated herein.

## BACKGROUND

This case is about the constitutionality of a Florida statute, Section 10 of Senate Bill 1718 ("S.B. 1718"), signed into law on May 10, 2023. Section 10 amended Florida Statute § 787.07 to impose criminal penalties on anyone "who knowingly and willfully transports into [Florida] an

individual whom the person knows, or reasonably should know, has entered the United States in violation of law and has not been inspected by the Federal Government since his or her unlawful entry from another country." *See* Fla. Laws, Ch. 2023-40 (amending Fla. Stat. § 787.07 (2022)).

Plaintiffs filed their Complaint on July 13, 2023, [ECF No. 1], and the case was assigned to Judge Roy K. Altman of the United States District Court for the Southern District of Florida, [ECF No. 2]. Plaintiffs are the Farmworkers Association of Florida, Inc. ("FWAF"), on behalf of itself and its members, as well as seven individual Plaintiffs, Andrea Mendoza Hinojosa, Carmenza Aragon, Maria Medrano Rios, Adrian Carrillo, Reinaldo Morales, Juana Lozano, and Diana Carrillo Medrano (collectively, "Plaintiffs").[1]

Plaintiffs sought to enjoin Section 10 as preempted under the Supremacy Clause and void for vagueness under the Due Process Clause of the Fourteenth Amendment. *See generally* Pls.' Second Mot. for Prelim. Inj. ("Preliminary Injunction Motion"), [ECF No. 30]. On May 22, 2024, Judge Altman entered an Order Granting Motion for Preliminary Injunction ("Preliminary Injunction Order"), [ECF No. 99], which found Plaintiffs Andrea Mendoza Hinojosa, Carmenza Aragon, Maria Medrano Rios, and the FWAF to have standing,[2] and preliminarily enjoined Section 10 as preempted by federal law under the Supremacy Clause of the U.S. Constitution.[3]

---

[1] The Complaint identifies the individual Plaintiffs by their initials. *See* [ECF No. 1]. Plaintiffs previously filed a motion for leave to proceed anonymously, *see* [ECF No. 29], but the motion was denied, *see* [ECF No. 86]. Accordingly, the Court will refer to the individual Plaintiffs in this action by their actual names rather than their initials.

[2] The Preliminary Injunction Order found standing to seek injunctive relief under the "One Good Plaintiff" rule, which holds that when multiple plaintiffs seek injunctive relief, "*only one plaintiff* with standing is required." *See* Prelim. Inj. Order at 5–6 (quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)). The Preliminary Injunction Order did not analyze or otherwise comment upon the standing of the remaining four Plaintiffs: Adrian Carrillo, Reinaldo Morales, Juana Lozano, and Diana Carrillo Medrano.

[3] Although the Preliminary Injunction Order found Section 10 to be preempted by federal law, it rejected Plaintiffs' argument that Section 10 was void for vagueness under the Due Process Clause. *See* Prelim. Inj. Order at 17–21.

*See* [ECF No. 99] at 40.  That same day, Judge Altman issued a Supplemental Order on Scope of Preliminary Injunction, [ECF No. 100], clarifying that this preliminary injunction ("Preliminary Injunction") applied statewide.

However, on May 23, 2024, Judge Altman entered an Order requiring additional briefing on the scope of the Preliminary Injunction, specifically, whether it "should apply (1) to the Plaintiffs who've established their standing; (2) to all the remaining Plaintiffs; (3) district-wide; or (4) state-wide." [ECF No. 101] at 1.  The parties filed opposing briefs on this question on June 6, 2025.  [ECF Nos. 104, 105].

On March 11, 2025, Judge Altman entered an Order on Scope of Preliminary Injunction ("Order on Scope"), [ECF No. 132].  The Order on Scope narrowed the Preliminary Injunction to apply only to those Plaintiffs who had demonstrated their standing, namely, Plaintiffs Andrea Mendoza Hinojosa, Carmenza Aragon, Maria Medrano Rios, the FWAF, and all current members of FWAF (as of the date of the Order on Scope).  *Id.* at 16.

Separately, on June 6, 2024, Defendants filed their Motion for Reconsideration, arguing that the Preliminary Injunction Order (1) did not consider Defendants' argument that Plaintiffs lack a cause of action either under the Supremacy Clause or in equity following the Supreme Court's decision in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), and (2) the FWAF's injuries as an organizational plaintiff cannot sustain equitable relief in this context.  *See generally* Defs.' Mot. for Recons.

On March 28, 2025, Judge Altman recused himself from this matter and the case was reassigned to the undersigned.  [ECF No. 135].  That same day, Plaintiffs filed their Motion for Reconsideration, requesting that the Court extend the Preliminary Injunction to the four individual Plaintiffs whose standing had not been analyzed in the Preliminary Injunction Order—Adrian

Carrillo, Reinaldo Morales, Juana Lozano, and Diana Carrillo Medrano—and who therefore were not covered by the Preliminary Injunction after it was narrowed by the Order on Scope. *See generally* Pls.' Mot. for Recons.

Currently before the Court are Defendants' Motion for Reconsideration and Plaintiffs' Motion for Reconsideration. Defendants' Motion for Reconsideration argues that (1) there is no cause of action to bring Plaintiffs' claims under the Supremacy Clause or in equity, and (2) even if there is a cause of action, the FWAF, as an organizational plaintiff, cannot seek equitable relief in this context. Plaintiffs' Motion for Reconsideration requests clarification regarding the standing of the four remaining Defendants and whether the Preliminary Injunction extends to them. The Court addresses each of these issues in turn.

## LEGAL REQUIREMENTS

Under Federal Rule of Civil Procedure 54(b), a district court may reconsider a non-final, interlocutory order "at any time prior to the entry of final judgment." *Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1242 (11th Cir. 2011). But "[r]econsideration of a previous order is an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002) (cleaned up). "In order to reconsider a judgment[,] there must be a reason why the court should reconsider its prior decision, and the moving party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Id.* at 1369. "Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *Benestad v. Johnson & Johnson*, No. 20-60496, 2022 WL 5239598, at *1 (S.D. Fla. Oct. 4, 2022) (cleaned up). A motion for reconsideration, in other words, "cannot be used to relitigate old

matters, raise argument or present evidence that could have been raised prior to the entry of judgment.  This prohibition includes new arguments that were previously available, but not pressed." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (cleaned up); *see also Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) ("It is an improper use of the motion to reconsider to ask the Court to rethink what the Court already thought through—rightly or wrongly."  (cleaned up)).

<u>ANALYSIS</u>

## I.  Cause of Action

Defendants argue that "Plaintiffs have failed to identify an express, implied, or equitable cause of action to enforce" the Immigration and Nationality Act ("INA"), an argument that was not addressed in the Preliminary Injunction Order.  Defs.' Mot. for Recons. at 2.

Defendants are mistaken.  As an initial matter, Plaintiffs are not suing to "enforce [the criminal provisions of] the INA."  *Id*.  In fact, Plaintiffs are not seeking to enforce any criminal statute at all.  Rather, Plaintiffs bring this action as an equitable pre-enforcement challenge on preemption grounds, arguing that Section 10 of S.B. 1718 "bypass[es] the federal government's definitions and prosecutorial and adjudicatory processes under the parallel federal statute," 8 U.S.C. § 1324, and intrudes on that "exact same federal field—transport of immigrants," Compl. ¶¶ 76–77.  That Congress chose not to create a private right of action to enforce the criminal provisions of the INA "does not imply its intent to bar [Plaintiffs] from invoking federal jurisdiction where, as here, they do so not to enforce the federal law themselves, but to preclude [the State] from subjecting them to [State] laws" they believe were "enacted in violation of federal

requirements." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 146 (2d Cir. 2016).[4]

The Eleventh Circuit specifically addressed (and rejected) Defendants' argument—that Plaintiffs cannot sue in equity to enjoin enforcement of a state law allegedly preempted by the INA—in *Georgia Latino Alliance for Human Rights v. Governor of Georgia*. *See* 691 F.3d 1250, 1262 (11th Cir. 2012) ("Like the other circuits to address the issue head on, we 'have little difficulty in holding that [Plaintiffs] have an implied right of action to assert a preemption claim seeking injunctive . . . relief.'" (quoting *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 334 n.47, 335 (5th Cir. 2005)).  Resisting this conclusion, Defendants insist that this aspect of *Georgia Latino* was "abrogated" by the Supreme Court's decision in *Armstrong*, 575 U.S. 320.  *See* Defs.' Mot. for Recons. at 7 n.3.

In *Armstrong*, the Supreme Court considered "whether Medicaid providers can sue to enforce § (30)(A) of the Medicaid Act," which requires that state Medicaid plans set out procedures to ensure that reimbursement rates for healthcare providers "are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers" to guarantee care and services equivalent to those "available to the general population in the geographic area" 575 U.S. at 322; *id.* at 323 (quoting 42 U.S.C. § 1396a(a)(30)(A)).  The Medicaid providers sued Idaho, claiming that "Idaho violate[d] § 30(A) by reimbursing providers of habilitation services at rates lower than § 30(A) permits," because Idaho's conduct was preempted by § 30(A) under the Supremacy Clause.  *Id.* at 324.

---

[4]  Defendants try to circumvent this distinction by positing that a "preemption claim is just one type of enforcement."  Defs.' Mot. for Recons. at 6.  But courts have uniformly rejected this view.  *See Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221 (2d Cir. 2008) ("A claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law[.]") (quoting *W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225–26 (2d Cir. 1987)); *Wright Elec., Inc. v. Minn. State Bd. of Elec.*, 322 F.3d 1025, 1028 (8th Cir. 2003) (same).

Rejecting the Medicaid providers' claims, *Armstrong* held that the Supremacy Clause does not itself "include[ ] a private right of action." *Id.* at 326. In saying so, however, the Supreme Court was careful to note that just because "the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law." *Id.* As the Supreme Court recognized, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 155–56 (1908)). *Armstrong* clarified that a plaintiff's "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action." *Id.* at 327. It is, as the Supreme Court explained, "a judge-made remedy" that, "in its application to state officers," does not "rest[ ] upon an implied right of action contained in the Supremacy Clause." *Id.* Indeed, although *Armstrong* rejected a standalone cause of action under the Supremacy Clause, it nevertheless went on to analyze plaintiffs' claims in equity under *Ex parte Young*.[5] *Id.* at 327–31.

Thus, *Armstrong* did nothing to alter the central holding in *Georgia Latino*—that plaintiffs can challenge an allegedly preempted state law in federal court prior to enforcement by asserting

---

[5] Defendants suggest that *Georgia Latino* "relied on the Supremacy Clause for its holding that the plaintiffs there had an equitable cause of action" and therefore "was clearly abrogated by *Armstrong*." Defs.' Mot. For Recons. at 7 n.3. On the contrary, *Armstrong* was unanimous on this critical point: Although there is no standalone cause of action under the Supremacy Clause, a plaintiff may nevertheless pursue equitable relief to enjoin state action preempted by the Supremacy Clause. *Armstrong*, 575 U.S. at 326 (Scalia, J.) ("[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted" (citing *Ex parte Young*, 209 U.S. 123, 155–156)); *id.* at 337 (Breyer, J., concurring in part and concurring in the judgment) ("Like all other Members of the Court, I would not characterize the question before us in terms of a Supremacy Clause 'cause of action.' Rather, I would ask whether federal courts may in these circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law.") (cleaned up); *id.* at 337 (Sotomayor, J., dissenting) (noting that "even though the Court is correct that it is somewhat misleading to speak of an implied right of action contained in the Supremacy Clause, that does not mean that parties may not enforce the Supremacy Clause by bringing suit to enjoin preempted state action") (cleaned up).

a cause of action in equity.  Since *Armstrong*, the Eleventh Circuit has reiterated its position that "there exists 'an implied right of action to assert a preemption claim seeking injunctive relief'" in a case where the plaintiffs' right of action to assert a preemption claim was heavily contested in both the lower court and the parties' appellate briefing.[6]  *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1276 (11th. Cir. 2018) (quoting *Ga. Latino*, 691 F.3d at 1262).

However, in affirming the general principle that plaintiffs may seek equitable relief to enjoin the enforcement of preempted state laws, *Armstrong* nevertheless rejected the plaintiffs' request for equitable enforcement because, the Supreme Court found, Congress intended to foreclose equitable remedies to enforce § 30 of the Medicaid Act.  575 U.S. at 327–28.  The *Armstrong* plaintiffs were invoking equitable remedies in their effort to get the defendants to pay them more money.  That was a problem, the Supreme Court explained, because "[t]wo aspects of § 30(a)," when taken together, "establish[ed] Congress's 'intent to foreclose' equitable relief." 575 U.S. at 328 (citation omitted).  First, Congress had already prescribed the "sole remedy . . . for a State's failure to comply with Medicaid's requirements . . . [*i.e.*,] the withholding of Medicaid funds by the Secretary of Health and Human Services."  *Id*.  Although this consideration "might not, *by itself,* preclude the availability of equitable relief," it does when combined with the

---

[6] Following *Armstrong*, other courts around the country have also uniformly held that plaintiffs may invoke a federal court's equitable jurisdiction to enjoin the enforcement of a preempted state law.  *See, e.g.*, *Bellsouth Telecomms., LLC v. Louisville/Jefferson Cnty. Metro Gov't*, No. 3:16-CV-124-TBR, 2016 WL 4030975, at *3 (W.D. Ky. July 26, 2016) (holding that, under *Armstrong*, a preemption plaintiff "may invoke a federal court's equitable jurisdiction [to enjoin allegedly preempted state action] even when no private cause of action exists"); *Spectrum Pac. W. LLC v. City of Yuma*, 507 F. Supp. 3d 1186, 1192 (D. Ariz. 2020) (referring to the defendant's "argument that Section 556 [of the Cable Communications Policy Act] does not confer a private right of action" as "irrelevant" because "[e]ven in the absence of an explicit statutory provision establishing a cause of action, a private party may ordinarily seek declaratory and injunctive relief against state action on the basis of federal preemption" (cleaned up)); *United States v. Texas*, 97 F.4th 268, 275, 278 (5th Cir. 2024) (holding that, though "the Supremacy Clause does not create a cause of action," the United States has a "cognizable path for seeking to enjoin an allegedly preempted state law," since "[w]hat logical basis is there for courts to say private parties and government agencies or actors may bring a[ ] [preemption] action sounding in equity but not the United States?").

Medicaid Act's "mandate that state plans provide for payments that are consistent with efficiency, economy, and quality of care," a "judgment-laden" and "judicially unadministrable" standard entrusted to "the [agency] alone." *Id.* (cleaned up). This combination of a "sole remedy" and a "judicially unadministrable" standard suggested that Congress "wanted to make the agency remedy that it provided exclusive," thereby displacing equitable remedies as means of enforcing § 30(A). *Id.* (quotation omitted).

Relying on *Armstrong*, Defendants assert that the INA similarly "provide[s] [no] right of action by implication," and Plaintiffs therefore "lack . . . an equitable cause of action to enforce the INA against the states." Mot. for Recons. at 3, 6. The question in *Armstrong*, however, was "whether Medicaid providers can sue to *enforce* § (30)(A) of the Medicaid Act." *Id.* at 322 (emphasis added). Again, Plaintiffs here are not "seeking to enforce § 1324 and its criminal prohibitions." Pls.' Reply to Defs.' Resp. to Pls.' Mot. for Prelim. Inj., [ECF No. 67] at 4. Those provisions, after all, "regulate the conduct of private actors, not the States[,] . . . and [the] Plaintiffs are not seeking to police violations of those statutes. They are not, for example, seeking the arrest or prosecution of anyone for those crimes." Pls.' Resp. to Defs.' Mot. for Recons, [ECF No. 109] at 8 (cleaned up).

On the contrary, Plaintiffs seek to enjoin enforcement of a state law preempted by federal law.[7] Nothing in *Armstrong* interferes with their "ability to sue to enjoin unconstitutional actions by state and federal officers"—an ability that, as *Armstrong* made clear, is "the creation of courts of equity," and which "reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327 (citation omitted). As one federal court has

---

[7] *See also* Order on Scope at 3–4 (citing cases for proposition that plaintiffs have a cause of action to enjoin enforcement of a preempted state law (first citing *Ga. Latino*, 691 F.3d at 1267; then citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); and then citing *Lozano v. City of Hazleton*, 724 F.3d 297, 323 (3d Cir. 2013))).

explained, "[t]he *Armstrong* holding does not preclude [a] [p]laintiff's equitable preemption claims" because "*Armstrong* did not foreclose parties from bringing equitable preemption suits under *Ex parte Young*"—a significant difference from cases where the plaintiffs wish "to use *Ex parte Young* as a shield [seeking] injunctive relief, in contrast to the plaintiffs in *Armstrong* who sought affirmative relief in the form of additional payments." *CNSP, Inc. v. Webber*, No. 17-0355 KG/SCY, 2020 WL 2745456, at *6 (D.N.M. May 27, 2020).  This statement is equally true here, where Plaintiffs seek to deploy *Ex parte Young* as a shield to protect themselves against the enforcement of an allegedly preempted state law.

Moreover, the INA does not display either of the "two aspects" that *Armstrong* found, when taken together, "establish[ed] Congress's 'intent to foreclose' equitable relief."  575 U.S. at 328.  First, the INA does not contain a "sole remedy."  *Id.  Armstrong* determined that Congress had foreclosed equitable relief under § 30(A) of the Medicaid Act because "the withholding of Medicaid funds by the Secretary of Health and Human Services" was the "sole remedy Congress provided for a State's failure to comply" with Medicaid requirements.  *Id.*  And even if the "provision for the Secretary's enforcement by withholding funds might not, *by itself*, preclude the availability of equitable relief," it did bar that relief "when combined with the judicially unadministrable nature of § 30(A)'s text."  *Id.*  But the INA is "part of a larger federal scheme," prescribing a number of different criminal sanctions "for those who facilitate the unlawful entry, residence, or movement of aliens within the United States."  *Valle del Sol*, 732 F.3d at 1024 (collecting examples of criminal sanctions related to the unlawful entry, residence, or movement of aliens).

Following *Armstrong*, many courts have found that Congress did not intend to foreclose equitable relief where, as here, a statute, "unlike the Medicaid Act in *Armstrong*, . . . does not

contain a sole remedy." *Webber*, 2020 WL 2745456, at *6; *see also King v. Youngkin*, 122 F.4th

539, 547 (4th Cir. 2024) (finding that Congress did not intend to foreclose equitable relief where

it did not make an "express provision of one method of enforcing a substantive rule [that] suggests

that Congress intended to preclude others." (quoting *Armstrong*, 575 U.S. at 328)); *Webber*, 2020

WL 2745456, at *6 (finding no "congressional intent to bar other parties from invoking federal

jurisdiction to bring preemption claims" where the Telecommunications Act of 1996's

"enforcement provision, 47 U.S.C. § 401, contemplates numerous remedies"); *Virgin Mobile USA,*

*L.P. v. Pat Apple*, No. 17-CV-2524-JAR-JPO, 2018 WL 2926576, at *3–4 (D. Kan. June 7, 2018)

(rejecting defendants' argument that Congress intended to foreclose equitable relief in preemption

case where the Federal Communications Act of 1934 "does not contain a sole remedy like the

Medicaid Act" but instead "contemplates numerous remedies"; and "Virgin Mobile want[ed] the

state officials to leave it alone, using *Ex parte Young* as a shield, rather than as a sword").

Second, Plaintiffs' challenge to Section 10 does not create a "judicially unadministrable"

or "judgment-laden" standard—*i.e.*, the kind of standard over which only an agency, with its

unique expertise, could provide "uniformity, widespread consultation, and resulting administrative

guidance[.]" *Armstrong*, 575 U.S. at 328.   Unlike the Medicaid Act provision at issue in

*Armstrong*, which required states to set Medicaid rates "consistent with efficiency, economy, and

quality of care," and that "safeguard against unnecessary utilization of such care," *id.* at 324

(quoting 42 U.S.C. § 1396a(a)(30)(A)), the federal scheme regulating those who facilitate the

unlawful movement of aliens within the United States does not create a single "judgment-laden"

standard that only a federal agency could administer, much less one entrusted to the sole discretion

of a specific agency, *id.* at 328.   In sum, there is nothing judicially unadministrable about blocking

a preempted state law in the field of immigration, and courts do so routinely.   *See generally Ga.*

*Latino*; *accord Valle del Sol*, 732 F.3d at 1025 n.17, 1026 (holding that an Arizona law that was "virtually indistinguishable" from statute in *Georgia Latino* was field preempted because of the "comprehensive nature of § 1324, its place within the INA's larger structure governing the movement and harboring of aliens, and § 1324(c)'s explicit but limited provision for state involvement"); *Lozano*, 724 F.3d at 316 ("We agree with the Eleventh Circuit and other courts that have held that 'the federal government has clearly expressed more than a 'peripheral concern' with the entry, movement, and residence of aliens within the United States and the breadth of these laws illustrates an overwhelmingly dominant federal interest in the field.'" (quoting *Ga. Latino*, 691 F.3d at 1264)); *United States v. South Carolina,* 720 F.3d 518, 530–31 (4th Cir. 2013) (finding that a South Carolina statute making it a felony to "transport, move or attempt to transport" or "conceal, harbor or shelter" a person "with intent to further that person's unlawful entry into the United States" or to help that person avoid apprehension or detection was both field preempted and conflict preempted); *Texas*, 97 F.4th at 278, 288 (holding that S.B. 4—a Texas statute prohibiting noncitizens from illegally entering or reentering the state—was "likely field preempted" and affirming the district court's conclusion that "the federal government has both a dominant interest and a pervasive regulatory framework to control immigration into the United States, precluding state regulation in the area").[8]

Federal courts routinely grant precisely the kind of equitable relief Plaintiffs are seeking here.  Notably, since entry of the Preliminary Injunction Order, two other federal courts have

---

[8]  It is also well established that a "pre-enforcement challenge to [a] pre-empted state law present[s] no barriers to justiciability," *Friends of the E. Hampton Airport*, 841 F.3d at 146, since "[s]tate law *must* . . . give way to federal law" when Congress has created a "framework of regulation so pervasive" such that there is "no room for the States to supplement it," *Arizona*, 567 U.S. at 399 (cleaned up and emphasis added); *cf. Hines v. Davidowitz*, 312 U.S. 52, 66 (1941) ("[T]he regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, the act of congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it." (cleaned up)).

granted motions for statewide preliminary injunctions in similar cases, rejecting many of the same arguments Defendants advance here.  In *United States v. Oklahoma*, the court granted the United States's motion for a preliminary injunction and enjoined the State of Oklahoma from enforcing H.B. 4156, which attempted to "impose[ ] state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States."   739 F. Supp. 3d 985, 990 (W.D. Okla. 2024).   There, the court explained that, "[w]hile Oklahoma is correct that the Supremacy Clause does not create a cause of action, it is well established that 'in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer.'"  *Id*. at 996 (quoting *Armstrong*, 575 U.S. at 327).  The court concluded that Oklahoma had failed to "identify some law that has displaced the Court's equitable powers" to preliminarily enjoin the preempted state law, and that "Oklahoma here 'cites to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity to enjoin executive action with regard to the matters at issue in this litigation.'"  *Id.* at 997 (quoting *Texas*, 97 F.4th at 276).

Similarly, in *United States v. Iowa*, the court entered a preliminary injunction to prevent enforcement of an Iowa statute (known as Senate File 2340) "that, among other things: (i) impose[d] criminal penalties under state law for certain immigration-related offenses; and (ii) require[d] state court judges to order noncitizens to return to the foreign countries from which they came."  737 F. Supp. 3d 725, 732 (S.D. Iowa 2024), *aff'd* 126 F.4th 1334 (8th Cir. 2025).[9] The court found that, "Senate File 2340 is preempted in its entirety by federal law and thus is

---

[9]  In *Iowa*, the individual plaintiffs moved for a preliminary injunction in their own case—that is, in a case they filed *separately* from a similar action the United States had brought against the state—and, at the time it issued its opinion, the court "ha[d] not formally consolidated the two cases." 737 F. Supp. 3d at 725. "In the interest of efficiency, however, the [c]ourt did hold a single hearing on the two motions for preliminary injunction" and "likewise issu[ed] this single ruling to address both motions[.]"  *Id.*  The fact that the United States was a plaintiff in *Iowa* thus had nothing to do with the outcome of that case.  *See generally id.* at *11–13 (finding that both "[t]he United States and the Iowa MMJ Plaintiffs [were] likely to prevail on their claims under the Supremacy Clause").

invalid under the Supremacy Clause." *Id.* The court also rejected Iowa's argument that "the United States has failed to state a viable claim because the Supremacy Clause does not create a cause of action where none otherwise would exist" under *Armstrong*, noting that "[a]lthough it held that the Supremacy Clause does not independently create a cause of action, *Armstrong* also reaffirmed the well-established principle that equity will provide such a cause of action in appropriate circumstances." *Id*. at 745 (cleaned up).

These recent cases therefore bolster the Court's view (reaffirmed by the Eleventh Circuit in *Newton*) that, even after *Armstrong*, private parties may invoke a federal court's equitable powers to enjoin the enforcement of allegedly preempted state laws.[10] *See Ga. Latino*, 691 F.3d at 1269 ("As a federal court, we do not sit in judgment of the policy decisions of state legislatures[.] . . . However, when state laws intrude into areas of overwhelming federal interest and erode the discretion implicit in the sovereignty of the country, we must recognize the supremacy of federal law.").

## II. *Ex parte Young* and Associational Standing

Finally, Defendants argue that, even if the individual Plaintiffs who have established their standing *can* sue in equity, "the organizational Plaintiff cannot sue in equity here—and therefore alleged injuries to this Plaintiff cannot properly be the basis for entering universal relief." Defs.' Mot. for Recons. at 6. Defendants' theory is that the FWAF and its members are not entitled to equitable relief under *Ex parte Young* because the FWAF is not a "direct target[ ] of regulation"

---

[10] In both of these cases, unlike here, the United States was one of the plaintiffs. But the "validity of an *Ex parte Young* action" does not "turn on the identity of the plaintiff." *Va. Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011). And, as the Fifth Circuit suggested in *Texas*: "Nothing in *Ex parte Young* indicates that an action sounding in equity is available to private parties but not sovereigns . . . . What logical basis is there for courts to say private parties . . . may bring an action sounding in equity but not the United States?" 97 F.4th at 277. These statements obviously presuppose that private parties can bring these equitable actions too.

under Section 10.  *See id.* at 7.  According to Defendants, the FWAF "does not allege that it is subject to Section 787.07," and a "'nonstatutory cause of action brought by plaintiffs who stand to incur only indirect injuries from enforcement of a state law,' like the organizational Plaintiff in this case, 'is far afield from *Ex parte Young*' and its arguable historical moorings." *Id*. at 8 (quoting *Texas*, 97 F.4th at 310 (Oldham, J., dissenting)).

To the extent Defendants are arguing that the FWAF is barred from equitable relief under *Ex parte Young* because it is not facing prosecution or regulation under Section 10, *see id*. at 7–8, Defendants are incorrect.  *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) ("The *Ex parte Young* doctrine does not demand that a plaintiff first risk the sanctions of imminent prosecution or enforcement in order to test the validity of a state law.").[11]    As the

---

[11]  Organizations can plainly advance claims under *Ex parte Young*.  *Stewart*, where the Supreme Court said that "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff," held that a *state agency* could bring an *Ex parte Young* suit.  563 U.S. at 256.  And, in that litigation, the "Respondents concede[d] that were VOPA a private organization rather than a state agency, the doctrine would permit this action to proceed."  *Id*.  In fact, the seminal Eleventh Circuit case, *Dream Defendants. v. Governor of the State of Florida*, 57 F.4th 879 (11th Cir. 2023), was also an *Ex parte Young* suit*, see id*. at 889 n.5 ("We agree with the district court that, based on *Ex parte Young*, Governor DeSantis is a proper party because he has statutory authority to enforce § 870.01(2)'s prohibition on riots."). In that case, the Eleventh Circuit affirmed the district court's finding that the organizational plaintiff had established associational standing. *See id*. at 886–87; *id*. at 887 n.4 ("In this case, only the first requirement is seriously in dispute, so we focus on whether the plaintiffs established that their members would otherwise have standing in their own right. The answer, as we explain below, is yes. . . . The plaintiffs easily satisfy the other two prongs of the associational standing inquiry.").  The Eleventh Circuit agreed with the district court that the organizational plaintiff's members—and not the organization itself—had established a credible threat of prosecution, crediting the "evidence showing that [the] members continue to self-censor by abstaining from protests for fear of being arrested and charged with rioting." *Id*. at 887.

On the one hand, the Preliminary Injunction Order did not find that the FWAF has associational standing. Instead, it held only that the FWAF has standing under the "diversion-of-resources" theory.  *See* Prelim. Inj. Order at 15 ("We also think that the Farmworker Association has standing to challenge Section 10.  An organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts." (cleaned up)); *see also S. River Watershed Alliance v. DeKalb Cnty., Ga.,* 69 F.4th 809, 819 n.11 (11th Cir. 2023) ("There are two ways to establish standing for organizational plaintiffs—the diversion-of-resources theory and the associational standing theory.").  On the other hand, Defendants never explain why an organization cannot advance a claim under *Ex parte Young* if it has standing under a "diversion-of-resources" theory, nor can the Court find any case that treats the two theories of organizational standing differently *vis a vis Ex parte*

Supreme Court has repeatedly held, in "determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Stewart*, 563 U.S. at 255 (cleaned up).  And "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff . . . . [T]he limits we have recognized reflect the principle that the general criterion for determining when a suit is in fact against the sovereign is the *effect* of the relief sought, . . . not who is bringing the lawsuit." *Id*. at 256 (emphasis in original) (cleaned up).

Plaintiffs' lawsuit satisfies this straightforward inquiry.  The Complaint alleges that "Section 10 violates the Supremacy Clause because Florida law enforcement agencies, officials, and prosecutors will be unilaterally carrying out the functions of federal immigration authorities without federal authorization under the INA and in conflict with the federal government." Compl. ¶ 121.  And the Complaint plainly seeks prospective relief, requesting that the Court "preliminarily and permanently enjoin[ ]" Defendants from enforcing Section 10 in the future.  *Id*. at 33; *see also id*. ¶ 10 ("This action challenges Section 10 to prevent imminent harm that Plaintiffs and other Floridians, including both U.S. citizens and noncitizens, will suffer as the law goes into effect and is implemented.  Plaintiffs seek injunctive and declaratory relief to bar such egregious unconstitutional actions from occurring in their communities.").  These allegations are more than sufficient under *Ex parte Young*.  *See Stewart*, 563 U.S. at 255–56 ("There is no doubt [the plaintiff's] suit satisfies [the] straightforward inquiry [under *Ex parte Young*].  It alleges that respondents' refusal to produce the requested medical records violates federal law; and it seeks an

_____

*Young*.  In any event, as discussed herein, the Court finds that the FWAF also has associational standing in this case.

injunction requiring the production of the records, which would prospectively abate the alleged violation.").

While the validity of an *Ex parte Young* action does not turn on the identity of the plaintiff, an organizational plaintiff must still establish its standing to pursue its claim.  Defendants argue that the FWAF lacks organizational standing because the "diversion of resources theory of standing only applies where the organization's 'core business activities' are interrupted and not where an organization spends money to 'inform their members and the public' about the effects of a law."  Defs.' Reply in Supp. Of Defs.' Mot. for Recons., [ECF No. 110] at 7 n.6 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024)).  But Plaintiffs expressly allege that Defendants' actions "directly affected and interfered with [the Farmworker Association's] core business activities." *All. for Hippocratic Med.*, 602 U.S. at 395; *see also, e.g.*, Pls.' Mem. in Supp. of Mot. for Prelim. Inj., [ECF No. 30-1] at 22 ("Section 10 has thus diverted FWAF's scarce resources away from its *regular, core* activities." (emphasis added)); Decl. of Nezahualcoyotl Xiuhtecutli ("Xiuhtecutli Decl."), [ECF No. 30-3] ¶ 35 ("[FWAF] [s]taff have been forced to spend time on calls rather than their normal work, which has resulted in delayed Medicaid applications, food stamps applications, and applications for U.S. Department of Agriculture Farm and Food Worker Relief."); *id*. ¶ 38 ("I anticipate that the community impact of Section 10, including arrests and detentions, will continue to divert FWAF's resources from its *core mission* of strengthening farmworker communities through its different programs and normal organizing work (emphasis added)).  As already determined in the Preliminary Injunction Order, this suffices to establish the organization's standing to proceed under the Eleventh Circuit's organizational standing precedents.  *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding that the NAACP had standing because it "is actively involved in voting activities and

would divert resources from its *regular activities* to educate and assist [affected individuals] in complying with the [challenged] statute" (emphasis added)).

In any event, Defendants' argument falls apart if the FWAF has *associational* standing to assert its claims on behalf of its members, since Defendants argue that "this Court did not address [associational standing] once it concluded that [the FWAF] had shown organizational standing based on financial injuries to the organization." Defs.' Mot. for Recons. at 8 n.4. Defendants contend that the "alleged injuries" the FWAF has suffered *as an organization* "cannot properly be the basis for entering universal relief." *Id*. at 6. And it is true that the Preliminary Injunction Order found only that the FWAF had standing *as an organization*, since it had "shown, through a sworn Declaration from its General Coordinator, that [it] had to divert resources away from its regular activities to educate and assist affected individuals in their efforts to comply with Section 10 of S.B. 1718." Prelim. Inj. Order at 16.

Nevertheless, the Court believes the FWAF also has *associational* standing on behalf of its members. An organization can establish its associational standing "to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). As to the first prong, "an organization must make specific allegations establishing that *at least one* identified member has suffered or will suffer harm." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (cleaned up and emphasis added). In other words, Plaintiffs "'need not establish that all of [the Farmworker Association's] members are in danger of suffering an injury,' but merely show that 'at least one member faces a realistic danger of suffering an

injury.'" *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Reg. & Elections*, 446 F. Supp. 3d 1111, 1119 (N.D. Ga. 2020) (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014)).

Here, the FWAF has established through a sworn declaration that at least one of its members "regularly transports fellow members out of and into Florida based on the harvest seasons," including "another member who initially entered the United States unlawfully several years ago and has had no contact at all with any immigration officials since his unlawful entry." Xiuhtecutli Decl. ¶ 25.[12]  The Declaration indicates that this member "will be directly harmed by Section 10," since the member "transport[s] people into the state of Florida whose immigration status could trigger a felony charge under Section 10."  *Id.* ¶ 23; *see also id.* ¶ 25 (noting that the member "now fears"—present tense—that the "act of providing transport to his fellow FWAF members and co-workers could expose him to felony charges").

This is essentially the same injury the Preliminary Injunction Order found sufficient to establish an injury in fact for individual Plaintiffs.  *See* Prelim. Inj. Order at 6 (finding that Plaintiff Andrea Mendoza Hinojosa had standing because she "aver[red] that she's transported undocumented immigrants (and is '100% willing to' continue transporting at least one undocumented immigrant) into the State of Florida" (quoting Decl. of Andrea Mendoza Hinojosa, [ECF No. 30-4] ¶ 14)).  The injury suffered by the unnamed member of the FWAF is likewise traceable to the passage of S.B. 1718.  *See* Xiuhtecutli Decl. ¶ 25 ("The FWAF member now fears that the otherwise perfectly legal act of providing transport to his fellow FWAF members and co-

---

[12]  Although this declaration does not identify this member's name, the Eleventh Circuit does not require an organizational plaintiff "to name individual plaintiffs on whose behalf the case was brought." *Suncoast Waterkeeper v. City of Gulfport*, No. 8:17-cv-35-T-24 MAP, 2017 WL 1632984, at *7 (M.D. Fla. May 1, 2017); *see also Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) ("These [three requirements for associational standing] are the sole requirements.  Accordingly, . . . an association may bring suit on behalf of its members or constituents despite the fact that individual members have not actually brought suit themselves.  Nor must the association name the members on whose behalf suit is brought.").

workers could expose him to felony charges [under Section 10].").  And it is similarly redressable by an injunction against the enforcement of Section 10 because, with the statute enjoined, his conduct would no longer put him at risk of arrest or prosecution.  The Court is thus satisfied that at least one member of the FWAF has standing to assert the equitable claims the FWAF has advanced here.

And the FWAF easily satisfies the other two prongs of associational standing.  This lawsuit is plainly germane to the organization's core purpose or mission, which includes "serv[ing] seasonal workers as well as migrant workers who travel with the seasons to harvest crops . . . back and forth between Florida, Georgia, and Alabama, crossing back into Florida multiple times per year."  Compl. ¶ 17; *see also id.* ¶¶ 20, 24 ("Many of [the Association's] members entered or remained in the United States unlawfully, and now have a wide range of immigration statuses and histories . . . . Many of FWAF's members will be directly harmed by Section 10, as they either transport people into the state of Florida whose immigration status could trigger a felony charge under Section 10, or they themselves have the immigration status that could trigger such a felony charge, and therefore may be unable to receive transportation.").  As Mr. Xiuhtecutli explained on behalf of the FWAF:

> Approximately 600 families that include dues-paying FWAF members left Florida at the end of the harvest season in May 2023.  Most of these members are from the Immokalee and Fellsmere areas, who travel back and forth between Florida and northern states based on the growing season.  Typically, these members would return in September 2023 for the squash, zucchini, chili pepper, tomatoes, lettuce, and other vegetable planting season.  However, based on . . . our organizers' conversations with members, I anticipate that approximately 100 member families will not return if S.B. 1718 remains in effect, because they do not want to risk a felony charge.  These same member families are unlikely to return for the vegetable harvesting seasons in the Florida winter and spring.  FWAF will lose many of these members, the dues from those

members, and the critical in-kind donations from those members
that help run FWAF's programs.

Xiuhtecutli Decl. ¶ 39.

Finally, the Court cannot say that the "constitutional . . . claims asserted, or the declaratory

or injunctive relief requested, require the participation of the individual members in this lawsuit."

*Greater Birmingham Ministries*, 992 F.3d at 1316.   Instructive here is *National Parks*

*Conservation Association v. Norton*, in which the Eleventh Circuit held that the third prong of the

associational-standing test was satisfied where the organizational plaintiffs' individual members

did not need to be made parties to the suit "to advance the [organizational plaintiffs'] equal

protection claim or to fashion the sort of prospective injunctive relief [the organizational plaintiffs]

sought."  324 F.3d 1229, 1244 (11th Cir. 2003).  So too here: the FWAF (as an organization) and

the individual Plaintiffs who have standing in this case are perfectly capable of advancing their

claims *without* the participation of the Association's 12,000 individual members.  In fact, the

Supreme Court has held that "individual participation" is "not normally necessary when"—as

here—"an association seeks prospective or injunctive relief for its members."  *United Food &*

*Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citing *Hunt v. Wash.*

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).  Instead, as the Supreme Court has

explained, "such participation would be required in an action for damages to an association's

members, thus suggesting that an association's action for damages running solely to its members

would be barred for want of the association's standing to sue."  *Id.*; *see also S. River Watershed*,

69 F.4th at 820 ("South River meets the third requirement of associational standing—*i.e.*, that

neither the claim asserted nor the relief requested requires the participation of individual members

in the lawsuit—because South River is seeking civil penalties, injunctive relief, and litigation

costs, not damages."  (cleaned up)).  In this case, Plaintiffs seek only declaratory and injunctive

relief, so participation of the FWAF's individual members is unnecessary. *See* Compl. at 33 (asking the Court to "[d]eclare Florida Statute § 787.07, as amended by S.B. 1718, Section 10, in its entirety, unconstitutional" and to "[p]reliminarily and permanently enjoin Defendants from enforcing Section 10 in its entirety"),

The Court therefore concludes that the FWAF has established *both* its organizational *and* its associational standing to pursue its claims in this case. As such, there is no question that the FWAF can sue under *Ex parte Young* on behalf of its members, since many of "its members face the exact same injuries that give standing to the individual Plaintiffs." Pls.' Resp. to Defs.' Mot. for Recons., [ECF No. 109] at 17; *see also Dream Defs.* 57 F.4th at 886–87 (allowing organizational plaintiff with associational standing to proceed under *Ex parte Young*). Defendants' only retort on this point is that, if the FWAF "could establish associational standing[,] . . . any remedy would necessarily be limited to the potential prosecution of those members specifically identified." Defs' Mot. for Recons. at 8 n.4. But the Eleventh Circuit has "routinely permitted organizations to sue on behalf of pseudonymously identified members," so Plaintiffs need not specifically identify any members of the FWAF who are subject to prosecution. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 773 (11th Cir. 2024). The Court therefore rejects Defendants' suggestion that "the organizational Plaintiff cannot sue in equity here." Defs' Mot. for Recons. at 6.

### III.   Individual Plaintiffs' Standing

The Preliminary Injunction Order found that individual Plaintiffs Andrea Mendoza Hinojosa, Carmenza Aragon, and Maria Medrano Rios had standing and entered a statewide injunction under the "One Good Plaintiff" rule, which holds that when multiple plaintiffs seek injunctive relief, "*only one plaintiff* with standing is required." *See* Prelim. Inj. Order at 5–6

(quoting *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)); *id.* at 17 ("We're therefore satisfied that *at least* one Plaintiff has standing to challenge the constitutionality of Section 10."). The Preliminary Injunction Order therefore did not analyze the standing of the four other individual Plaintiffs in this action—Adrian Carrillo, Reinaldo Morales, Juana Lozano, and Diana Carrillo Medrano (collectively, "Remaining Plaintiffs"). Because the Order on Scope limited the Preliminary Injunction to only those Plaintiffs who established their standing—*i.e.*, Andrea Mendoza Hinojosa, Carmenza Aragon, and Maria Medrano Rios—Plaintiffs' Motion for Reconsideration requests that the Court clarify whether the Preliminary Injunction also extends to the Remaining Plaintiffs.[13]

The Court finds that Plaintiffs Adrian Carrillo and Reinaldo Morales have standing, but Juana Lozano and Diana Carrillo Medrano do not. Adrian Carrillo and Reinaldo Morales are therefore covered by the Preliminary Injunction, but Juana Lozano and Diana Carrillo Medrano are not.

To establish standing, a plaintiff must demonstrate (1) an injury in fact—an "invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) causation—a "causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court"; and (3) redressability—"it must be likely, as opposed to merely speculative, that the injury will be

---

[13]   Plaintiffs' Motion for Reconsideration suggests that the Court need not conduct an individualized standing analysis to extend the Preliminary Injunction to the remaining Plaintiffs. *See* Pls.' Mot. for Recons. at 3 ("While a Court has no obligation to analyze each plaintiff's standing separately, the Court should not deny relief based solely on the *absence* on [sic] an individual standing determination."). However, the Preliminary Injunction in this matter applies only to those Plaintiffs "who have demonstrated their standing." Order on Scope at 15. Accordingly, the Court will analyze the individual standing of each of the Remaining Plaintiffs to determine whether each is covered by the Preliminary Injunction.

redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).

Where a plaintiff brings a pre-enforcement constitutional challenge to a state statute, she may demonstrate injury in fact by establishing "a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." *Ga. Latino*, 691 F.3d at 1257 (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998)) (cleaned up). This may be shown where "(1) [the plaintiff] was threatened with application of the statute; (2) application is likely; or (3) there is a credible threat of application." *Id.* at 1258 (quoting *Socialist Workers Party*, 145 F.3d at 1245); *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (finding that, in a pre-enforcement challenge, a plaintiff meets the injury-in-fact requirement "where he has alleged 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014))). Conversely, individuals who have "no fears of state prosecution except those that are imaginary or speculative" are not proper parties in a pre-enforcement suit challenging the constitutionality of a state statute. *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971)); *see also Younger*, 401 U.S. at 42 (finding that individual intervenor-plaintiffs had no standing where they "f[elt] inhibited" by a state criminal statute that criminalized teaching communism but "d[id] not claim that they ha[d] ever been threatened with prosecution, that a prosecution [wa]s likely, or even that a prosecution [wa]s remotely possible."); *Poe v. Ullman*, 367 U.S. 497, 507 (1961) (plurality) ("[T]he mere existence of a state penal statute . . . constitute[s] insufficient grounds to support a federal court's adjudication of its constitutionality . . . if real threat of enforcement is wanting.")

Plaintiff Adrian Carrillo has standing.  Carrillo is a U.S. citizen and resident of Florida. *See* Decl. of Adrian Carrillo ("Carrillo Decl."), [ECF No. 30-10] ¶ 3.  He planned to drive with his mother, Maria Medrano Rios, and sister, Diana Carrillo Medrano, to visit family in Texas.  *See id.* ¶ 6.  Neither his mother nor his sister have immigrant or non-immigrant status under federal law, although his sister has a pending application for Deferred Action for Childhood Arrivals ("DACA") status and his mother has a pending case in immigration court.  *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj., [ECF No. 30-1] at 3.  Adrian Carrillo had to cancel this trip and now cannot travel to Texas with his mother and sister because he is afraid that he could be prosecuted for driving his sister and mother back into Florida.  *See* Carrillo Decl. ¶ 9.  These injuries are almost identical to those of Maria Medrano Rios, Adrian Carrillo's mother, who already has standing under the Preliminary Injunction Order and likewise states that Section 10 prevents her from visiting her family in Texas.  *See* Prelim. Inj. Order at 9 (finding that Maria Medrano Rios has "an *ongoing* injury in fact" because S.B. 1718 puts her "in the position of either refraining from conduct she alleges to be unconstitutionally prohibited or engaging in the proscribed conduct and exposing herself to arrest and prosecution").  Carrillo's injury is directly traceable to Section 10 because his injury stems directly from conduct prohibited by Section 10.  It would also be redressed by enjoining enforcement of Section 10 against him because his conduct would no longer put him at risk of arrest or prosecution.  *See Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (noting that, in many cases, "redressability and traceability overlap as two sides of a causation coin").  Accordingly, the Court finds that Adrian Carrillo has standing.

Plaintiff Reinaldo Morales also has standing.  Morales, a U.S. citizen, is a deacon in his local Catholic Diocese in Georgia and also serves as the head of a nonprofit organization.  Decl. of Reinaldo Morales, [ECF No. 30-6] ¶¶ 3, 4, 10.  Since becoming a deacon in 2005, Mr. Morales

has travelled to Florida approximately forty times in connection with his ministry and nonprofit work, and has previously transported undocumented immigrants—including those who have not had any contact with immigration authorities since entering the United States—from Georgia to Florida for immigration appointments with United States Citizenship and Immigration Services. *Id.* ¶¶ 11–14. Morales continues to receive calls from undocumented immigrants who need assistance with transportation. *Id.* ¶ 15. Although Morales is "willing and able to do so," he fears that he could be arrested under S.B. 1718, thus preventing him from "doing an important part of [his] ministry." *Id.* ¶¶ 15–17. These injuries are substantially similar to those of Andrea Mendoza Hinojosa, who has already demonstrated her standing because S.B. 1718 prevents her from driving undocumented immigrants from Georgia to immigration appointments in Florida as part of her nonprofit work, which she has done in the past and is willing to do in the future. *See* Prelim. Inj. Order at 6 ("[Mendoza's] reluctance to engage in conduct she would otherwise have engaged in is sufficient to show an injury in fact." (citing *W. Va. ex rel. Morrisey v. U.S. Dep't of the Treas.*, 59 F.4th 1124, 1137 (11th Cir. 2023)). And, as with Adrian Carrillo, Morales's injury is directly traceable to S.B. 1718 and would be redressed by an injunction against Section 10. Accordingly, the Court finds that Reinaldo Morales has standing.

Plaintiff Juana Lozano does not have standing. Lozano, a Florida resident, is a field coordinator for a nonprofit organization based in Florida. Decl. of Juana Lozano ("Lozano Decl."), [ECF No. 30-5] ¶¶ 3–4. Lozano has "never had contact with immigration authorities" and currently has no immigration status. *Id.* ¶¶ 2, 13. Lozano suggests she has standing for two reasons. First, although Lozano does not have a driver's license, [ECF No. 29-2] ¶ 8, she often drives passengers in her personal vehicle to and from Florida to attend "trainings, conferences, and workshops dealing with leadership, activism, and workers' rights," Lozano Decl. ¶ 8; *id.* ¶¶ 9–10,

including passengers who "entered the United States without papers but have since obtained lawful status" and others who "entered the United States unlawfully and have not had any contact with immigration authorities," *id.* ¶ 10.  Second, because Lozano is herself undocumented and has not had prior contact with immigration authorities, she posits that if she allows "a trusted co-worker to drive" her out of and into Florida to attend such conferences, "he or she could be prosecuted because of [Lozano's] lack of immigration status."

Neither of these theories suffice to demonstrate Lozano's standing.  As to Lozano's first theory, she does not demonstrate an injury in fact because she does not show an invasion of a "*legally protected* interest."  *Lujan*, 504 U.S. at 560 (emphasis added).  At first blush, it may appear that Lozano has standing because she suffers the same injury as other Plaintiffs: a credible threat of prosecution for conduct that is arguably proscribed by Section 10, *i.e.*, driving individuals into Florida who have not had any contact with immigration authorities.  But unlike these other Plaintiffs, Lozano does not have a driver's license, making it illegal for her to drive into Florida regardless of her purpose.  *See* Fla. Stat. § 322.03(1)(a) (prohibiting and prescribing misdemeanor penalties for driving without a license).  That is, although Lozano may suffer an injury if Section 10 is enforced against her, her asserted interest—driving others without a license—is itself illegal regardless of whether Section 10 applies to her or not.  Because Lozano's asserted injury stems from conduct that is illegal independent of Section 10, she does not demonstrate that Section 10 invades a "legally protected" interest and therefore does not have a cognizable injury in fact sufficient to demonstrate standing.  *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) ("[A] person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" (citing 13 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal*

*Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005))); *Jadeja v. Redflex Traffic Sys., Inc.*, 764 F. Supp. 2d 1192, 1196 (N.D. Cal. 2011) (finding that plaintiff did not have a legally protected interest sufficient to support injury in fact in suit against traffic camera providers when plaintiff was fined because traffic cameras recorded him breaking the law by running a red light).

Lozano's second standing theory—that Defendants may prosecute a third party for transporting Lozano into Florida—also fails to establish an injury in fact because Lozano does not demonstrate "a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." *Ga. Latino*, 691 F.3d at 1257 (quoting *Socialist Workers Party*, 145 F.3d at 1245) (cleaned up). Although Defendants may prosecute a third party for transporting Lozano into Florida, there is no indication that Lozano herself faces a "likely" or "credible threat of prosecution" for a third party's conduct. *Id.* at 1258 (quoting *Socialist Workers Party*, 145 F.3d at 1245); *cf. Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). And the third parties who might face jeopardy by driving Lozano into Florida are perfectly capable of vindicating their own rights, as demonstrated by the individual Plaintiffs who have already established standing.

Lozano also suggests that she "*could* be charged with soliciting or conspiring to violate Florida law" as she makes arrangements with others to transport her out of and back into Florida. Lozano Decl. ¶ 13 (emphasis added). But any such possibility is purely "conjectural" and "hypothetical," *Lujan*, 504 U.S. at 560, where Lozano does not aver that she has engaged in such conduct in the past and expresses no present purpose or concrete plans of engaging in such conduct in the future. *See id.* at 564 ("[S]ome day" intentions—without any description of concrete plans,

or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.") (emphasis in original); *see also Ga. Latino*, 691 F.3d at 1257 (noting that individuals who have "no fears of state prosecution except those that are imaginary or speculative" are not proper parties in a pre-enforcement suit challenging the constitutionality of a state statute (quoting *Younger*, 401 U.S. at 42 (1971)).[14]  Accordingly, Juana Lozano does not have standing.

Plaintiff Diana Carrillo Medrano also does not have standing.  Carrillo Medrano, a Florida resident, is the daughter of Maria Medrano Rios and the sister of Adrian Carrillo, who are also Plaintiffs in this action.  Decl. of Diana Carrillo Medrano, [ECF No. 30-9] ¶ 2.  Carrillo Medrano has a pending DACA application but does not currently have legal status in the United States.  *Id.* ¶ 4.  Carrillo Medrano planned on travelling by car with her mother and brother to visit family in Texas.  *Id.* ¶ 6.  However, unlike her mother and brother, Carrillo Medrano does not have a driver's license or a driver's permit, and does not plan to drive or otherwise transport herself or anyone else into Florida.  *Id.* ¶ 6.  Carrillo Medrano, along with her mother and her brother, cancelled the trip to Texas because they "decided it would be too dangerous for them to drive, because [Carrillo Medrano] is undocumented" and her mother, Maria Medrano Rios, "has a pending immigration case."  *Id.*  As a result of Section 10, Carrillo Medrano "feel[s] trapped in Florida" because, if "[she] did leave, [she] would not be able to come home without putting someone [she] love[s] at risk of being arrested for a felony."  *Id.* ¶ 8.

Like Lozano, Carrillo Medrano does not herself face any credible threat of prosecution under Section 10.  The claim is, in effect, that Carrillo Medrano has standing because Section 10

---

[14]  Moreover, the Court knows of no authority (nor have Plaintiffs pointed to any) that would allow a plaintiff to graft an inchoate offense such as conspiracy or solicitation onto a criminal statute in order to expand the scope of that statute for the purpose of manufacturing standing in a pre-enforcement challenge.

could directly injure third parties and then indirectly inflict costs on her.  *See id.* ¶ 6 (stating that Carrillo Medrano believes it would be "too dangerous *for them*"—*i.e.*, her mother and brother—"to drive" her into Florida); *id.* ¶ 8 (stating that Carrillo Medrano fears that leaving Florida and coming back would put "*someone [Carrillo Medrano] love[s]* at risk of being arrested for a felony") (emphasis added); *id.* ¶ 8 (stating that Carrillo Medrano "feels trapped" in Florida as a result of Section 10).  But individuals who have "no fears of state prosecution except those that are imaginary or speculative" are not proper parties in a pre-enforcement suit challenging the constitutionality of a state statute.  *Ga. Latino*, 691 F.3d at 1257 (quoting *Younger*, 401 U.S. at 42); *see also Warth*, 422 U.S. at 499.  And the mere fact that Carrillo Medrano "feels inhibited" by Section 10 does not suffice to establish an injury in fact where there is no "claim that [she] has ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible."[15]  *Younger*, 401 U.S. at 42.  Accordingly, Diana Carrillo Medrano does not have standing.

The Court therefore finds that Plaintiffs Adrian Carrillo and Reinaldo Morales have standing to seek injunctive relief against enforcement of Section 10.  Accordingly, these Plaintiffs are also protected by the Preliminary Injunction, as set forth in this Order.  However, Plaintiffs Juana Lozano and Diana Carrillo Medrano do not have standing and are therefore not covered by the Preliminary Injunction.

## **CONCLUSION**

Based upon the foregoing, it is hereby **ORDERED and ADJUDGED** as follows:

1. Defendants' Motion for Reconsideration, [ECF No. 106], is **DENIED**.

---

[15]  As with Lozano, the individuals actually at risk of prosecution for transporting Carrillo Medrano face no impediment to vindicate their own rights.  This is particularly apparent in Carrillo Medrano's case, as the Court has already found that Carrillo Medrano's brother and mother have standing and the preliminary injunction in this case enjoins enforcement of Section 10 against them.

2.  Plaintiffs' Motion for Reconsideration, [ECF No. 136], is **GRANTED** *in part*.

3.  The Preliminary Injunction issued in the Preliminary Injunction Order, [ECF No. 99], as modified by the Order on Scope, [ECF No. 132], shall apply as follows:

a.  Fla. Stat. § 787.07 is **PRELIMINARY ENJOINED**.  Defendants must take no steps to enforce Fla. Stat. § 787.07 against Plaintiffs Andrea Mendoza Hinojosa, Carmenza Aragon, Maria Medrano Rios, Adrian Carrillo, Reinaldo Morales, the Farmworker Association of Florida, and all current members (as of the date of the Order on Scope) of the Farmworker Association of Florida until otherwise ordered by the Court.

b.  This preliminary injunction binds Defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with them—who receive actual notice of this injunction by personal service or otherwise.

**DONE AND ORDERED** in Miami, Florida this 17th day of April, 2025.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**